EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| San Gerónimo Caribe Project, Inc.; Firstbank Puerto Rico, Inc.<br><br>Apelados-Peticionarios<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico, representado por el Secretario de Justicia; Junta de Planificación representada por su Presidente; Administración de Reglamentos y Permisos representada por su Administrador, Departamento de Recursos Naturales y Ambientales representado por su Secretario<br><br>Apelantes-Recurridos<br><br>Hilton International of Puerto Rico, Inc.; Hotel Development Corp.<br><br>Demandados | Certificación<br><br>2008 TSPR 129<br><br>174 DPR \_\_\_\_ |

Número del Caso: CT-2008-4

Fecha: 31 de julio de 2008

Abogados de la Parte Peticionaria:

Lcdo. Jaime Sifre Rodríguez
Lcdo. José Juan Torres Escalera
Lcdo. José A. Cepeda Rodríguez
Lcdo. José A. Cuevas Segarra
Lcdo. Luis Sánchez Betances
Lcdo. Adrian Sanchez Pagán
Lcdo. Steven C. Lausell

Abogado de la Parte Demandada:

Lcdo. Roberto Boneta Carrión
Lcdo. Jorge A. Fernández Reboredo
Lcda. María Teresa Figueroa
Lcdo. Edgardo L. Rivera Rivera
Lcdo. Nelson J. Santiago Marrero

Colegio de Abogados de Puerto Rico:

                                            Lcda. Celina Romany Siaca
                                            Presidenta

                                            Lcdo. Luis E. Colón Ramery
                                            Presidente
                                            Instituto del Notariado Puertorriqueño

                                            Lcdo. Osvaldo Toledo Martínez
                                            Lcdo. Ángel Alicea Parés
                                            Lcdo. Israel Pacheco Acevedo
                                            Lcdo. Héctor Torres Vilá


Oficina del Procurador General:

                                            Lcdo. Luis José Torres Asencio
                                            Procurador General Auxiliar

                                            Lcdo. Pedro J. Cabán Vales
                                            Procurador General Auxiliar



Materia: Certificación


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

San Gerónimo Caribe Project,      *
Inc.; Firstbank Puerto Rico, Inc. *
                                  *
   Apelados-Peticionarios         *
                                  *
        v.                        *
                                  *
                                  *    CT-2008-04
Estado Libre Asociado de          *
Puerto Rico, representado por     *
el Secretario de Justicia;        *
Junta de Planificación            *    Certificación
representada por su               *
Presidente; Administración de     *
Reglamentos y Permisos            *
representada por su               *
Administrador, Departamento       *
de Recursos Naturales y           *
Ambientales representado por      *
su Secretario                     *
                                  *
   Apelantes-Recurridos           *
                                  *
Hilton International of Puerto     *
Rico, Inc.; Hotel Development     *
Corp.                             *
                                  *
   Demandados                     *
***********************************

Opinión del Tribunal emitida por el Juez Presidente SEÑOR HERNÁNDEZ DENTON

San Juan, Puerto Rico, a 31 de julio de 2008.

En esta ocasión, nos corresponde resolver una controversia que trasciende las particularidades fácticas del caso de epígrafe. En esencia, debemos determinar si ciertos terrenos ganados al mar mediante rellenos realizados en la entrada de la Isleta de San Juan a mediados del siglo pasado -sobre los cuales actualmente se erige parte del proyecto de desarrollo mixto comúnmente conocido como Paseo Caribe- son bienes privados o de dominio público.

Al resolver dicha interrogante, tenemos presente que las obras de relleno en controversia formaron parte de una

política urbanista promovida por el Estado durante la primera mitad del siglo XX que resultó en la modificación de una tercera parte del litoral de San Juan y en el asentamiento de diversas zonas históricas del área metropolitana, tales como Puerta de Tierra, Barrio Obrero, Isla Verde, Sabana, Amelia, Ocean Park, Isla Grande, Juana Matos y el Condado. No cabe duda que la clasificación dominical que hoy le otorguemos a las tierras objeto de este pleito tendrá serias consecuencias sobre los derechos propietarios y la seguridad jurídica de las miles de familias que habitan en esas comunidades de San Juan y de otras partes de Puerto Rico con un tracto similar, pues gran parte de éstas también se cimentaron sobre terrenos ganados al mar.

Luego de analizar el derecho aplicable, concluimos que al momento de realizarse los mencionados rellenos era suficiente cumplir con un esquema administrativo para la desafectación de los terrenos ganados al mar. Toda vez que las agencias competentes autorizaron a título de dominio las obras de relleno realizadas en el *Coast Guard Parcel* en el año 1941 y en el *Condado Bay Parcel* en la década de los cincuenta, resolvemos que dichos predios son bienes patrimoniales susceptibles de apropiación particular. En vista de que no se desprende de los autos que se presentara prueba sobre error o fraude en la concesión de los permisos correspondientes, y dado que San Gerónimo Caribe Project, Inc. es el titular de los referidos terrenos privados, confirmamos la sentencia dictada por el Tribunal de Primera Instancia.

# I

La controversia de autos surgió principalmente como consecuencia de la publicación de la Opinión del Secretario de Justicia de 11 de diciembre de 2007, Consulta Núm. 07-130-B. En esa Opinión, dicho funcionario concluyó que los terrenos ganados al mar son, como mínimo y desde hace siglos, bienes de dominio público, por lo que no son susceptibles de enajenación sin una autorización legislativa expresa.[1] En atención a dicha tesis, éste le hizo varias recomendaciones a las agencias concernidas para que reevaluaran todo lo relativo a los permisos otorgados a San Gerónimo Caribe Project, Inc. (en adelante, SGCP) para la construcción y el desarrollo del Proyecto Paseo Caribe.

En vista de las recomendaciones vertidas por el Secretario de Justicia en la referida Opinión, el 14 de diciembre de 2007 la Junta de Planificación de Puerto Rico emitió una Resolución relacionada a la Consulta de Ubicación Núm. 99-79-0155-JPU sobre el Proyecto Paseo Caribe. En dicha Resolución, la Junta expresó que a raíz de la Opinión del Secretario de Justicia habían surgido ciertas interrogantes sobre la titularidad de los predios en los que ubica el proyecto. Por consiguiente, dicha agencia le ordenó a las partes afectadas expresarse sobre la Opinión citada en el término de cinco (5) días.

---

[1] Esta Opinión contrasta con una opinión anterior del Secretario de Justicia que sostenía que los terrenos ganados al mar en los predios en que ubica el Proyecto Paseo Caribe eran bienes patrimoniales. Op. Sec. Just. Núm. 19 (2002). Asimismo, se revocó una opinión anterior del Secretario de Justicia que concluía que la playa del Hotel Caribe Hilton era de naturaleza privada. Op. Sec. Just. de 25 de noviembre de 1970 (no publicada).

Del mismo modo, la Junta le ordenó al Departamento de Recursos Naturales y Ambientales que realizara y presentara un nuevo deslinde para establecer la zona marítimo-terrestre de forma consistente con la nueva interpretación legal del Secretario de Justicia. Por último, le requirió a la Administración de Reglamentos y Permisos (en adelante, ARPE) que tomara las medidas cautelares necesarias para implantar las recomendaciones de dicho funcionario.

Ese mismo día, ARPE emitió una "Orden para Mostrar Causa" dirigida a SGCP. En dicha orden, ARPE dispuso para la celebración de una vista en la cual SGCP tendría que "mostrar causa por la cual no se debe dictar una orden dejando en suspenso los permisos y decretando la paralización de las obras de construcción […] por un término de sesenta días".

Así las cosas, y ante la incertidumbre ocasionada por la Opinión del Secretario de Justicia y las actuaciones de las agencias administrativas mencionadas, SGCP y First Bank Puerto Rico, Inc. (en adelante, First Bank) presentaron ante el Tribunal de Primera Instancia, Sala Superior de San Juan, una demanda de sentencia declaratoria contra el Estado Libre Asociado de Puerto Rico y otras partes indispensables el 19 de diciembre de 2007. En dicho recurso, SGCP y First Bank -- como acreedor de varias hipotecas sobre los bienes en litigio-- solicitaron al foro de instancia, entre otras cosas, que declarase que la porción de los terrenos ganados

al mar que está dentro de las fincas registrales de SGCP con relación al Proyecto Paseo Caribe no son de dominio público.[2]

En oposición, el Estado reprodujo la teoría legal esbozada por el Secretario de Justicia en la referida Opinión y sostuvo que los terrenos ganados al mar en donde radica parte del Proyecto Paseo Caribe son, como mínimo, bienes de dominio público. Asimismo, adujo que todos los actos de dominio ejercidos por el Estado y por las partes sobre dichos predios adolecen de nulidad, dado que los bienes de dominio público son inalienables, imprescriptibles e inembargables.

Tras la celebración de una vista, las partes presentaron un escrito titulado "Estipulaciones de hechos que no están en controversia". En dicho documento se estipuló específicamente que las partes coincidían "en que la controversia de umbral a ser resuelta en el caso de epígrafe es si los terrenos ganados al mar objeto de controversia son o no de dominio público, la cual claramente es una controversia de derecho".

Evaluados los planteamientos de ambas partes, el Tribunal de Primera Instancia dictó sentencia. Al así hacerlo, resolvió que: (1) tanto la porción de terrenos

_____

[2] En la alternativa, los demandantes solicitaron que se declarara que los terrenos cuya titularidad fue controvertida por la Opinión del Secretario de Justicia fueron usucapidos, por lo que el título obtenido por SGCP es válido. Asimismo, adujeron que el Estado Libre Asociado está impedido —bajo la doctrina de cosa juzgada por transacción extrajudicial— de alegar ahora que cualquier porción del *Coast Guard Parcel* nunca dejó de ser de dominio público. En última instancia, alegaron que SGCP y First Bank son terceros registrales a quienes no se les puede despojar de sus títulos registrales o acreencias hipotecarias sobre estos terrenos por las doctrinas de accesión a la inversa, actos propios y derechos adquiridos. No obstante, en esta Opinión no atendemos tales señalamientos, pues la resolución de la controversia de umbral hace innecesaria su discusión.

ganados al mar por los Estados Unidos para acrecentar al *Coast Guard Parcel* en el año 1941, como los terrenos ganados al mar por la Compañía de Fomento Industrial para crear el *Condado Bay Parcel* en la década de los cincuenta, no son bienes de dominio público; y (2) SGCP y First Bank son terceros registrales en cuanto a los títulos o acreencias hipotecarias existentes sobre los mismos.

Insatisfecho, y por entender que la mencionada sentencia era contraria a derecho al no reconocer el carácter demanial de los terrenos ganados al mar, el Procurador General presentó un escrito de apelación ante el Tribunal de Apelaciones. Acto seguido, SGCP y First Bank presentaron ante nos un recurso de certificación.

Conscientes de la necesidad de una pronta solución al presente caso, acogimos la solicitud de certificación y concedimos a las partes un término simultáneo para presentar sus respectivos alegatos. De otra parte, y ante una oportuna solicitud para ello, autorizamos la intervención del Instituto de Notariado Puertorriqueño, Inc. del Colegio de Abogados de Puerto Rico como *amicus curiae*.

Con el beneficio de la comparecencia de las partes y del *amicus curiae*, procedemos a resolver la controversia ante nuestra consideración.

## II

De entrada, y para atender con el cuidado requerido la presente controversia, es menester examinar el trasfondo histórico y registral de los terrenos en donde ubica el Proyecto Paseo Caribe; a saber, los predios conocidos desde

mediados del siglo pasado como el *Coast Guard Parcel* y el *Condado Bay Parcel*.

Como asunto de umbral, debemos determinar la naturaleza y la evolución del estado de derecho con relación a los terrenos sumergidos que fueron rellenados y, por ende, ganados al mar para la fecha en que éstos fueron objeto de compraventas y de transacciones de dominio, tanto por el gobierno de los Estados Unidos como por el Estado Libre Asociado de Puerto Rico. El análisis de los antecedentes históricos sobre la titularidad de tales predios nos permitirá determinar si la controversia ante nos debe resolverse conforme al derecho federal, al derecho puertorriqueño o a los preceptos del derecho de propiedad de ambos sistemas jurídicos. Veamos.

Como es sabido, España y los Estados Unidos de América suscribieron el Tratado de París para dar fin a la Guerra Hispanoamericana en diciembre de 1898. En virtud del Artículo VIII de dicho tratado, todos los terrenos, propiedades y bienes patrimoniales de la Corona Española en Puerto Rico, **así como "los demás bienes inmuebles que con arreglo a derecho son de dominio público"**, fueron adquiridos por el gobierno de los Estados Unidos. Art. VIII, Tratado de París, L.P.R.A., Tomo 1 (Énfasis nuestro). Véase, además, <u>Pueblo v. Del Valle</u>, 60 D.P.R. 184, 192 (1942).

En ocasiones anteriores, hemos señalado también que al momento de la firma de dicho tratado todas las aguas navegables de Puerto Rico, al igual que los terrenos sumergidos bajo éstas, eran bienes sujetos a la soberanía de

la Corona Española con arreglo al estado de derecho español. Pueblo v. Dimas, 18 D.P.R. 1061 (1912); Art. 339.1 del Código Civil español de 1889; Art. 1 de la Ley de Puertos de 1880, Colección Legislativa de España, Madrid, 1881, t. 124, 2da parte, pág. 787. Por tanto, las tierras sumergidas – incluyendo las que luego fueron objeto de relleno en el supuesto de las parcelas en controversia-- pasaron al control y dominio de los Estados Unidos por mandato expreso del Tratado de París. Dicho tratado, a su vez, surtió el mismo efecto con respecto al Fortín San Jerónimo[3] y sus terrenos colindantes, pues éstos pertenecían también a la Corona Española.[4]

Ahora bien, el 12 de abril de 1900, el Congreso de los Estados Unidos aprobó la Ley Foraker para establecer un gobierno civil en Puerto Rico. 31 Stat. 77, L.P.R.A., Tomo 1. En lo pertinente al presente caso, la Sección 13 de dicha ley dispuso que algunas de las propiedades adquiridas por los

---

[3] A pesar de que existen múltiples referencias a este monumento histórico como el "Fortín San Gerónimo", nótese que su nombre oficial en español es el "Fortín San Jerónimo del Boquerón".

[4] En el pasado, este Tribunal ha tomado conocimiento judicial de que, en su origen, la totalidad territorial de la Isla de Puerto Rico pertenecía a la Corona Española por razón de descubrimiento, conquista y colonización. En algunas instancias, el dominio de los terrenos de la isla fue pasando gradualmente a la propiedad particular de los ciudadanos por concesiones onerosas o gratuitas realizadas por el gobierno central. Rubert Armstrong v. ELA, 97 D.P.R. 588, 615 (1969); Pueblo v. Rojas, 53 D.P.R. 121, 131 (1938). En lo que respecta al Proyecto Paseo Caribe, es preciso señalar que el mismo radica en unos terrenos que forman parte del litoral nororiental de la entrada peninsular a la Isleta de San Juan, que nunca fueron enajenados ni concedidos a ningún ciudadano particular, pues se destinaron por cuatro siglos a la defensa de los mares y del poblado colonial.

Estados Unidos en virtud del Tratado de París --como los puentes y carreteras-- quedaban "bajo la dirección" del gobierno insular establecido por la misma para ser "administrados a beneficio de El Pueblo de Puerto Rico". No obstante, **la referida sección específicamente excluía de tal entrega jurisdiccional "la superficie de los puertos o aguas navegables"**. Sección 13, Ley Foraker, *supra*. (Énfasis nuestro).[5]

De esta manera, los terrenos sumergidos en aguas navegables o en las bahías --que claramente eran bienes sujetos a la soberanía de la Corona bajo el régimen colonial español-- continuaron bajo la administración y el dominio exclusivo del gobierno federal tras la aprobación de la Ley Foraker. López Sobá v. Fitzgerald, 130 D.P.R. 46, 57 (1992). Dicha ley tampoco le transfirió al Pueblo de Puerto Rico la titularidad sobre el Fortín San Jerónimo ni sobre los predios colindantes a éste, por lo que el gobierno de los Estados Unidos mantuvo su dominio sobre los mismos.

Posteriormente, el 1 de julio de 1902 el Congreso aprobó una ley que autorizaba al Presidente de los Estados Unidos a declarar reservas de tierras y edificios públicos pertenecientes al gobierno federal en Puerto Rico, para los propósitos que éste considerara necesarios, dentro del término de un (1) año de su aprobación. Public Law No. 249,

---

[5] Además, la Ley Foraker dispuso también que las leyes y ordenanzas vigentes en Puerto Rico al momento de aprobarse dicho estatuto continuarían en vigor, en tanto en cuanto no fuesen incompatibles con las leyes de los Estados Unidos o con las disposiciones de la propia Ley Foraker, y mientras no fuesen enmendadas o derogadas mediante una ley del Congreso o de la autoridad legislativa de Puerto Rico. Sección 8 de la Ley Foraker; Muñoz Díaz v. Corte, 42 D.P.R. 384, 390 (1931).

32 Stat. 731 (en adelante, Ley de 1902). Además, dicho estatuto dispuso que todos los terrenos y edificios públicos pertenecientes al gobierno federal en Puerto Rico, **no reservados** por el Presidente de los Estados Unidos bajo la autoridad de la referida ley, y **sin incluir las bahías o aguas navegables y las tierras sumergidas bajo éstas**, serían transferidos al gobierno insular para su uso y administración a favor del Pueblo de Puerto Rico.[6] Rubert Armstrong v. E.L.A., *supra*, pág. 603; Pueblo v. Dimas, *supra*, pág. 1074.

En su parte operativa, la Sección 1 de dicha ley dispuso lo siguiente:

> *Be it enacted* . . . [t]hat the President be, and he is hereby, authorized to make, within one year after the approval of this Act, **such reservation of public lands and buildings** belonging to the United States in the island of Porto Rico, for military, naval, light-house, marine-hospital, post-offices, custom-houses, United States courts, and other public purposes, as he may deem necessary, **and all the public lands and buildings**, **not including harbor areas and navigable streams and bodies of water and the submerged lands underlying the same**, owned by the United States in said island and not so reserved be, and the same are hereby, granted to the government of Porto Rico, to be held or disposed of for the use and benefit of the People of said island . . . . Sección 1, Ley de 1902, *supra*. (Énfasis nuestro).

Como se puede apreciar, dicho estatuto impedía expresamente que la titularidad de las bahías, las aguas navegables y las tierras sumergidas bajo éstas, se transfiriera al gobierno de Puerto Rico.

---

[6] Esta cesión se hacía a condición expresa de que el gobierno de Puerto Rico renunciara a cualquier interés o reclamación en los terrenos y edificios reservados por el Presidente bajo las disposiciones de dicha ley. *Id.* Mediante legislación, el gobierno insular cumplió efectivamente con esta condición el 16 de febrero de 1903.

Al amparo de la autoridad conferida por la mencionada Ley de 1902, el Presidente Theodore Roosevelt emitió el 30 de junio de 1903 varias proclamas y órdenes ejecutivas que reservaron un sinnúmero de terrenos y edificios públicos en todo Puerto Rico para propósitos militares y navales del gobierno federal. En particular, la Orden Ejecutiva del 30 de junio de 1903 estableció la Reserva Militar Principal o la Reserva Militar de San Juan. Véase Orden General No. 97, publicada el 7 de julio de 1903. Dicha reserva comprendía todos los predios del litoral de la Isleta de San Juan —y en lo pertinente a los terrenos en controversia— desde el Morro hasta el Fortín San Jerónimo hacia el este y desde el Canal San Antonio hasta la Laguna del Condado hacia el norte. Surge de los autos que dicha reserva incluía los terrenos en los que hoy día enclavan el Fortín San Jerónimo, el Hotel Caribe Hilton y por lo menos una porción significativa del Proyecto Paseo Caribe, además de otros edificios contiguos.[7]

---

[7] En lo referente al presente caso, la Reserva Militar Principal se delimitaba de la siguiente manera:

> 1000 feet more or less to the San Antonio Channel; thence following said channel easterly to the San Antonio Bridge; **thence northerly along the shore line of the Laguna TO THE SEA IN FRONT OF SAN GERONIMO; thence northerly and westerly ALONG THE SEA PASSING SAN GERÓNIMO**, Escambrón, and San Cristobal to a point in line with the westerly line of the San Sebastian Bastion[…]. Orden General de 1903, *supra* (Énfasis nuestro).

A base del estilo de redacción utilizado por el Congreso al aprobar la Ley de 1902, las partes sostienen dos puntos de vista divergentes en cuanto a si la referida ley prohibía al Presidente reservar los terrenos sumergidos para propósitos federales Asimismo, las partes difieren en cuanto a si la referida orden de 1903 incluyó lo que en la actualidad se conoce como la zona marítimo-terrestre e, incluso, los terrenos sumergidos que fueron rellenados por el Estado a

Años más tarde, específicamente el 2 de marzo de 1917, el Congreso aprobó la segunda ley orgánica para Puerto Rico, comúnmente conocida como la Ley Jones. Public Law No. 368, 39 Stat. 951, L.P.R.A. Tomo 1. Véase López Sobá v. Fitzgerald, *supra*. La Sección 7 de la referida ley es idéntica a la Sección 13 de la Ley Foraker, con la excepción de que dispuso que todas las tierras y edificios públicos del gobierno federal en Puerto Rico, que aún no se habían reservado hasta ese momento y que no se habían transferido a la administración del gobierno de Puerto Rico por mandato de la Ley Foraker o de la Ley de 1902, se trasladarían desde su aprobación al control del gobierno insular. Por otro lado, la Sección 8 de la Ley Jones ordenó la transferencia de "[l]a superficie de los puertos y los cursos y extensiones de aguas navegables y los terrenos sumergidos bajo ellas dentro y alrededor de la Isla de Puerto Rico y de las islas y aguas adyacentes que ahora pertenecen a los Estados Unidos y no han sido reservados por los Estados Unidos para fines públicos".

---

mediados del siglo pasado y cuya naturaleza dominical es objeto de controversia en el caso de autos. No obstante, y a pesar de que gran parte de la discusión de las partes gira en torno al alcance de la Ley de 1902 y la Orden Ejecutiva de 1903, consideramos que no es necesario abordar ese asunto para disponer del presente caso. Lo cierto es que independientemente de que si los terrenos sumergidos objeto de controversia hubieren sido propiedad del gobierno federal o del gobierno de Puerto Rico, basta con determinar si el gobierno de los Estados Unidos era el propietario de los terrenos aledaños a la costa para resolver el asunto jurisdiccional del derecho aplicable. California ex rel. State Lands Commission v. United States, 457 U.S. 273 (1982).

Sección 8, Ley Jones, *supra* (Énfasis nuestro).[8] Véase <u>León v. Transconex</u>, 119 D.P.R. 102 (1987).

Desde el cambio de soberanía en los últimos años del siglo XIX, los Estados Unidos ocupó en calidad de dueño los terrenos que luego se identificaron como la Reserva Militar de San Juan. Como mencionamos anteriormente, esta reserva federal incluía todos los terrenos aledaños al litoral nororiental de la Isleta de San Juan y al Fortín San Jerónimo, incluyendo por lo menos una porción significativa de los terrenos en donde actualmente radica el Proyecto Paseo Caribe. Por tanto, la Ley Jones no alteró el dominio del gobierno de los Estados Unidos sobre éstos.

Estos predios estuvieron bajo el control del Departamento de Guerra de los Estados Unidos hasta diciembre de 1919, cuando se traspasaron los mismos al Departamento de la Marina y se redesignaron como la Reserva Naval San Jerónimo. Posteriormente, la Marina cedió en arrendamiento una parte de esas tierras —incluyendo el Fortín San Jerónimo y los terrenos colindantes objeto de controversia— al entonces retirado Teniente Comandante de la Marina Virgil

---

[8] Han surgido dudas sobre si lo que la Ley Jones transfirió al gobierno insular fue el dominio sobre estos bienes o el control y la administración de los mismos en beneficio del Pueblo de Puerto Rico. No obstante, el Congreso despejó toda duda y aclaró el asunto cuando aprobó en el año 1980 una enmienda a la Sección 8 de la Ley de Relaciones Federales, equivalente a la Sección 8 de la Ley Jones, *supra*, para definir el "control" al que se refiere dicha disposición como todo derecho, título e interés sobre los terrenos sumergidos bajo aguas navegables a favor del gobierno de Puerto Rico. Ley Pública Núm. 96-202 del 12 de marzo de 1980, 94 Stat. 91, 48 U.S.C. sec. 749. Mediante la referida enmienda, el Congreso confirmó la jurisdicción y el dominio de Puerto Rico sobre los terrenos sumergidos alrededor de sus costas en virtud de la Ley Jones, *supra*.

Baker, dado que dicho departamento ya no necesitaba de éstas para propósitos navales. El contrato de arrendamiento estipulaba un término de 999 años y contenía una condición a los efectos de que el mismo se hacía "pending complete transfer by Congress of title to the Lessee, which transfer needs the approval of the Navy Department". Véase Exhibit Estipulado Núm. 1, Ap. Vol. I.[9]

En virtud de la Ley Pública Núm. 35 aprobada por el Congreso federal el 12 de julio de 1921, se otorgó el contrato de arrendamiento entre los Estados Unidos y el señor Baker. Este contrato estipulaba unos lindes y rumbos frente al litoral de la Isleta de San Juan que expresamente incluían terrenos sumergidos. Véase Exhibit Estipulado Núm. 2, Ap. Vol. I. De otra parte, la Reserva Naval San Jerónimo se inscribió en el Registro de la Propiedad en diciembre de 1921 a nombre de los Estados Unidos. El contrato de arrendamiento a favor del señor Baker se inscribió posteriormente en el Registro.[10]

---

[9] Nótese que el "arrendamiento" a favor del señor Baker ha sido valorado para efectos prácticos por los tribunales puertorriqueños y federales como un negocio jurídico a título de dominio. Los Estados Unidos retuvo el título en el contrato original de arrendamiento no para privar al señor Baker y sus cesionarios de cualquiera de los beneficios resultantes del título de dominio, sino únicamente para proteger su derecho reservado de libre uso en cualquier emergencia de seguridad nacional. United States v. San Gerónimo Development Co., 154 F.2d 78 (C.A. 1, 1946); De la Haba v. Tribunal, 76 D.P.R. 923 (1954), confirmada en San Gerónimo Development Co. v. Treasurer of P.R., 233 F.2d 126 (1956).

[10] Se desprende del expediente que este contrato de arrendamiento fue impugnado por el gobierno de los Estados Unidos ante el Tribunal Federal en el año 1925. El Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito sostuvo la validez del contrato, mas no dirimió el asunto de

Ahora bien, la bifurcación en el tracto dominical de las dos parcelas objeto de controversia comenzó en agosto de 1929, cuando el Presidente de los Estados Unidos emitió la Proclama Núm. 1889 al amparo de la Sección 7 de la Ley Jones, *supra*. Mediante esta orden ejecutiva, el Presidente Herbert Hoover traspasó al Pueblo de Puerto Rico todo derecho, título e interés de los Estados Unidos sobre ciertos terrenos, incluyendo algunos de los predios arrendados al señor Baker.[11]

No obstante lo anterior, la Proclama Presidencial de 1929 específicamente retenía y reservaba cinco (5) acres de los terrenos antes mencionados para el uso del Departamento de la Marina en el desarrollo de servicios de comunicación, constituyendo una nueva reserva de los terrenos que actualmente se conocen como el **Coast Guard Parcel**, finca que se mantuvo bajo el dominio del gobierno federal hasta el año

_____

la titularidad de los terrenos sumergidos, pese a una solicitud a esos efectos del gobierno de Puerto Rico, quien participó en el pleito en calidad de interventor. El gobierno de Puerto Rico intentó impugnar el arrendamiento precisamente por incluir terrenos sumergidos, pero nunca aceptó el "quitclaim deed" ofrecido por el señor Baker. De hecho, el tribunal apelativo federal expresó que "in any event, the proofs do not show that Commander Baker has defrauded the government in the matter of the submerged area". Véase Baker v. United States, 27 F. 2d 863 (1st Cir. 1928).

[11] De hecho, dicha proclama hace mención expresa de los terrenos sumergidos, al declarar que las tierras de la Reserva Naval San Jerónimo se cederían al gobierno insular:

> together with all the right, title and interest of the United States **in all shore and submerged lands lying shoreward of a line** drawn through points Nos. 90, 91, 92 and 93, as shown on the military chart of the Military Reservation of San Juan, Puerto Rico. Proclama Presidencial Núm. 1889 del 26 de agosto de 1929. (Énfasis nuestro).

1991. Por otro lado, desde que se emitió la Proclama Presidencial de 1929 no hay duda que el dominio de los predios restantes de la Reserva Naval San Jerónimo, incluyendo los terrenos sumergidos en los referidos puntos de las fincas que hoy forman parte del **Condado Bay Parcel**, fue transferido al gobierno de Puerto Rico. Veamos detenidamente.

### A. *Coast Guard Parcel*

En diciembre de 1940, como parte de unas obras de mejoras al *Coast Guard Parcel*, la Marina de los Estados Unidos presentó ante la Comisión de Servicio Público y el Departamento de Interior de Puerto Rico una solicitud para llevar a cabo unos trabajos de relleno en los terrenos sumergidos adyacentes a la costa de dicha parcela. En particular, se solicitó permiso para rellenar una zona de la Laguna del Condado consistente de 450 pies de largo, 200 pies de ancho y 6 pies sobre el nivel mínimo del mar, según su flujo y reflujo ("mean low water"). Tras obtener los permisos necesarios de las mencionadas agencias insulares y del Departamento de Guerra de los Estados Unidos, la Marina rellenó aproximadamente 1.92 cuerdas de terrenos sumergidos frente al *Coast Guard Parcel*. Según estipularon las partes, dichas obras concluyeron en octubre de 1941 conforme a los planos del permiso.[12]

---

[12] Las partes y la sentencia apelada discuten la aplicación de la Ley Pública Núm. 703 del 2 de julio de 1940 aprobada por el Congreso y llegan a conclusiones divergentes en cuanto a si el mero relleno de los terrenos sumergidos aledaños al *Coast Guard Parcel* constituyó un ejercicio de expropiación forzosa al amparo de la referida ley. De igual forma, discuten la aplicabilidad de la Ley Núm. 66 del 25 de abril de 1940 de la Asamblea Legislativa de Puerto Rico para ponderar la posibilidad de que los terrenos sumergidos fueron

Durante el transcurso de cincuenta años, el gobierno federal poseyó ininterrumpidamente y en calidad de dueño los terrenos ganados al mar que acrecentaron el *Coast Guard Parcel*.[13] En noviembre de 1991, la Administración de Terrenos del Estado Libre Asociado de Puerto Rico y la Administración de Servicios Generales de los Estados Unidos otorgaron un contrato de compraventa. En dicho contrato, el gobierno de Puerto Rico adquirió, a título oneroso, los terrenos del *Coast Guard Parcel*.[14] Dicha transacción jurídica incluía claramente los terrenos ganados al mar que son objeto de controversia en el presente caso, pues describía su área limítrofe al este como la Laguna del Condado.[15]

---

transferidos al gobierno de Estados Unidos en virtud de la mencionada legislación. No obstante, somos del criterio que esta discusión es innecesaria para la solución adecuada del caso de autos.

[13] Nótese que en junio de 1986, la Junta de Planificación aprobó el Reglamento de Zonificación del Condado, el cual incluía los terrenos rellenados como parte de una zona comercial turística. Asimismo, el Fortín San Jerónimo y una estrecha franja de terrenos que bordeaba la costa —para propósitos de acceso a esta edificación histórica— se zonificaron como propiedad pública.

[14] Surge del expediente que en el año 1990, el Estado solicitó información y cursó varias comunicaciones a la Administración de Servicios Generales de los Estados Unidos sobre la titularidad de los terrenos del *Coast Guard Parcel*. No obstante, el Estado decidió no impugnar tal titularidad y decidió negociar la compraventa de dichos terrenos tras ponderar las posibilidades de prevalecer en la esfera judicial contra el gobierno federal. Véase Memorando de la Oficina del Gobernador, 14 de febrero de 1991.

[15] Más aún, el contrato estipulaba que su aceptación constituía una transacción extrajudicial y una renuncia a cualquier disputa, reclamo, o causas de acción "including, but not limited to quiet title actions, in any way related to the subject property and arising from the beginning of time to the current date". Véase Exhibit Estipulado Núm. 33, Ap. Vol. I.

En diciembre de 1992 la Junta de Planificación y el Gobernador de Puerto Rico aprobaron el Plan de Usos de Terreno y el Reglamento de Zonificación Especial para la entrada de la Isleta de San Juan. Reglamento de Planificación Núm. 23. Este reglamento cambió la zonificación del *Coast Guard Parcel* a una Zona de Desarrollo Especial, permitiendo en la misma un área bruta de construcción de 60,350 metros cuadrados. Para incentivar el desarrollo incremental de dicha zona, se permitió la subdivisión de las parcelas en solares más pequeños. En septiembre de 1998 la Administración de Terrenos de Puerto Rico adoptó una Resolución en la que aprobó la venta del *Coast Guard Parcel* al Hotel Development Corporation, una corporación creada al amparo de las leyes de Puerto Rico y cuyo único accionista es la Compañía de Turismo.

### B. Condado Bay Parcel

Por otro lado, la porción restante de los terrenos ganados al mar en controversia se encuentra en el *Condado Bay Parcel.* Esta parcela se rige plenamente por el derecho puertorriqueño, pues es un hecho incontrovertible que tanto los terrenos sumergidos que se rellenaron para formar el *Condado Bay Parcel* en la década de los cincuenta como los terrenos costeros colindantes ya le pertenecían al gobierno de Puerto Rico.

Como mencionamos en la Parte II de esta Opinión, mediante la Proclama Presidencial Núm. 1889 de 1929 el gobierno federal traspasó al gobierno insular de Puerto Rico todo título, derecho e interés sobre los terrenos de la

Reserva Naval San Jerónimo, incluyendo los predios que formaban parte del arrendamiento del señor Baker. En enero de 1947, San Gerónimo Development Company, una corporación propiedad del señor Baker, subarrendó a la Compañía de Fomento Industrial de Puerto Rico una parcela de sus terrenos por los restantes años del arrendamiento original para la construcción del Hotel Caribe Hilton. Esta finca subarrendada por la Compañía de Fomento Industrial colindaba –pero no incluía– los terrenos del litoral en el que enclava el Fortín San Jerónimo,[16] por lo que el gobierno de Puerto Rico presentó una demanda de expropiación contra el señor Baker en noviembre del año 1949 para adquirir los mismos.

La Declaración de Adquisición y Entrega Material de la Propiedad que se presentó junto a la demanda describía la propiedad objeto de la expropiación, la cual expresamente incluía 6,949.1923 metros cuadrados de tierras sumergidas y 3,360.448 metros cuadrados de tierra firme. Véase Exhibit Estipulado Núm. 16, Ap. Vol. I. Es decir, más de dos terceras partes de los predios objeto de expropiación en aquel momento eran terrenos sumergidos. Luego de llevar a cabo estas transacciones, el gobierno procedió a inscribir los terrenos en el Registro de la Propiedad a título de dominio a favor del Estado Libre Asociado de Puerto Rico.

---

[16] La Ley Núm. 49 del 20 de abril de 1949 autorizó al Comisionado del Interior a negociar el traspaso y la devolución de la nuda propiedad sobre los terrenos en donde enclava el Fortín San Jerónimo al gobierno de los Estados Unidos, con la condición de que ese país adquiriera la "posesión y dominio absoluto" sobre los mismos para dedicarlo a un parque nacional o monumento histórico administrado por el Servicio Nacional de Parques. No obstante, la historia confirma que dicho traspaso nunca se concretó.

Consistente con la política pública de planificación urbana dirigida por el Estado Libre Asociado en aquella época, la Compañía de Fomento Industrial presentó en la década de los cincuenta (1950) una Consulta de Ubicación ante la Junta de Planificación para realizar unas obras de relleno en los terrenos sumergidos del área expropiada y subarrendada al señor Baker, con el propósito ampliar las instalaciones del Hotel Caribe Hilton. Véase Op. Sec. Just. del 25 de noviembre de 1970 (no publicada), pág. 8. Mediante un Informe de la Junta adoptado en junio de 1955, se aprobó la Consulta para la construcción de dicha ampliación y la constitución de la parcela rellenada que hoy se conoce como el *Condado Bay Parcel*. Así, pues, se realizaron los rellenos y las obras de mejoras del Hotel Caribe Hilton a tenor de los permisos concedidos por las autoridades gubernamentales.

En abril de 1959, el entonces Secretario de Obras Públicas de Puerto Rico, Hon. Roberto Sánchez Vilella, emitió una Certificación para solicitar la inscripción en pleno dominio ante el Registro de la Propiedad de una parcela de terreno en el área entre el Fortín y los terrenos del Caribe Hilton, la cual incluía ciertos terrenos ganados al mar que formaban parte del *Condado Bay Parcel*.[17] Ese mismo mes, dicho funcionario —como gobernador interino de Puerto Rico— emitió una Orden Ejecutiva en la cual autorizó el traspaso gratuito

---

[17] De hecho, y por encomienda del gobierno a raíz de su importancia para la industria turística de la isla, el propio Sánchez Vilella supervisó directamente la construcción y el desarrollo del Caribe Hilton como ingeniero residente del proyecto. Aníbal Sepúlveda Rivera, Puerto Rico Urbano, Atlas Histórico de la Ciudad Puertorriqueña, Vol. 4, Carimar, San Juan, 2004, pág. 60.

de dicha parcela a favor de la Compañía de Fomento Industrial. En vista de ello, en diciembre de 1961 Sánchez Vilella, en su capacidad de Secretario de Obras Públicas, otorgó una escritura de traspaso de la mencionada parcela a favor de la Compañía de Fomento Industrial, la cual aclaraba que tales terrenos fueron ganados al mar por el Estado Libre Asociado de Puerto Rico, y que los mismos se utilizarían para el desarrollo de la industria del turismo.

Esta parcela fue inscrita como la Finca Núm. 439 en el Registro de la Propiedad, Sección de San Juan. Desde entonces, la Compañía de Fomento Industrial fue el titular del mencionado terreno pero la porción rellenada que formaba parte del Hotel Caribe Hilton fue administrada por la cadena de hoteles Hilton por virtud de un contrato de arrendamiento. En lo referente al caso de autos, parte del Proyecto Paseo Caribe y los demás proyectos relacionados a éste también ocupan hoy día una porción de esos terrenos ganados al mar.

En octubre de 1992, los derechos de la Compañía de Fomento Industrial bajo el Contrato de Subarrendamiento de los predios en donde enclava el Hotel Caribe Hilton fueron cedidos a Hotel Development Corporation. En octubre de 1998, el entonces Secretario de Transportación y Obras Públicas, Hon. Carlos Pesquera Morales, expidió una Certificación a los efectos de que el Estado Libre Asociado de Puerto Rico era el dueño de dos parcelas aledañas a los terrenos de la Administración de Terrenos y al Hotel Caribe Hilton que formaban parte del *Condado Bay Parcel* y que eran, a su vez,

"terrenos adquiridos del Mar". Véase Exhibit Estipulado Núm. 40, Ap. Vol. I.[18]

En vista de ello, dicho funcionario solicitó ante el Registro de la Propiedad la inscripción a título de dominio de tales parcelas, compuesta de terrenos rescatados del mar mediante los rellenos realizados en la década de los cincuenta (1950) por el gobierno de Puerto Rico. El mes siguiente, y mediante autorización del Gobernador Hon. Pedro Rosselló González conforme a la Ley Núm. 10 de 18 de junio de 1970, 23 L.P.R.A. sec. 671 (m), dicha parcela fue cedida a la Compañía de Turismo de Puerto Rico para que dicha corporación pública "utilice, administre y disponga conforme a los poderes conferídoles [sic] por ley y de acuerdo a los mejores intereses de Puerto Rico". Véase Exhibit Estipulado Núm. 41, Ap. Vol. I.

## C. Integración del Coast Guard Parcel y del Condado Bay Parcel

En noviembre de 1998, y luego de varios trámites administrativos, Hotel Development Corporation le vendió a Hilton International of Puerto Rico, Inc. el *Coast Guard Parcel*, el *Condado Bay Parcel* y la Finca Núm. 439, transacción que fue inscrita en el Registro de la Propiedad. Así las cosas, en julio de 2000 Hilton International le vendió el *Coast Guard Parcel* a SGCP mediante una escritura de

---

[18] Simultáneamente, dicho funcionario solicitó junto a la Administración de Terrenos la rectificación registral del *Coast Guard Parcel*, dado que la misma aparecía inscrita dos veces a favor de diferentes dueños –el Estado Libre Asociado y la Administración de Terrenos– como consecuencia de varios trámites accidentados ante el Registro de la Propiedad. Véase Exhibit Estipulado Núm. 39, Ap. Vol. I.

compraventa inscrita en el Registro de la Propiedad. Poco antes, mediante Resolución dictada en enero de 2000, la Junta de Planificación aprobó la Consulta de Ubicación para un proyecto mixto residencial, comercial y turístico propuesto por SGCP para estos terrenos.

En dicho negocio jurídico, el desarrollador asumió las obligaciones pactadas entre Hotel Development Corporation y Hilton International. A su vez, mediante otra escritura de compraventa otorgada ese mismo día, Hilton International le vendió a SGCP una nueva finca resultante de la agrupación del remanente de dos parcelas segregadas; a saber, del *Condado Bay Parcel* y de la Finca 439. Luego de varias segregaciones que constan inscritas o presentadas en el Registro de la Propiedad —incluyendo la segregación de una parcela identificada como Camino de Acceso al Fortín—[19] ARPE expidió varios permisos de construcción y de uso para distintos componentes del Proyecto Paseo Caribe. A su vez, SGCP

---

[19] Nótese que el debate público sobre el acceso al Fortín San Jerónimo fue lo que suscitó originalmente la presente controversia. En el año 2007 SGCP y el Instituto de Cultura Puertorriqueña se reunieron y firmaron un Acuerdo de Reconocimiento de un Acceso Irrestricto y a Perpetuidad del Pueblo de Puerto Rico al Fortín San Jerónimo del Boquerón. En dicho contrato, las partes estipularon que se otorgaría una escritura en la que se establecería el rango de derecho que ostenta el Estado Libre Asociado de Puerto Rico en el mencionado acceso. No obstante, el Departamento de Justicia se aseguró de no conceder ningún reconocimiento en cuanto a la titularidad de los terrenos en controversia. En vista de ello, al día de hoy no se ha otorgado ningún tipo de escritura constituyendo servidumbre de paso a favor del Estado Libre Asociado de Puerto Rico. Según la Opinión del Secretario de Justicia de diciembre de 2007, la razón por la cual aún no han perfeccionado el mencionado convenio es que la constitución de una servidumbre de paso presume la existencia de un predio sirviente cuya titularidad es ajena.

constituyó hipoteca sobre los referidos proyectos a favor de First Bank.

### D. Derecho federal vis a vis derecho civil puertorriqueño

Ante la realidad fáctica de que el gobierno de los Estados Unidos era el dueño del *Coast Guard Parcel* desde el cambio de soberanía en 1898 hasta su compraventa por el gobierno de Puerto Rico en 1991, no cabe duda de que los rellenos realizados por la Marina en el año 1941 en dicha parcela se deben examinar desde la óptica del derecho federal. Ello es así independientemente de quién fuera el titular de los terrenos sumergidos que fueron rellenados posteriormente, pues el Tribunal Supremo Federal ha resuelto que cualquier disputa o controversia sobre terrenos costeros —o cercanos al mar— que sean propiedad del gobierno de los Estados Unidos se rige por el derecho federal. Véanse California ex rel. State Lands Commission v. United States, *supra*; Hughes v. Washington, 389 U.S. 290 (1967); Borax Consolidated v. City of Los Angeles, 296 U.S. 10 (1935).

Por otro lado, es evidente que la Proclama Presidencial Núm. 1889 de 1929 cedió todo título sobre los predios en que hoy ubican el Hotel Caribe Hilton, el Fortín San Jerónimo y las fincas colindantes a favor del gobierno de Puerto Rico, incluyendo los terrenos contiguos al *Condado Bay Parcel*. Por tanto, es menester concluir que la controversia en torno a la titularidad de los terrenos ganados al mar que forman parte de dicha parcela se debe analizar según el derecho civil

puertorriqueño vigente para la fecha en que la Compañía de Fomento Industrial realizó las mencionadas obras de relleno.

En vista de la divergencia histórica en el tracto dominical de ambas parcelas, a continuación examinamos de manera cronológica el desarrollo doctrinal y normativo sobre los terrenos ganados al mar bajo el sistema legal aplicable a cada una.

**III**

En primer lugar, debemos tener presente que el gobierno de los Estados Unidos era el titular del *Coast Guard Parcel* al momento en que se realizaron las obras de relleno en controversia. Por tanto, como mencionamos anteriormente, es evidente que la titularidad de los terrenos previamente sumergidos adyacentes a dicha parcela costera- los cuales fueron rellenados por el Departamento de la Marina en 1941- debe examinarse conforme al derecho común federal. California ex rel. State Lands Comission v. United States, *supra*; Hughes v. Washington, *supra*. Véase, además, Roberts v. U.S.O. Council of P.R., 145 D.P.R. 58 (1998).

En vista de lo anterior, y ante la ausencia de legislación federal que atienda expresamente el asunto de la titularidad de los terrenos ganados al mar por particulares o el propio gobierno, debemos acudir a la doctrina jurisprudencial para atender la presente controversia. En Alexander Hamilton Ins. Co. v. Virgin Islands, 757 F. 2d 534 (1985), el Tribunal de Apelaciones de los Estados Unidos para el Tercer Circuito discutió cabalmente el esquema normativo y

doctrinal del derecho común anglosajón con relación a los terrenos ganados al mar mediante rellenos artificiales.

En ese caso, dicho foro apelativo tuvo ante su consideración una disputa en torno a la titularidad de ciertos terrenos ganados al mar mediante el relleno de tierras sumergidas, y concluyó que el propietario costero adquiere el título sobre el terreno ganado al mar cuando la obra de relleno se lleva a cabo con la debida autorización gubernamental:

> Where the reclamation and filling of the adjacent shore or submerged soil was expressly permitted by legislative enactment, or was authorized by a statute fixing a bulkhead, harbor, or dock line, or similar statute, or **by a valid license or permit, or by local common law**, it has usually been held or recognized that filled land created by a riparian or littoral proprietor belongs to him as part of the upland, at least where the public rights with respect to navigation and commerce are not substantially impaired. (Énfasis nuestro). Alexander Hamilton Insurance, *supra*, pág. 546. Véanse, además, U.S. v. Groen, 72 F. Supp. 713 (D.D.C. 1947). Greater Providence Chamber of Commerce v. State, 657 A.2d 1038 (R.I. 1995) B.H. Glenn, Rights to land created at water´s edge by filling or dredging, sección 2(b) 91 A.L.R. 2d pág. 857, 867.[20]

Más aún, dicho foro federal expresó en ese caso que la regla relativa a la adquisición del título sobre los terrenos ganados al mar tras mediar autorización para el relleno se ha aplicado incluso en ausencia de lenguaje expreso a esos efectos, pues se estima que la autorización gubernamental

---

[20] De manera análoga, el Tribunal Supremo Federal ha resuelto que "accretions, regardless of cause, accrue to the upland owner". California ex rel. State Lands Commission v. U.S., *supra*, pág. 285. A pesar de que dicha regla del derecho común federal atiende los casos de acreción gradual y no es expresamente aplicable a los rellenos, la misma es ilustrativa del reconocimiento de que los terrenos previamente sumergidos bajo las aguas navegables del gobierno federal son susceptibles de apropiación particular.

previa crea una expectativa de que se reconocerá la titularidad de los terrenos reclamados sobre la cual el propietario que realiza el relleno debe poder confiar. Alexander Hamilton Insurance, *supra*.

De otra parte, bajo el derecho común anglosajón el propietario de un terreno bordeado por la costa puede tener derecho a "reclamar" las tierras sumergidas bajo el mar circundante en determinadas circunstancias. Sin embargo, ello no implica que un propietario pueda rellenar arbitrariamente terrenos sumergidos **que no estén bajo su dominio** con el propósito de extender los lindes de su propiedad. Reid v. State, 373 So.2d 1071 (Ala. 1979); véase Board of Trustees of Internal Imp. Trust Fund v. Bankers Life & Cas. Co., 331 So.2d 381 (Fla. Dist. Ct. App. 1er Dist. 1976). Por tanto, la titularidad sobre los terrenos sumergidos permanece inalterada si éstos son rellenados por un particular sin la autorización correspondiente. Véase City of Newport Beach v. Fager, 39 Cal. App. 2d 23, 102 P.2d 438 (2d Dist. 1940).

Asimismo, el Estado puede conceder su autorización para el relleno de terrenos sumergidos en virtud de su derecho dominical sobre éstos. De esa forma, de producirse el relleno por un particular bajo una autorización gubernamental, de ordinario las porciones de terrenos reclamados pasan a formar parte integral del predio colindante y el título corresponderá al titular del mismo. Véanse Ward Sand & Materials Co. v. Palmer, 237 A.2d 619 (NJ 1968); O'Neill v. State Highway Dept., 235 A.2d 1 (NJ 1967); Mallon v. City of Long Beach, 282 P.2d 481 (Cal. 2d. 1955).

En casos similares al que hoy nos ocupa, bajo el derecho común se ha resuelto que previa autorización gubernamental el propietario del lote bordeado por el mar y del terreno sumergido adyacente al mismo puede rellenar válidamente ese terreno con el fin de "reclamarlo" y habilitarlo como parte del predio no sumergido. Sin embargo, la obra de relleno no puede interferir con las facultades sobre la navegación y el comercio que poseen tanto el gobierno federal como los estados. Véase People v. Broedell, *365 Mich. 201, 112 NW.2d 517 (1961)*.[21] Así las cosas, es evidente que bajo el derecho común angloamericano el propietario de un terreno contiguo al mar que rellena **con permiso del Estado** los terrenos sumergidos adyacentes a su propiedad tiene derecho a la titularidad sobre el terreno ganado al mar. Véase, e.g., Greater Providence Chamber of Commerce v. State, 657 A.2d 1038 (R.I. 1995).

Dicha norma es claramente aplicable a la controversia de autos en lo relativo al *Coast Guard Parcel*. Se desprende del expediente que el gobierno federal obtuvo todos los permisos necesarios para rellenar los terrenos sumergidos contiguos a la referida parcela. Para realizar dichas obras, el Gobierno estadounidense solicitó, no sólo la autorización del Departamento de Guerra,[22] sino también el permiso de la

---

[21] Véanse, además, Adaray Realty Corp. v. Faber, 227 App. Div. 618, 235 N.Y.S. 660 (1929), In re City of New York, 246 N.Y. 1, 157 NE 911 (1927). State ex rel. McLeod v. Murrell's Inlet Camp & Marina, Inc., 259 S.C. 404, 192 SE.2d 199 (1972); State v. A. J. Industries, Inc., 397 P.2d 280 (Alsk. 1964).

[22] De hecho, al momento de llevarse a cabo el referido relleno, el *Rivers and Harbors Appropiations Act* de 1899

Comisión de Servicio Público y del Departamento del Interior de Puerto Rico. Concedidos tales permisos, el gobierno federal procedió a realizar diversos actos de dominio sobre el lote conocido hoy como el *Coast Guard Parcel*. A la luz de estos hechos, resulta forzoso concluir que como propietario de los predios aledaños a los terrenos sumergidos, el gobierno federal advino titular de las tierras ganadas al mar mediante las obras de relleno realizadas por la Marina estadounidense.

De otra parte, ninguno de los permisos otorgados expresaba reserva o prohibición alguna que privara a los Estados Unidos de adquirir la titularidad de los nuevos predios rellenados. Por tanto, es meritorio concluir que **al momento en que tales terrenos fueron ganados al mar en el *Coast Guard Parcel*, éstos pasaron a ser propiedad patrimonial del Departamento de la Marina de los Estados Unidos de conformidad con el derecho común federal**.

## IV

Examinado el derecho federal con relación al *Coast Guard Parcel*, nos corresponde dilucidar la controversia en torno a la titularidad de los demás terrenos ganados al mar que forman parte de las fincas registrales de SGCP. Como indicamos anteriormente, la controversia en torno al *Condado Bay Parcel* se debe resolver exclusivamente al amparo del derecho puertorriqueño, pues los terrenos objeto de

---

disponía que **en ausencia de autorización** del Secretario de Guerra, no podría depositarse relleno alguno en bahías, lagunas o cuerpos de agua navegables de los Estados Unidos. 33 U.S.C.A. sec. 403 (Énfasis nuestro). Ello demuestra la existencia de un esquema administrativo que contemplaba tales obras de relleno.

controversia ya se encontraban bajo la soberanía del Estado Libre Asociado de Puerto Rico para la fecha en que se realizaron los rellenos con el objetivo de ampliar las instalaciones del Hotel Caribe Hilton. Por consiguiente, a continuación examinamos el desarrollo doctrinal y normativo de los terrenos sumergidos y los terrenos ganados al mar en el ordenamiento civilista puertorriqueño.

### A

Sabido es que el estado de derecho puertorriqueño, en referencia a la clasificación jurídica de los bienes relacionados al litoral y a la zona marítimo-terrestre, tuvo su antesala moderna en la Ley de Aguas española del 3 de agosto de 1866. Esta legislación especial, extendida a Puerto Rico por la Real Orden de 8 de agosto de 1866, disponía en su Artículo 1 que serían bienes de dominio nacional y uso público: 1) las costas o fronteras marítimas del territorio español, con sus obras, ensenadas, calas, radas, bahías y puertos; 2) el mar litoral, o la zona marítima que ciñe las costas, en toda la anchura determinada por el derecho internacional; y 3) las playas.[23] Colección Legislativa de España, Madrid, Tomo XCVI, Segunda Parte, 1866, págs. 294-346. Rubert Armstrong v. ELA, *supra*, pág. 625.

---

[23] Dicho artículo definía las playas como

> el espacio que alternativamente cubren y descubren las aguas en el movimiento de la marea. Forma su límite interior o terrestre donde llegan las más altas mareas y equinocciales. Donde no fueren sensibles las mareas, empieza la playa por la parte de tierra en la línea donde llegan las aguas en las tormentas o temporales ordinarios. Artículo 1, Ley de Aguas española de 1866.

Por otro lado, los Artículos 4 y 5 de la referida ley articulaban un claro reconocimiento de la posibilidad de que existiera propiedad privada en los terrenos ganados al mar, e incluso, en lo que actualmente se conoce como la zona marítimo-terrestre. En particular, el Artículo 5 de la Ley de Aguas española proveía que **"[l]os terrenos ganados al mar por consecuencia de obras construidas <u>por el Estado</u> o por las provincias o pueblos <u>o particulares competentemente autorizados serán de propiedad de quien hubiese construido las obras</u>**, a no haberse establecido otra cosa en la autorización" (Énfasis nuestro).[24] Es decir, se reconocía la posible patrimonialidad de los terrenos ganados al mar.

Dicha ley rigió en Puerto Rico hasta el 5 de febrero de 1886, cuando por Real Orden se extendieron a Puerto Rico la Ley de Aguas del 13 de junio de 1879 y la Ley de Puertos española del 7 de mayo de 1880. La Ley de Aguas de 1879 sustituyó a la Ley de Aguas española de 1866 sólo en cuanto a las aguas terrestres. Con relación a las aguas marítimas, y en lo pertinente al caso de autos, la Ley de Aguas de 1866 fue sustituida por la Ley de Puertos de para la Isla de Puerto Rico de 1886. <u>Colección Legislativa de España</u>, Madrid,

---

[24] Por otro lado, el Artículo 4 de la referida ley disponía lo siguiente:

> Son del dominio público los terrenos que se unen a las playas por las accesiones y aterramientos que ocasione el mar. Cuando ya no los bañen las aguas del mar, ni sean necesarios para los objetos de utilidad pública, ni para establecimiento de especiales industrias, ni para el servicio de vigilancia, **el Gobierno los declarará propiedad de los dueños de las líneas colindantes en aumento de ellas** (Énfasis nuestro).

Tomo CXXXVI, Segunda Parte, 1887, págs. 436-448. Véase Rubert Armstrong v. ELA, *supra,* pág. 623.

La Ley de Puertos de 1886 introdujo en nuestro ordenamiento el concepto jurídico de la zona marítimo-terrestre. La misma dispuso en su Artículo 1 que "son de dominio nacional y público, sin perjuicio de los derechos que correspondan a los particulares" la zona marítimo-terrestre y el mar litoral o la zona marítima que ciñe las costas de la Isla. En efecto, la clasificación de dominio nacional y uso público de los mismos bienes que se enumeraban en el Artículo 1 de la derogada Ley de Aguas española de 1866 se mantuvo prácticamente inalterada. El mencionado artículo definía la zona marítimo-terrestre como "el mar en su flujo y reflujo, en donde son sensibles las mareas, y las mayores olas en los temporales en donde no lo sean". Por tanto, la única diferencia práctica entre la declaración demanial establecida por ambas legislaciones españolas al respecto es que la Ley de Puertos de 1886 sustituía el término "playa" por "zona marítimo-terrestre". E. Desdentado Daroca, La expropiación de los enclaves privados en el litoral, Thomson, 2007, pág. 26.

A su vez, la referida legislación española estableció en su Artículo 2 que los terrenos que se unieran a la zona marítimo-terrestre por las accesiones y aterramientos **que ocasionara el mar** continuarían en el dominio nacional y uso público.[25] Mientras que el Artículo 4 de la derogada Ley de Aguas de 1866 disponía que el Estado podía declarar las

---

[25] Nótese que este artículo de la Ley de Puertos de 1880 se refiere específicamente a las accesiones naturales ocasionadas por el mar, y no a los terrenos ganados al mar por el ser humano mediante obras de relleno.

nuevas formaciones como propiedad de los dueños de las líneas colindantes, el mencionado Artículo 2 de la Ley de Puertos de 1886 establecía que:

> [c]uando por consecuencia de estas accesiones, y por efecto de retirarse el mar, la línea interior que limita la expresada zona avance hacia aquellos terrenos sobrantes de **lo que era la antigua zona marítimo-terrestre, pasarán a ser propiedad del Estado**, previo al oportuno deslinde por el Ministerio de Ultramar, de acuerdo con el de Marina; y el primero **podrá enajenarlos cuando no se consideren necesarios para servicios marítimos u otros de utilidad pública.** (Énfasis nuestro).

Es decir, la Ley de Puertos de 1886 reconocía el posible carácter patrimonial y la susceptibilidad enajenable de los terrenos que previamente se encontraban en la zona marítimo-terrestre. Al declarar estos terrenos como propiedad enajenable del Estado, la propia ley contempló la clasificación patrimonial mediante la desafectación natural de unos terrenos antes ocupados por las aguas. De otra parte, esta legislación decimonónica reconoció la existencia de enclaves privados en la zona marítimo-terrestre por vía excepcional, dado que claramente establecía que sus efectos serían sin perjuicio de los derechos que correspondan a los particulares.[26] Véase <u>Rubert Armstrong v. ELA</u>, *supra*, págs.

---

[26] De hecho, tanto la Ley de Aguas española de 1866 como la Ley de Puertos de 1880 han sido criticadas por la doctrina científica por permitir –en la práctica y en la teoría– la nacionalización patrimonial y la privatización del mar, las riberas y las costas al reconocer la propiedad particular en la zona marítimo-terrestre. Véanse T. Quintana López, <u>La Privatización de los Terrenos de que ha sido Desalojado el Mar</u>, Revista de Administración Pública, núm. III, Septiembre-Diciembre 1986, pág. 384; R. Parada, <u>Derecho administrativo: Bienes públicos; Derecho Urbanístico</u>, 7ma ed., T. III, Madrid, 1998, pág. 164; J.L. Villar Palasi, <u>Apuntes de derecho administrativo</u>, Facultad de Derecho, Madrid, pág. 66. Véase además, la Exposición de Motivos de la Ley Orgánica de

622-623; Exposición de Motivos, Ley de Aguas española de 1866. Véase además, E. Desdentado Daroca, La expropiación de los enclaves privados en el litoral, *supra*, pág. 24-34.

Más aún, la Ley de Puertos de 1886 claramente dispone en su Artículo 7 que "[l]os terrenos de propiedad particular colindantes con el mar o enclavados en la zona marítimo-terrestre, están sometidos a la servidumbre de salvamento y de vigilancia litoral" (Énfasis nuestro). Nuevamente, el ordenamiento clasificatorio establecido por dicha legislación especial reconoce la posibilidad de ostentar propiedad privada sobre terrenos que, de ordinario, se considerarían como bienes de dominio público. De hecho, este Tribunal estableció en Rubert Armstrong v. ELA, *supra*, pág. 630, que los manglares, o marismas de la zona marítimo-terrestre no son, por su sola condición de manglares, "bienes de dominio y uso público de los de aquella naturaleza que están fuera del alcance del comercio de los hombres". En ese caso, luego de examinar las referidas legislaciones especiales, reconocimos la posibilidad de que exista propiedad y título particular sobre dichos bienes en determinadas circunstancias.

De otra parte, el Capítulo VI de la referida Ley de Puertos -titulado "De las obras construidas por particulares"- estableció un esquema administrativo que claramente reconoce la posibilidad de realizar obras

Costas Española de 1988. La doctrina jurisprudencial española también ha reconocido la posibilidad de enclaves privados en la zona marítimo-terrestre al amparo de la mencionada legislación hídrica. Véanse, a modo ilustrativo, las sentencias del Tribunal Supremo español (STS) del 20 de abril de 1959 (RJ 1959 4309), 18 de junio de 1965 (RJ 1965 3338), 19 de junio de 1967 (RJ 1967, 3171), 13 de octubre de 1981 (RJ 1981 3737), 20 de enero de 1993 (RJ 1993, 447).

permanentes a título particular en terrenos que en otros supuestos podrían considerarse como enclavados en la zona marítimo-terrestre o como bienes de dominio nacional y público. Por ejemplo, el Artículo 38 establece que "[e]n ningún punto de las costas, playas, puertos y desembocaduras de los ríos, ni en las islas formadas en la zona marítima, se podrán ejecutar obras nuevas, de cualquier especie que fueren ni construirse edificio alguno **sin la competente autorización con arreglo a lo establecido en esta Ley**". (Énfasis nuestro).[27]

Asimismo, y en lo pertinente al caso de autos, resulta reveladora la única mención que hizo la Ley de Puertos de 1886 en cuanto a los terrenos ganados al mar. El Artículo 57 de la referida ley dispuso que:

> [e]n las concesiones de obras en los puertos **con los cuales se ganen terrenos al mar**, se **exceptuará** siempre de los que se reconozcan de propiedad del concesionario la parte necesaria para la zona de servicio a que se refiere el artículo 34, **la cual quedará propiedad del Estado.** (Énfasis nuestro).

---

[27] Por otro lado, el Artículo 42 de la Ley de Puertos requería que cuando las construcciones fueran de carácter permanente, la autorización la tendría que otorgar el Ministro de Ultramar, en consulta con el Ministro de la Marina. Asimismo, el Artículo 45 establecía que estos funcionarios tenían la facultad para autorizar la formación de "salinas, fábricas, y otros establecimientos que en todo o en parte ocupen terrenos de dominio público o con destino al servicio particular". A su vez, el Artículo 51 de la referida Ley de Puertos establecía un esquema administrativo para la concesión de permisos para desecar y aprovechar las marismas que fueran propiedad del Estado o de particulares. Más aún, el Artículo 55 declaraba que estas concesiones en las marismas se otorgarían sin pública licitación y a perpetuidad. Es decir, dicha ley contemplaba la posibilidad de que las entidades gubernamentales con jurisdicción pudieran autorizar y permitir la ejecución de obras nuevas en los bienes antes mencionados, e incluso contemplaba que se rescataran los terrenos sumergidos en las marismas.

Como se puede apreciar, la intención legislativa que se colige del mencionado artículo es excluir de la propiedad particular de un individuo el espacio necesario para proveerle servicio a los buques, pues los puertos se consideraban como bienes de dominio público en virtud de la misma ley. Artículo 4, Ley de Puertos de 1886.

Dicha salvedad establecida para los terrenos ganados al mar en los puertos era precisamente la excepción a la regla general que establecía el Artículo 2 de la Ley de Aguas Española de 1866 y que se reiteró mediante la Real Orden del 20 de agosto de 1883, la cual disponía para la atribución de la propiedad de los terrenos ganados al mar a quien hubiere realizado las obras de relleno o desecación con el permiso correspondiente. Esta Orden, decretada de forma aclaratoria después de la aprobación de la Ley de Puertos española de 1880, establecía que los terrenos ganados al mar litoral fuera de los puertos con obras construidas por el Estado o particulares competentemente autorizados para ello serían propiedad de la entidad que los hubiere llevado a cabo. Colección Legislativa de España, Madrid, Tomo CXXXI, 1884, pág. 398.

Para atender la falta de regulación específica de la Ley de Puertos de 1886 en cuanto a los terrenos ganados al mar fuera de los puertos, y en virtud del Artículo 2 del Real Decreto que extendió la referida legislación a Puerto Rico, el Ministro de Ultramar dictó una Instrucción que calcó, en esencia, el mismo texto de la Real Orden antes citada. Colección Legislativa de España, Madrid, 1887, Tomo 136, 2da

parte, pág. 1124. El Artículo 22 de dicha Instrucción disponía que

> **Los terrenos ganados al mar litoral <u>fuera de los puertos</u> con obras construidas por el Estado, las provincias, los Municipios o los particulares, competentemente autorizados <u>serán de propiedad de la entidad que los hubiere llevado a cabo</u>**[…] (Énfasis nuestro).

Es incuestionable, pues, que esta última regla –también adoptada por el Rey mediante la Real Orden de 10 de mayo de 1886– estableció una norma administrativa que reafirmaba y aclaraba con certeza jurídica el esquema privatizador de la mencionada legislación decimonónica en cuanto a los terrenos ganados al mar y su aplicación expresa a Puerto Rico.[28]

---

[28] El Real Decreto de 5 de febrero de 1886 que hizo extensivo a Puerto Rico la Ley de Puertos de 1880, disponía en su Artículo 2 que "[e]l Ministro de Ultramar dictará la Instrucción para ejecución de la ley, y dará cuenta á las Cortes del presente decreto." Posteriormente, el Ministro de Ultramar promulgó la referida Instrucción, y ésta se aprobó y se hizo extensiva a Puerto Rico mediante Real Orden de 10 de mayo de 2006. <u>Colección Legislativa de España</u>, Madrid, Tomo CXXXVI, Segunda Parte, 1887, págs. 1116-1117. Publicada en la Gaceta de Madrid, 19 de mayo de 1886, No. 139, 1886/03882.

Este instrumento jurídico, la Instrucción, comparte en este caso los requisitos que condicionan el ejercicio de la potestad reglamentaria. Así, esta Instrucción no se limita a definir la organización interna del órgano administrativo y dirigir su actividad como la de sus funcionarios, sino que regula derechos y deberes de los particulares, así como refleja también normas interpretativas de la legislación de puertos que vincularán desde luego, a la Administración. Además, se promulga en virtud del Real Decreto de 5 de febrero de 1886 que hizo extensiva la Ley de Puertos a Puerto Rico y que ordenó al Ministerio de Ultramar a dictar la correspondiente Instrucción para su ejecución.

Finalmente, una vez promulgada se publicó en la Gaceta de Madrid, por lo cual podemos concluir que la misma encubre verdaderamente un auténtico reglamento. F. Garrido Falla, <u>Tratado de Derecho Administrativo</u>, Revista de Administración Pública, Núm. 48, 1965, págs. 107 et. seq. Cf., M. Moreno Rebato, <u>Circulares, Instrucciones y Ordenes de Servicios: Naturaleza y régimen jurídico</u>, Revista de Administración Pública, Núm. 147, 1998, págs. 159 *et seq.*

En vista de lo anterior, y a pesar de que los terrenos sumergidos bajo los puertos y las aguas navegables no se mencionan en las referidas leyes españolas, resulta evidente que el estado de derecho vigente tras el cambio de soberanía –el cual surge expresamente de la Ley de Puertos de 1886 y el Artículo 22 de su respectiva Instrucción– contemplaba la propiedad particular en los terrenos ganados al mar, e incluso, en la zona marítimo-terrestre en determinadas circunstancias.[29]

Es por ello que, conforme a la referida legislación decimonónica, para que los terrenos ganados al mar puedan considerarse como de dominio público, tendrían que formar parte de la zona marítimo-terrestre aún después del acto de desecación o relleno. Es decir, estos terrenos tendrían que ser bañados por "el mar en su flujo y reflujo, en donde son

---

[29] A modo ilustrativo, el estado de derecho antes mencionado tuvo vigencia en España hasta finales del XX, pues los Reglamentos de Puertos de 1912 y 1928, la Ley de Puertos de 1928, así como la Ley de Costas del 26 de abril de 1969, no alteraron la susceptibilidad patrimonial de los terrenos ganados al mar o previamente sumergidos. Véase T. Quintana López, La Privatización de los Terrenos de que ha sido Desalojado el Mar, supra. De hecho, el Artículo 2 de la Ley de Puertos española de 1928 concedía un derecho de tanteo a los dueños colindantes de los terrenos ganados por accesiones o aterramientos cuando el Ministerio de Hacienda desafectara y enajenara los mismos. No fue hasta la aprobación de la Ley de Costas y Puertos del 28 de julio de 1988, aprobada al amparo del Artículo 132.2 de la Constitución Española de 1978, que cambió la visión en cuanto a los terrenos ganados al mar. Ello, dado que el Artículo 132.2 de la Constitución española estableció expresamente que "[s]on bienes de dominio público estatal los que determine la ley y, en todo caso, la zona marítimo-terrestre, las playas, el mar territorial y los recursos naturales de la zona económica **y la plataforma continental**" (Énfasis nuestro). No obstante, el Tribunal Supremo español ha aclarado que ello no puede operar en perjuicio de derechos adquiridos, pues la misma Constitución impide que dicha norma tenga "trascendencia confiscatoria". STS del 10 de junio de 1996 (RJ 1996, 4752).

sensibles las mareas, y las mayores olas en los temporales en donde no lo sean". Artículo 1, Ley de Puertos de 1886.

Así, pues, al examinar el derecho puertorriqueño aplicable al caso de autos, debemos ponderar si alguna ley posterior de nuestro ordenamiento alteró o modificó el estado de derecho antes mencionado para la fecha en que se realizaron las obras de relleno objeto de controversia.[30] El Procurador General sostiene que tanto las enmiendas al Código Civil de Puerto Rico de 1902 provenientes de Louisiana como la aprobación de la Ley de Puertos de 1928 cambiaron dramáticamente el estado de derecho relacionado a la clasificación de los terrenos ganados al mar en nuestra jurisdicción. No le asiste la razón.

## B

En primer lugar, debemos señalar que el Artículo 12 del Código Civil de 1902 establece que sus disposiciones se aplicarán de manera supletoria en las materias que se rijan por leyes especiales. 31 L.P.R.A. sec. 12. Ante la vigencia de la Ley de Puertos de 1886 y el Artículo 22 de su respectiva Instrucción, **es evidente que el Código Civil no tuvo el efecto de derogar el estado de derecho que emanó de tales leyes especiales en cuanto a los puertos y los terrenos ganados al mar.**[31]

---

[30] Debemos señalar que es incontrovertible que las leyes, ordenanzas y reglas administrativas españolas antes discutidas mantuvieron su vigencia en Puerto Rico luego del cambio de soberanía en 1898, por mandato expreso de la Sección 8 de la Ley Foraker, *supra*.

[31] De hecho, el Tribunal Supremo de España resolvió en una sentencia emitida el 6 de marzo de 1897 que la Ley de Puertos de 1880, por referirse en su totalidad a una materia

No obstante, en casos sobre el carácter demanial y la desafectación de los bienes relativos a la costa y a la zona marítimo-terrestre, este Tribunal ha entendido meritorio acudir al Código Civil de manera supletoria, pues este cuerpo normativo regula sistemáticamente la clasificación dominical de los bienes y las cosas en nuestro ordenamiento jurídico, incluyendo el mar y sus riberas. Rubert Armstrong v. ELA, *supra*, pág. 631; Pueblo v. Dimas, *supra*, págs. 1072-1073. A su vez, y aunque tenemos presente que la Ley de Puertos de 1886 y el Artículo 22 de su respectiva Instrucción configuran el estado de derecho que aplica específicamente a los terrenos ganados al mar, ello no impide que el Estado procure la afectación posterior de tales predios patrimoniales conforme al esquema normativo establecido por el Código Civil para tales propósitos. Veamos.

Nótese que el Artículo 254 del Código Civil de 1930, proveniente del Código Civil de Louisiana, dispone que "[l]as cosas comunes son aquéllas cuya propiedad no pertenece a nadie en particular y en las cuales todos los hombres tienen libre su uso, en conformidad con su propia naturaleza: tales son el aire, las aguas pluviales, el mar y sus riberas". 31 L.P.R.A. sec. 1023. De otra parte, el Artículo 255 del Código Civil dispone –de manera idéntica al Artículo 339(1) del Código Civil español de 1889– que "[s]on bienes de dominio público, los destinados al uso público, como los caminos, canales, ríos, torrentes y otros análogos". 31 L.P.R.A. sec.

---

especial, no fue derogada por el Código Civil. STS de 6 de marzo de 1897, Jurisprudencia Civil, Colección completa de las sentencias dictadas por el Tribunal Supremo, Tomo 81, Madrid, 1897, pág. 439.

1024. Sin embargo, se omitió la segunda parte del Artículo 339 del Código Civil español de 1889 que disponía que también eran de dominio público los bienes que le pertenecían privativamente al Estado. Conforme al nuevo ordenamiento establecido por el Código Civil de 1902, estos bienes dejaron de ser considerados como bienes de dominio nacional y público y sencillamente se reconocieron como bienes patrimoniales del Estado. 31 L.P.R.A. sec. 1025. A su vez, el Artículo 256 dispone que son bienes de uso público "los caminos estaduales y los vecinales, las plazas, calles, fuentes y aguas públicas, los paseos, y las obras públicas de servicio general, costeadas por los mismos pueblos o con fondos del tesoro de Puerto Rico". *Id.* Véanse además, Ortiz v. Municipio de Naguabo, 108 D.P.R. 366, 369 (1979); E.L.A. v. Tribunal Superior, 97 D.P.R. 644, 668-669 (1959).[32]

Es decir, a partir del año 1902 se estableció en Puerto Rico un esquema tripartito de clasificación de bienes conforme a su susceptibilidad de dominio y apropiación: comunes, públicos o patrimoniales. Ello aparenta contrastar con el régimen clasificatorio establecido por el estado de derecho español, que sólo reconocía dos clasificaciones dominicales: los bienes públicos y los bienes privados. Artículo 338, Código Civil español de 1889, *supra*.

A pesar de ello, el reconocimiento de la naturaleza comunal de los bienes naturales como el aire y el mar no era

---

[32] A pesar de que la enumeración provista por la mencionada disposición no era de carácter taxativo, lo cierto es que en Rubert Armstrong v. ELA, *supra*, pág. 631, enfatizamos que el mencionado artículo "no mencionaba los manglares ni marismas como tal" para fundamentar la naturaleza patrimonial de los terrenos en controversia.

ajeno al ordenamiento civil español. De hecho, Manresa explica que el Código Civil de España obra correctamente al prescindir de alusión alguna al dominio del mar por ser éste un bien común, universal y humano. Sin embargo, este tratadista critica que no se haya incluido en la enumeración de bienes de dominio público al mar litoral, por entender que éste es un bien susceptible de apropiación sujeto a la soberanía del Estado, como así lo reconoce la Ley de Puertos de 1880. Manresa, Comentarios al Código Civil Español, Madrid, 8va ed., rev. 1976, T. III, pág. 117-118.[33]

Ciertamente, la distinción primordial entre la clasificación de las cosas bajo el estado de derecho español que reconocía la Ley de Puertos y el Código Civil español era el carácter relativo y mutable de éstas en y fuera del comercio. Sin embargo, **esta distinción se mantuvo intacta bajo el esquema tripartito establecido por el Código Civil de**

_____

[33] Por otro lado, el tratadista español Sabino Álvarez Gendín postula que los bienes comunes y los bienes de dominio público no se diferencian en prácticamente nada, salvo que existe mayor facilidad para que los bienes de dominio público se transformen jurídicamente en bienes patrimoniales. S. Álvarez Gendín, El dominio público, Bosch, Barcelona, 1956, pág. 208. De hecho, tanto los bienes comunes como los bienes de dominio público son inalienables, imprescriptibles e inembargables mientras no pierdan su clasificación demanial o "en tanto que dura su afectación". Véase Figueroa v. Municipio de San Juan, 98 D.P.R. 534, 563 (1970); ELA v. Tribunal Superior, supra, pág. 671; Scaevola, Código Civil, Tomo XXXII (Vol. 1), págs. 359, 361 y 364, Ed. Reus, 1965; Castán, Derecho Civil Español, Común y Foral, Tomo I (Vol. 2), pág. 839, 10ma. Ed. Reus, 1962. De otra parte, la propia doctrina científica de Louisiana apunta a que los códigos civiles modernos, como el de Alemania y España, obran correctamente al prescindir de referencia alguna a los bienes comunes, pues se entiende que la clasificación legal —y no sus características inherentes— debe ser el factor determinante al pasar juicio sobre la susceptibilidad patrimonial de las cosas. A.N. Yiannopoulos, 2 La. Civ. L. Treatise, Property § 46 (4ta ed.); Staudinger-Dilcher, Kommentar zum B.G.B. vor § 90 ann.27 (12ma ed. 1980).

**1902**, el cual cuenta con dos órdenes de cosas o bienes que trascienden el alcance de la propiedad privada; a saber, las cosas susceptibles de apropiación y las cosas no susceptibles de apropiación. 31 L.P.R.A. sec. 1081.

Mientras que los bienes de dominio público no son susceptibles de propiedad privada <u>por virtud de la ley</u>; los bienes comunes enumerados en el Artículo 254 no son susceptibles de apropiación particular <u>por razón de su propia naturaleza</u>. De hecho, el Artículo 274 del Código Civil –proveniente del Artículo 482 de Louisiana– establece enfáticamente esta distinción, al disponer que

> [e]ntre las cosas que no son susceptibles de apropiación están comprendidas aquellas que no pueden ser propiedad particular por razón de su objeto, tales como las cosas en común o sean aquéllas cuyo uso y disfrute pertenece a todos los hombres.
>
> Hay otras cosas, por el contrario, que aunque por su naturaleza son susceptibles de propiedad particular, pierden esta cualidad como consecuencia de la aplicación que de ellas se hace para fines públicos incompatibles con la propiedad privada, si bien pueden adquirir su primitiva condición tan pronto cese el fin público que se les hubiera dado; tales son los terrenos de la carreteras, calles y plazas públicas. 31 L.P.R.A. sec. 1082.[34]

Claramente, el esquema tripartito antes descrito no impide que los terrenos ganados al mar sean susceptibles de

---

[34] Por otro lado, El Artículo 341 del Código Civil español –aplicable en Puerto Rico desde 1890 hasta 1902– establecía que "los bienes de dominio público, cuando dejen de estar destinados al uso general o a las necesidades de la defensa del territorio, pasan a formar parte de los bienes de propiedad del Estado". Por tanto, es evidente que el Fortín y sus terrenos aledaños eran bienes de dominio nacional y público conforme al estado de derecho español. No obstante, el propio Código Civil contemplaba su desafectación cuando cesara el uso militar, en cuyo caso pasarían a ser bienes patrimoniales del Estado.

apropiación patrimonial. Ello, dado que la naturaleza de estos bienes tras ser rellenados o desecados posibilita su apropiación física por un particular, independientemente de que la ley no permita dicha apropiación.[35] De hecho, en vista de esta realidad conceptual es que tanto la Ley de Aguas española como la Ley de Puertos de 1886 y el Artículo 22 de su respectiva Instrucción permitían la mutación dominical de los terrenos previamente sumergidos tras ser ganados al mar mediante accesión o relleno, pues reconocían la posibilidad de ostentar propiedad particular sobre tales predios descubiertos mediante la autorización competente de las agencias facultadas para ello.

De conformidad con este análisis, Godreau y Giusti comentan lo siguiente al discutir los bienes comunes y su

---

[35] No se deben confundir los bienes comunes –que en su generalidad universal y humanística no pueden ser objeto de apropiación (el aire, el viento y el mar)– con los bienes de dominio público "por su naturaleza". Estos últimos, aunque singular y técnicamente podrían ser susceptibles de apropiación (un metro cuadrado del mar litoral o el cauce de un río), el estado de derecho lo impide por mandato de la ley. Véase M. Hauriou, Precis de Droit administratif et Droit public, Paris, 1914, pág. 665, citado en S. Martín Retortillo, Aguas Públicas y Obras Hidráulicas, Tecnos, Madrid, 1966, págs. 231-232.

De conformidad con lo anterior, el Artículo 449 del Código Civil de Louisiana, en referencia a los bienes comunes, se refiere a los bienes que no son susceptibles de apropiación por su naturaleza abundante y universal, como el aire y el alta mar ("high seas"), y no al mar litoral. De hecho, el mar litoral, las aguas navegables y los terrenos sumergidos bajo éstas se enumeran en el Artículo 450 de dicho Código como bienes públicos que le pertenecen al Estado en su capacidad pública, precisamente, por su naturaleza susceptible de apropiación particular: "Public things that belong to the state are such as running waters, the waters and bottoms of natural navigable water bodies, the territorial sea, and the seashore". Art. 450, La. Civ. Code.

entrelazamiento con las disposiciones de las leyes especiales aplicables:

> **Respecto al mar y sus riberas, aunque son bienes de dominio público, también están sujetos a determinados regímenes especiales**. Así, en lo que respecta a **la titularidad de las playas, hay que referirse a la antigua Ley de Aguas española de 1866**, modificada en 1879, según la cual éstas eran susceptibles de apropiación por los particulares y quienes únicamente tenían que tolerar servidumbres de pesca y de salvamento a lo largo de una estrecha franja. **Igual concepción permeaba la Ley de Puertos de 1880, que empezó a regir en Puerto Rico a partir del 1886**. M. Godreau y J.A. Giusti, Las concesiones de la Corona y propiedad de la tierra en Puerto Rico, Siglos XVI-XX: Un estudio jurídico, 62 Rev. Jur. U.P.R. 351, 560 (1993) (Énfasis nuestro).

Es decir, indudablemente el uso del mar es común de todos los seres humanos y que por virtud de su naturaleza, no es susceptible de apropiación patrimonial. Como explica Manresa, "[e]l mar, en efecto, tiene la condición de aquellas cosas que, según las leyes naturales, no pueden ser objeto de un dominio exclusivo". Manresa, *supra*, pág. 115.[36] Por otro lado, **el mar litoral**, o el mar cercano a las costas, está sujeto al régimen especial que estableció la Ley de Puertos de 1886 y la normativa hídrica especial antes mencionada.

---

[36] Es menester señalar que el concepto jurídico del mar como bien común de la humanidad tiene su origen en el derecho romano, por lo que fue posteriormente adoptado en las Tercera Partida del Rey Alfonso el Sabio e incorporado marginalmente en las leyes hídricas decimonónicas en referencia al carácter demanial del mar litoral. Rubert Armstrong v. ELA, *supra*, pág. 617. No obstante, debemos aclarar que conforme al derecho internacional público, este concepto se refiere a los fondos marinos y submarinos situados fuera de la jurisdicción de los Estados. Véase Resoluciones 2749 y 2750 del XXV período ordinario de la Asamblea General de las Naciones Unidas, 1970. Véase además, A. Vázquez Arrizosa, El Nuevo Derecho del Mar, Temis, Bogotá, 1976, págs. 192-193. En el caso de Puerto Rico, la jurisdicción sobre sus mares se extiende a tres (3) millas náuticas. 94 Stat. 91, 48 U.S.C. sec. 749.

Ello es así, pues las playas no son un ente estático en términos científicos ni jurídicos. Con el pasar del tiempo y por virtud de los fenómenos geológicos y ambientales, la marea fluctúa y altera el espacio comprendido por la zona marítimo-terrestre, según se define en la Ley de Puertos de 1886. Precisamente de esta premisa se desprende la política pública instituida por la Ley de Puertos de 1886 y el Artículo 22 de su respectiva Instrucción en cuanto a la susceptibilidad patrimonial de los terrenos ganados al mar.

Ya sea por causa de las accesiones o aterramientos ocasionados naturalmente por el mar, o por las obras de relleno o desecación para ganar terreno autorizadas por el Estado, las leyes especiales antes mencionadas contemplaban y regulaban expresamente la nueva naturaleza física que permitía la susceptibilidad patrimonial en determinadas circunstancias de los terrenos ahora descubiertos. Véase Escriche, Diccionario Razonado de Legislación y Jurisprudencia, París, 1853, pág. 1249. Como señala Fernando Garrido Falla, no hay duda que una pequeña parcela de terreno, aunque se encuentre enclavada en la zona marítimo-terrestre, puede ser poseída y rendir utilidad a un particular. Esta realidad física basta para probar que su naturaleza es susceptible de apropiación particular. Véase F. Garrido Falla, Comentarios al Código Civil y Compilaciones Forales, Dirigido por M. Albaradejo, Tomo V, Vol. 1, pág. 62.[37]

_____

[37] Más aún, existe un consenso entre los tratadistas españoles de que —a la luz del Código Civil y la Ley de Puertos de 1880— si se retira el mar surge una nueva zona

Al no poderse clasificar los terrenos ganados al mar como bienes comunes, se justificaba normativamente el esquema privatizador para tales predios que estableció la Ley de Puertos de 1886 y el Artículo 22 de su respectiva Instrucción. Por tanto, es forzoso concluir que dicho régimen especial –el cual mantuvo su vigencia incluso después de la aprobación del Código Civil– impide expresamente tal clasificación demanial.

Además, los terrenos ganados al mar tampoco se pueden considerar, sólo por esa condición previa de terrenos sumergidos, como bienes de dominio y uso público de los de aquella naturaleza que están fuera del alcance del comercio de los hombres, según éstos se definen por los Artículos 255 y 256 del Código Civil de 1930. 31 L.P.R.A. secs. 1024, 1025; Rubert Armstrong v. ELA, *supra*. Ello es más evidente aún, pues el régimen especial aplicable que se desprende la Ley de

---

marítimo-terrestre, convirtiéndose el espacio libre en un terreno sobrante que puede quedar desafectado y transformado en un bien patrimonial. Al respecto, García de Enterría comenta que la extensión de la zona marítimo-terrestre

> dependerá, en cada momento, con relación a la misma parcela de terreno, de la situación del mar, que no es siempre la misma, sino variable, según el movimiento de la arena de los fondos, según la erosión, el aluvión, etc. […] Debe entenderse que estos espacios libres son terrenos perfectamente patrimoniales, en cuanto a que han perdido su calidad de zona marítimo-terrestre […] E. García de Enterría, Dos Estudios Sobre la Usucapión en Derecho Administrativo, Editorial Tecnos, Madrid, 1974, pág. 120.

Véanse, además, L. Diez Picazo, Estudios sobre la Jurisprudencia Civil, Madrid, 1969, vol. II, págs. 39-40; F. Garrido Falla, *supra*, pág. 85; S. Álvarez Gendín, *supra*, págs. 79-83; Sainz Moreno, Dominio Público Estatal de las Playas y Zona Marítimo Terrestre, RAP, 1982, págs. 237-239.

Puertos de 1886 y el Artículo 22 de su respectiva Instrucción proveía para que los terrenos ganados al mar fueran propiedad particular de quienes hubiesen realizado la obra de relleno con autorización competente. Por consiguiente, los terrenos ganados al mar no pueden ser automáticamente considerados como bienes de dominio público conforme al estado de derecho antes mencionado si tales predios no satisfacen la definición jurídica del concepto zona marítimo-terrestre que estableció y delimitó la referida legislación hídrica del siglo XIX.

*C*

Por otro lado, debemos examinar si las disposiciones de la Ley de Muelles y Puertos de 1928 relativas a los terrenos ganados al mar son incompatibles con los preceptos instituidos sobre los mismos por la Ley de Puertos de 1886.[38] En lo pertinente a los terrenos ganados al mar, la Sección 47(b) de la Ley de Puertos de 1928 estableció las facultades de los Capitanes de Muelles, al disponer que estos funcionarios tendrían la función y responsabilidad de:

> [v]igilar por sí y con su [sic] auxiliares, por la conservación de los muelles, malecones, terraplenes y porque tanto éstos como los terrenos públicos que forman la zona marítima y los terrenos agregados a ella **o ganados al mar**, sean conservados y no sean ocupados **sin el consentimiento del Comisionado del Interior**[…](Énfasis nuestro).

De dicho articulado no se colige una nueva definición de la zona marítimo-terrestre ni una modificación a la

---

[38] Nótese que la Ley de Muelles y Puertos no derogó en su totalidad la Ley de Puertos de 1886, pues este Tribunal ha resuelto que las leyes portuarias aprobadas con posterioridad a dicha legislación decimonónica deben interpretarse conjuntamente para determinar si las disposiciones de la primera aún son aplicables. López Sobá v. Fitzgerald, *supra*.

susceptibilidad patrimonial o la naturaleza dominical de los terrenos ganados al mar, según contemplaban la Ley de Puertos de 1886 y el Artículo 22 de su respectiva Instrucción. Esta ley sólo establecía un sistema administrativo para el manejo de los muelles y los puertos, por lo que dicha disposición se refiere exclusivamente a ciertos deberes y facultades de un funcionario público.[39]

Ahora bien, con posterioridad a los actos de relleno bajo nuestro escrutinio, en el año 1968 la Asamblea Legislativa aprobó una ley que por primera vez mencionaba expresamente los terrenos ganados al mar como parte del concepto jurídico de la zona marítimo-terrestre. La Ley Núm. 151 del 28 de junio de 1968, conocida como la Ley de Muelles y Puertos de 1968, establecía las funciones y los deberes de la Autoridad de los Puertos y del Secretario de Obras Públicas sobre la zona marítimo-terrestre. 23 L.P.R.A. secs. 2101-2801.

En lo pertinente al caso de autos, el Artículo 1 de la referida ley definió y delimitó la zona marítimo-terrestre como el espacio de las costas de Puerto Rico que baña el mar en su flujo y reflujo, en donde son sensibles las mareas, y

---

[39] De hecho, en López Sobá v. Fitzgerald, supra, aclaramos que las leyes de puertos posteriores a la Ley de Puertos de 1886, incluyendo la Ley de Puertos de 1928, "solamente reglamentan el servicio de muelles y puertos de la isla", sin regular asuntos sustantivos sobre la titularidad de los bienes aledaños a la costa. De otra parte, este Tribunal ha expresado que "la intención del legislador en dicha disposición no fue otra […]que prohibir, **a menos que se haya obtenido un permiso escrito del Comisionado del Interior**, la construcción, en las orillas de los puertos, bahías o radas, y en los terrenos públicos que forman la zona marítima y en los terrenos agregados a ella o ganados al mar". Pueblo v. del Valle, supra, pág. 189 (Énfasis nuestro).

las mayores olas en los temporales en donde las mareas no son sensibles, incluyendo los terrenos ganados al mar y las márgenes de los ríos "hasta el sitio en que sean navegables o se hagan sensibles las mareas". 23 L.P.R.A. sec. 2103(n). Véase además, Mun. de San Juan v. J. C. A., 152 D.P.R. 673 (2000). No obstante, dicha ley no tiene ningún efecto sobre el caso de autos, pues expresamente dispone en su Sección 1.11 que la misma **"[n]o afectará derechos adquiridos** u obligaciones incurridas por la Autoridad o persona **alguna bajo la legislación anterior** […]" 23 L.P.R.A. sec. 2111 (Énfasis nuestro).[40]

Así las cosas, y por todo lo antes expuesto, no cabe duda de que el estado de derecho en Puerto Rico sobre los terrenos ganados al mar para la fecha en que se realizaron las obras de relleno en ambas parcelas se desprendía exclusivamente de la Ley de Puertos de 1880 y el Artículo 22 de la Instrucción promulgada a tenor con el Artículo 2 del Real Decreto de 5 de febrero de 1886, la cual se aprobó y se extendió a Puerto Rico mediante la Real Orden de 10 de mayo de 1886. Por consiguiente, resulta forzoso resolver la controversia de autos en cuanto al *Condado Bay Parcel* bajo dichos estatutos y la doctrina civilista aplicable.

## V

La doctrina civilista antes examinada nos lleva a concluir que como consecuencia de su naturaleza susceptible de mutación dominical y apropiación particular tras ser

---

[40] Por tanto, es innecesario examinar el alcance de la definición de zona marítimo-terrestre que se desprende de la referida legislación de 1968, pues dicha ley especial no es de aplicación al caso de autos.

ganados al mar, los terrenos sumergidos bajo aguas navegables son, como máximo, bienes de dominio y uso público por virtud del ordenamiento jurídico instituido por la Ley de Puertos de 1886 y el Código Civil de Puerto Rico. 31 L.P.R.A sec. 1024. No obstante, tal como explicamos antes, los terrenos ganados al mar no se pueden considerar, por esa sola condición de provenir del mar litoral, como bienes de dominio y uso público de los de aquella naturaleza que están fuera del alcance del comercio de las personas. Aclarado lo anterior, nos corresponde determinar si en el caso de autos, los terrenos sumergidos que posteriormente se ganaron al mar fueron debidamente desafectados conforme al estado de derecho vigente para la fecha en que se realizaron los rellenos en el *Condado Bay Parcel.*

## A

En el estado de derecho puertorriqueño aún impera una bifurcación entre los bienes de dominio público y los bienes patrimoniales que permite la mutación dominical de las cosas mediante actos de afectación y desafectación. 31 L.P.R.A. 1082. En nuestro ordenamiento civilista, la afectación implica que una cosa queda destinada a un fin de interés público y adquiere la clasificación jurídica particular de bien de dominio público. *Id.*; Figueroa v. Municipio de San Juan, *supra*. Véase además, M. Ballbé, Concepto del dominio público, Barcelona: Bosch, 1945.

El acto de afectación se desprende de una declaración del legislador (Código Civil, Ley de Puertos, etc.) o mediante actos administrativos realizados por el Estado bajo

la autorización de alguna ley (como por ejemplo, la construcción de una plaza o de un cementerio). En vista de ello, la clasificación demanial puede responder exclusivamente a la propia naturaleza de la cosa sin que se requiera ningún acto ulterior del soberano, como sería el caso de los ríos y los torrentes, pues su afectación está definida de modo general en la ley con relación a determinadas circunstancias físicas o naturales. 31 L.P.R.A. sec. 1024. En otros casos, la afectación responde al acto singular del soberano para construir o establecer un inmueble para fines públicos, como por ejemplo, las carreteras estatales o cementerios municipales.[41]

Según el profesor Godreau, el uso público es el factor definitorio en la clasificación de estos bienes, pues

> [e]l carácter de dominio público de un bien no depende de su naturaleza física o geológica. Lo determinante es su finalidad: el uso público del mismo. **De ahí que un bien, originalmente de dominio público, pueda transformarse en bien patrimonial, susceptible de enajenación, si su uso cesa de ser público**. M. Godreau y J.A. Giusti, *supra*, pág. 563. (Énfasis nuestro).

Por consiguiente, la desafectación es el acto contrario a la afectación, que produce el efecto de la pérdida de la clasificación de dominio público del bien objeto de dicho acto. Como mencionamos anteriormente, la desafectación contemplada por el Artículo 274 del Código Civil de Puerto Rico requiere que para adquirir una condición patrimonial, el

---

[41] Véase, por ejemplo, Balzac v. Registrador, 51 D.P.R. 757, 759 (1937). Véase además, F. Garrido Falla, Comentarios al Código Civil y Compilaciones Forales, Dirigido por M. Albaradejo, Tomo V, Vol. 1, págs. 56-57; A. Guaita, Derecho Administrativo: Aguas, montes, minas, 2da edición, Civitas, págs. 24-34; García de Enterría, supra, pág. 117.

bien de dominio público susceptible por su naturaleza de propiedad particular cese el fin público que se le hubiera dado. 31 L.P.R.A. 1082. Véase además, Balzac v. Registrador, *supra*.

La doctrina civilista española sobre los bienes de dominio público establece que la desafectación procede del mismo modo en que tuvo lugar la afectación. Es decir, la mutación dominical ocurre por virtud de la ley, por actos administrativos, o por cambios en las condiciones naturales de los bienes que los excluyen de lo previsto en la ley.[42] S. Álvarez Gendín, El Dominio Público, *supra*, pág. 41. De otra parte, Manresa indica que "la función del Estado, como supremo ordenador jurídico de la sociedad, entraña la facultad de distinguir las cosas públicas y de determinar, en virtud de su soberanía, el destino propio de los medios". Manresa, *supra*, pág. 128.

Conforme a la doctrina española, el acto de desafectación puede ser realizado tanto por una autoridad legislativa o una entidad administrativa, siempre y cuando ésta tenga competencia para ello. Más aún, se entiende que el destino de las cosas no depende tanto de una declaración expresa ejecutiva o administrativa, sino del uso público que se le concede a las mismas. Cuando el uso público cesa respecto a determinados bienes, cesa también su clasificación de dominio público. Manresa, *supra*, pág. 129; García de

---

[42] Por otro lado, se ha postulado que tanto la afectación y la desafectación de las cosas al uso público resultará simplemente de las puras circunstancias de hecho del uso o del no uso, sin precisión alguna de fórmulas sacramentales. García de Enterría, *supra*, pág. 101.

Enterría, *supra*. La desafectación, sea expresa o tácita, generalmente implica que los bienes pasan al patrimonio particular del Estado para regirse por leyes especiales administrativas, como lo sería la Ley de Puertos y la Ley de Aguas. Asimismo, la transformación patrimonial de tales bienes implica que éstos pierden su carácter de inalienabilidad, imprescriptibilidad e inembargabilidad. Figueroa v. Municipio de San Juan, *supra*.

De otra parte, es menester señalar que la desafectación de los bienes que son de dominio público "por su naturaleza" requiere que éstos pierdan la condición que justifica su inclusión en el dominio público. Garrido Falla explica que para que ocurra esta mutación dominical tienen que mediar unas modificaciones topográficas artificialmente introducidas por un particular (como lo sería la alteración de un cauce de un río que deja al descubierto el antiguo álveo o el relleno y desecación de una marisma), o unas alteraciones naturales de sus condiciones físicas (como lo sería, por ejemplo, la retirada del mar, que supondría simultáneamente la retirada de la zona marítimo-terrestre). Según el mencionado tratadista, en estos casos no hay duda de que se puede producir una desafectación, siempre y cuando se cumpla con el esquema administrativo contemplado por el régimen especial aplicable.[43] En el caso de los terrenos ganados al mar, dicho

_____

[43] Asimismo, se ha reconocido que la Ley de Aguas y la Ley de Puertos contemplaban la desafectación por la "consumación de efectos". García de Enterría, *supra*, pág. 115. Los terrenos ganados al mar no son necesariamente espacios naturales de la zona marítimo-terrestre, pues las obras de relleno o de desecación producen una transformación de las características físicas y naturales que pueden excluir al

esquema proviene de la Ley de Puertos de 1886 y el Artículo 22 de su respectiva Instrucción. Véase Garrido Falla, *supra*, págs. 84-85.

***B***

Se desprende de dicha doctrina que la desafectación contemplada por el Artículo 274 del Código Civil de Puerto Rico puede ocurrir por virtud de un acto de soberanía, ya sea mediante la aprobación de una ley a tales efectos o mediante un acto administrativo con los poderes delegados para ello; o por virtud de los cambios en la condición natural de los bienes que los excluyan de la clasificación contemplada por la propia ley. El factor fundamental para la desafectación debe ser que haya cesado el fin público que se le hubiera dado al bien objeto de desafectación. 31 L.P.R.A. sec. 1082.

De hecho, nuestro ordenamiento puede requerir una combinación de las modalidades de desafectación para que ésta proceda conforme a derecho. En lo referente a los terrenos sumergidos, los cuales consideramos bienes de dominio público "por su naturaleza" por mandato del Código Civil, hemos observado que el estado de derecho vigente para la fecha en que se realizaron los rellenos en el *Condado Bay Parcel* –que se desprende exclusivamente de la Ley de Puertos de 1886 y el

---

predio rescatado de la mencionada definición jurídica. A modo ilustrativo, la Ley de Costas española de 1988 reconoce esta característica particular de los terrenos ganados al mar en su Disposición Transitoria Segunda, la cual garantiza los derechos adquiridos sobre los mismos si existe un título administrativo suficiente. Así, pues, se excluyen los terrenos rellenados bajo propiedad particular del régimen de expropiación en la zona marítimo-terrestre contemplado por el estado de derecho español introducido por la Constitución de 1978 y la Ley de Costas de 1988. E. Desentado Daroca, supra, págs. 62-63.

Artículo 22 de su respectiva Instrucción- contemplaba la posible desafectación de éstos al transformarse en terrenos ganados al mar. Para que procediera la desafectación, no tan sólo se requería la degradación de la naturaleza de los terrenos sumergidos mediante actos de accesión u obras de desecación y relleno, sino que se requería el cumplimiento con un esquema administrativo establecido por la referida legislación hídrica española.

Dicha conclusión se desprende de la doctrina civilista antes mencionada, integrada con la normativa que estableció tanto la Ley de Aguas española de 1866 como la Ley de Puertos de 1886 y el Artículo 22 de su Instrucción. Estas legislaciones hídricas formularon el estado de derecho aplicable al caso de autos, el cual claramente contemplaba la posibilidad de que los terrenos ganados al mar litoral mediante obras construidas por el Estado, los Municipios o los particulares competentemente autorizados para ello fueran propiedad de la entidad que los hubiere llevado a cabo.[44]

Es decir, la desafectación de los terrenos sumergidos en aguas navegables no tan sólo requiere un acto de alteración a su naturaleza que justifique la nueva clasificación

---

[44] De hecho, este Tribunal resolvió una demanda sobre la titularidad de unos terrenos ganados al mar a favor del Estado y en contra de la persona que rescató los terrenos sumergidos mediante la desecación y relleno de manglares, pues tales actos fueron voluntarios y no se demostró "que estuvieran autorizados por el Estado Español". Pueblo v. Dimas, 18 D.P.R. 1061 (1912). Véase además, a modo ilustrativo, la sentencia del 23 de marzo de 1972, Aranzadi núm. 1562, en la que el Tribunal Supremo de España expresó que "[l]os terrenos ganados al mar como consecuencia de obras construidas por particulares competentemente autorizados serán propiedad de quien las hubiere ejecutado, principio sancionado por la jurisprudencia de todos los tiempos […]".

patrimonial, sino que requiere un acto administrativo que autorice y convalide tales obras de degradación artificial. Para ello, varias disposiciones de la Ley de Puertos de 1886 y su respectiva Instrucción establecían un esquema administrativo con relación a la concesión de permisos y autorizaciones para la construcción de obras permanentes en las costas, puertos, marismas y otros terrenos enclavados en la zona marítimo-terrestre a título particular. A. Guaita, Derecho Administrativo: Aguas, montes, minas, *supra,* págs. 30-31.

La Ley de Muelles y Puertos de 1928 sólo alteró este esquema en el sentido de sustituir al Ministerio de Ultramar y de la Marina por el Comisionado de Interior del gobierno insular de Puerto Rico.[45] Sin embargo, y contrario a lo que aduce el Procurador General,[46] no hemos encontrado ninguna fuente jurídica en el estado de derecho puertorriqueño que exija una declaración expresa de la Asamblea Legislativa para

---

[45] A su vez, el Comisionado del Interior fue posteriormente sustituido por el Secretario de Obras Públicas. Ley Núm. 6 del 24 de julio de 1952.

[46] Para ello, cita al Tribunal Supremo de Louisiana en State ex rel. Guste v. Board of Commissioners of Orleans Levee District, 456 So.2d 605 (La. 1984) y sugiere que adoptemos su raciocinio normativo. No obstante, es evidente que dicha analogía es totalmente improcedente e inaplicable al contexto puertorriqueño, pues ese caso se refiere específicamente a varias enmiendas constitucionales aprobadas en Louisiana en la primera mitad del siglo XX cuyo propósito era conceder un mandato amplio a las agencias pertinentes para realizar varias obras de dragado y relleno a título patrimonial. Lo que en esencia sugiere el Procurador al citar la jurisprudencia de ese estado es que la desafectación de los terrenos ganados al mar requiere de una enmienda constitucional que sea clara y expresa en cuanto a su intención de desafectar dichos bienes o de transferir su titularidad.

que proceda la desafectación de los terrenos ganados al mar cuando éstos dejan de ser un bien de dominio público "por su propia naturaleza" tras la autorización administrativa de la entidad pública con jurisdicción para ello.[47]

**De conformidad con el estado de derecho antes examinado, es evidente que el *Condado Bay Parcel* constituye un terreno ganado al mar que fue debidamente desafectado en su totalidad, por lo que no puede ser clasificado como un bien de dominio público.** Las obras de relleno realizadas en la década de los cincuenta que crearon dicha parcela –con el

---

[47] Para fundamentar esta teoría, el Procurador indica que la desafectación no puede darse "arbitrariamente o sólo mediante la determinación del funcionario o de la entidad que tenga su custodia", pues alega que será necesario que la inutilidad surja de fenómenos naturales, o que medie un acto legislativo declarando el cese de tal inutilidad. M. Godreau y J.A, Giusti, *supra*, pág. 563. Para sustentar esta premisa, se refiere al Artículo VI, Sección 9 de la Constitución. Art. VI, sec. 9, Const. ELA, L.P.R.A. Tomo 1. La citada cláusula constitucional requiere que la enajenación de propiedades del Estado y el desembolso de fondos públicos se haga para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado. Aponte Hernández v. Acevedo Vilá, res. 16 de febrero de 2006, 2006 T.S.P.R. 24. Sin embargo, esta cláusula constitucional no regula la clasificación jurídica o posible desafectación de los bienes de dominio público. Véase Asociación Pro Control de Acceso Calle Maracaibo v. Cardona, 144 D.P.R. 1 (1997).

Este Tribunal ha establecido que los bienes de dominio público no son susceptibles de enajenación ni posesión privada, por lo que el Estado no puede disponer de ellos mientras mantengan tal carácter. Caquías v. Asoc. Res. Mansiones Río Piedras, 134 D.P.R. 181. 292 (1993); Rubert Armstrong vs. ELA, *supra*, pág. 616; Ortiz Carrasquillo vs. Municipio de Naguabo, *supra*, pág. 369; Balzac v. Registrador, *supra*, pág. 759. Además, nótese que todas las enajenaciones en cuestión se hicieron mediante el Hotel Development Corporation, que ya ostentaba la propiedad privada de estos terrenos conforme a la Ley Núm. 10 de 18 de junio de 1970, 23 L.P.R.A. sec. 671 (m), la cual autoriza el traspaso de bienes públicos y patrimoniales del Estado a la Compañía de Turismo para los fines que dicha corporación pública estime necesarios o convenientes.

propósito de ampliar las instalaciones del Hotel Caribe Hilton- fueron dirigidas por el propio Estado Libre Asociado por conducto de la Compañía de Fomento Industrial.

Estas obras recibieron la autorización correspondiente de la Junta de Planificación y del Departamento de Obras Públicas, organismos administrativos con jurisdicción para la fecha en que se realizaron los rellenos en la referida parcela.[48] Se colige de la normativa civilista examinada que, en el caso del *Condado Bay Parcel*, dicha autorización administrativa fue un acto jurídico adecuado y suficiente –según la Ley de Puertos de 1886 y el Artículo 22 de su respectiva Instrucción– para desafectar los mencionados terrenos. **Por tanto, tales predios patrimoniales se integraron al comercio de las personas conforme al estado de derecho aplicable, por lo que pueden ser objeto de apropiación particular.**

## VI

Por otro lado, y con relación al *Coast Guard Parcel*, es menester aclarar que no ocurrió una afectación tácita de dicha parcela tras su adquisición por la Administración de Terrenos en 1991. No cabe duda de que al extinguirse el interés federal sobre tales predios, los mismos han estado sujetos de manera prospectiva al derecho estatal. Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co., 429

---

[48] Por otro lado, es menester señalar que el uso y destino público del predio previamente sumergido **cesó** inmediatamente tras ser rescatado del mar, pues surge del expediente que el *Condado Bay Parcel* fue utilizado para ampliar el Caribe Hilton y para crear un área de estacionamiento privado bajo la administración del mencionado hotel.

U.S. 363 (1977). Sin embargo, ello no implica que el derecho estatal se pueda aplicar retroactivamente en perjuicio de derechos adquiridos al amparo de un estado de derecho distinto al que imperaba cuando se llevaron a cabo las obras de relleno en controversia.

Aunque el Artículo 1 de la Ley de Muelles y Puertos de 1968, *supra*, se podría interpretar para incluir los terrenos ganados al mar en la definición de zona marítimo-terrestre, dicha definición no podría aplicarse de forma alguna a los rellenos del *Coast Guard Parcel* que se llevaron a cabo en 1941. Como mencionamos anteriormente, la misma Ley de Puertos de 1968 establece claramente que sus preceptos "[n]o afectará[n] derechos adquiridos u obligaciones incurridas por la Autoridad o persona alguna bajo la legislación anterior. Pero esta ley será aplicable a todas las acciones y procedimientos que surjan después de su vigencia […]". 23 L.P.R.A. 2111.

A la luz de lo anterior, es inevitable concluir que el derecho puertorriqueño aplicable al *Coast Guard Parcel* a partir de 1991 es el estado de derecho que emana de la Ley de Puertos de 1886 y el Artículo 22 de su respectiva Instrucción, según lo examinamos en las partes IV y V de esta Opinión. Ello, dado que las obras de relleno en controversia se realizaron a título patrimonial por el Departamento de la Marina en 1941, casi tres décadas antes de que entrara en vigor la Ley de Puertos de 1968.

Somos del criterio que aunque el gobierno de Puerto Rico tenía la potestad para afectar nuevamente tales predios

cuando los adquirió mediante un contrato de compraventa para destinarlos al uso y dominio público de conformidad con el estado de derecho puertorriqueño, el expediente del caso de autos demuestra que tal conversión dominical nunca ocurrió. Para determinar si el carácter de un bien es de dominio público, lo más importante es considerar la finalidad y destino que se le otorgue al mismo, y no su naturaleza física o geológica. 31 L.P.R.A. 1082. Véase M. Godreau y J.A. Giusti, *supra*, pág. 563.

El gobierno de Puerto Rico nunca destinó ni administró los terrenos ganados al mar del *Coast Guard Parcel* como bienes de dominio público. Ni las expresiones de un funcionario de la Administración de Terrenos ni un Reglamento de Zonificación Especial que nunca fue implementado y que fue derogado por uno que reconoce la patrimonialidad de los terrenos al año siguiente de la adquisición de los terrenos constituyen actos suficientes para la debida configuración de la afectación demanial de los terrenos. Por consiguiente, concluimos que tales predios continuaron siendo bienes patrimoniales tras su adquisición por el Estado Libre Asociado de Puerto Rico en 1991.

De otra parte, es menester señalar que el Departamento de Recursos Naturales y Ambientales certificó en diciembre de 1994 un deslinde de la zona marítimo-terrestre de los terrenos rellenados del *Coast Guard Parcel*, que según se desprende del expediente, no interfería con los predios proyectados para la construcción del Proyecto Paseo Caribe. Véase Exhibit Estipulado Núm. 34, Ap. Vol. I. Asimismo, en

septiembre de 1998, dicha agencia aprobó el deslinde de la zona marítimo-terrestre del Hotel Caribe Hilton -incluyendo, claro está, el *Condado Bay Parcel*- el cual también certificó que dicha parcela no se encontraba enclavada en la zona marítimo-terrestre del litoral colindante. Véase Exhibit Estipulado Núm. 35, Ap. Vol. I.

Aunque dichos terrenos ganados al mar están enclavados en lo que anteriormente formaba parte de la zona marítimo-terrestre, no se ha presentado prueba alguna de que los terrenos objeto de controversia se encuentren, luego de realizados los rellenos, en el espacio de las costas que baña el mar en su flujo y reflujo, ni en donde son sensibles las mareas, ni en el espacio al cual llegan las mayores olas en los temporales en donde las mareas no son sensibles. Por tanto, es forzoso concluir que conforme al derecho aplicable, los terrenos ganados al mar en el *Condado Bay Parcel* y el *Coast Guard Parcel* fueron debidamente desafectados y convertidos en bienes patrimoniales, por lo que son susceptibles de apropiación particular.

## VII

Para concluir, la polémica relacionada al Proyecto Paseo Caribe ha generado un intenso debate en el país sobre la seguridad jurídica y la estabilidad normativa de nuestro ordenamiento constitucional. Este principio universal del derecho exige el reconocimiento de que las leyes y las reglas en una sociedad democrática emanan de la soberanía del pueblo, expresada por conducto de los poderes ejecutivos y legislativos del gobierno, y que existe un poder judicial

independiente para garantizar la certeza y la confianza en la interpretación imparcial del estado de derecho aplicable. Ello se mantuvo presente al pasar juicio sobre la clasificación jurídica de los terrenos ganados al mar objeto de controversia, pues su resolución trasciende las particularidades del caso de autos al incidir sobre una política de planificación urbana que cimentó los orígenes de muchas comunidades del país.

Por tanto, es necesario enmarcar esta Opinión en el contexto histórico apropiado. Debemos recalcar que una tercera parte del litoral de la bahía de San Juan ha sido modificada por rellenos o dragados. Las áreas rellenadas –en su mayoría mediante obras gubernamentales realizadas alrededor de los años cuarenta (1940) con finalidades urbanas– comprenden las zonas de Puerto Nuevo, Martín Peña, la Puntilla, Puerta de Tierra, Isla Grande, Sabana y Amelia, Isla de Cabras, Puente Blanco, Juana Matos, Barrio Obrero, Ocean Park, Isla Verde, el Condado, la península Esperanza y por último, las porciones sudeste y noreste de la Isleta de San Juan. Véase J. Seguinot Barbosa, San Juan, Puerto Rico: La Ciudad al margen de la Bahía, una visión geoecológica y jurídica, Editorial GEO, 1997, pág. 90. Véanse, además, A. Sepúlveda & J. Carbonell, Cangrejos – Santurce, Historia ilustrada de su desarrollo urbano (1519-1950), Centro de Investigaciones CARIMAR, Oficina Estatal de Preservación Histórica, San Juan (1987); A. Sepúlveda, San Juan, Historia ilustrada de su desarrollo urbano, 1508-1898, Centro de Investigaciones Carimar, San Juan (1989).

De esta forma, la política de dragado y relleno dirigida por el propio Estado durante gran parte del siglo XX dio origen a muchas comunidades de la ciudad capital, las cuales abarcan una diversidad socioeconómica y cultural representativa de la sociedad puertorriqueña. Surge de nuestro ordenamiento que en la mayoría de los sectores mencionados –como por ejemplo, los barrios de Sabana y Amelia asentados sobre las áreas de manglares al sur de la bahía– no ha mediado acto legislativo alguno para aclarar la naturaleza privativa de los terrenos rellenos. Véase J. Seguinot Barbosa, *supra*, pág. 74.[49] A pesar de la falta de acción legislativa para aclarar la naturaleza patrimonial de estos sectores rescatados del mar o de terrenos sumergidos en áreas de manglares, lo cierto es que el Estado promovió y participó activamente en este proceso de rellenos para fines urbanísticos.[50]

_____

[49] El Procurador General alega que a lo largo del siglo XX la Asamblea Legislativa entendió necesario emitir legislación específica para enajenar terrenos sumergidos y terrenos ganados al mar. No obstante, se desprende del historial legislativo de los pocos ejemplos que nos presenta que el propósito de dichas leyes era aclarar la incertidumbre sobre la titularidad que ostentaban varias agencias sobre algunos predios enclavados en la zona-marítimo terrestre, establecer servidumbres de acceso a la playa, e incluso, eximir a varios hoteles de la servidumbre de vigilancia litoral requerida para terrenos de esta índole. Ese fue el caso de la Ley Núm. 25 del 2 de agosto de 1990 en cuanto al Hotel El Conquistador, y la Ley Núm. 3 del 22 de agosto de 1990 en referencia a unos predios del Hotel Condado Beach, el Centro de Convenciones y el Hotel La Concha. A pesar de lo anterior, no hemos encontrado ley alguna para desafectar los terrenos rellenados en el litoral de la bahía en los que hoy se asientan las comunidades mencionadas.

[50] Por ejemplo, el gobierno de Puerto Rico le garantizaba una parcela a toda persona que colaborara en los rellenos de las áreas manglares de Puerta de Tierra. El plan urbanístico diseñado por el Estado consistía en la desecación y relleno

En el caso de autos, y desde el contexto histórico antes mencionado, es evidente que las obras de relleno del *Coast Guard Parcel* y del *Condado Bay Parcel* realizadas a mediados del siglo XX no fueron producto de una anomalía o de un procedimiento administrativo irregular. Todo lo contrario, el origen de los terrenos ganados al mar objeto de controversia en el presente caso forma parte de un proyecto que se ajustaba enteramente al enfoque urbanístico de la época, con la autorización expresa de las entidades gubernamentales que se entendían con jurisdicción para otorgar los permisos correspondientes. Avalar la novel teoría esgrimida por el Estado en este caso colocaría en una precaria situación a miles de hogares localizados en algunas de las zonas más características de la zona metropolitana. No podemos actuar en abstracción de esa realidad.

Por todo lo antes expuesto, concluimos que los terrenos ganados al mar en el *Coast Guard Parcel* y en el *Condado Bay*

_____

de todas las áreas de manglares al margen de la bahía. Este plan incluía los canales de San Antonio y Martín Peña; las áreas de Las Monjas en Hato Rey, y el sector entre el canal de San Fernando, Cataño y Bayamón. Véase "La Bahía de San Juan: La desecación de los manglares" en el periódico El Mundo, 25 de octubre de 1920, pág. 3, citado en J. Seguinot Barbosa, *supra*. Este proyecto urbano de rellenos respondía a que la creciente demanda por espacios para la construcción obligó al Estado a vender en subasta pública terrenos manglares y pantanosos. *Id*. págs. 66-67. Cónsono con dicha política pública, de 1930 a 1950 se realizaron varios rellenos de la antigua ciénaga de Machuchal para desarrollar las comunidades de Ocean Park y Punta Las Marías. Asimismo, se rellenó un sector de la orilla norte del Caño Martín Peña para ampliar la comunidad de Barrio Obrero. A. Sepúlveda & J. Carbonell, *supra*, págs. 48, 60. De otra parte, el gobierno federal llevó a cabo un relleno inmenso de los alrededores de la bahía de San Juan en las áreas de manglares al sur del canal de San Antonio, Isla Grande y la isla Miraflores con material proveniente de la bahía, en el sector donde se construyó el aeropuerto Isla Grande y en el que hoy día ubica el Centro de Convenciones.

*Parcel* fueron debidamente desafectados conforme al estado de derecho aplicable. Estos terrenos son susceptibles de enajenación patrimonial, por lo que no son bienes de dominio público. Por consiguiente, se declara No ha Lugar la apelación y se confirma la sentencia declaratoria dictada por el Tribunal de Primera Instancia. Se declara que SGCP es el titular de los terrenos bajo nuestro escrutinio, y que First Bank es el acreedor hipotecario de los mismos conforme a los asientos pertinentes del Registro de la Propiedad.

Por otro lado, y en vista de que hemos resuelto la controversia con respecto a la titularidad de los terrenos ganados al mar, nada impide que SGCP, Hilton International, y el Estado Libre Asociado de Puerto Rico procedan a otorgar una escritura constituyendo una servidumbre de paso que establezca los accesos públicos necesarios al Fortín San Jerónimo del Boquerón, tanto para su reparación y mantenimiento, como para el uso y disfrute del público en general. Sin duda alguna, el Fortín San Jerónimo es un bien de dominio público que le pertenece al Pueblo de Puerto Rico, por lo que dicha servidumbre debe constituirse libre de restricciones y a perpetuidad.

Se dictará Sentencia correspondiente.


                                        Federico Hernández Denton
                                             Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

San Gerónimo Caribe Project,      *
Inc.; Firstbank Puerto Rico, Inc. *
                                  *
    Apelados-Peticionarios         *
                                  *
        v.                         *
                                  *
                                  *      CT-2008-04
Estado Libre Asociado de           *
Puerto Rico, representado por      *
el Secretario de Justicia;         *
Junta de Planificación             *      Certificación
representada por su                *
Presidente; Administración de      *
Reglamentos y Permisos             *
representada por su                *
Administrador, Departamento        *
de Recursos Naturales y            *
Ambientales representado por       *
su Secretario                      *
                                  *
    Apelantes-Recurridos           *
                                  *
Hilton International of Puerto      *
Rico, Inc.; Hotel Development      *
Corp.                              *
                                  *
    Demandados                     *
***********************************

SENTENCIA

San Juan, Puerto Rico, a 31 de julio de 2008.

Por los fundamentos expuestos en la Opinión que antecede la cual se hace formar parte íntegra de la presente, se confirma la sentencia declaratoria dictada por el Tribunal de Primera Instancia. Se declara que SGCP es el titular de los terrenos bajo nuestro escrutinio, y que First Bank es el acreedor hipotecario de los mismos conforme a los asientos pertinentes del Registro de la Propiedad.

Por otro lado, y en vista de que hemos resuelto la controversia con respecto a la titularidad de los terrenos ganados al mar, nada impide que SGCP, Hilton International, y el Estado Libre Asociado de Puerto Rico procedan a otorgar una escritura constituyendo una servidumbre de paso que establezca los accesos públicos necesarios al Fortín San Jerónimo del Boquerón, tanto para su reparación y mantenimiento, como para el uso y disfrute del público en general. Sin duda alguna, el Fortín San Jerónimo es un bien de dominio público que le pertenece al Pueblo de Puerto Rico,

por lo que dicha servidumbre debe constituirse libre de restricciones y a perpetuidad.

Así lo pronuncia y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. Todos los Jueces intervienen por Regla de Necesidad. La Jueza Asociada señora Fiol Matta emitió Opinión Disidente y Concurrente.


                          Aida Ileana Oquendo Graulau
                          Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| San Gerónimo Caribe Project, Inc., Firstbank Puerto Rico, Inc.<br>            Peticionarios<br><br>            v.<br><br>Estado Libre Asociado de Puerto Rico, representado por el Secretario de Justicia, Junta de Planificación representada por su Presidente, Administración de Reglamentos y Permisos representada por su Administrador, Departamento de Recursos Naturales y Ambientales representado por su Secretario<br>            Recurridos<br><br><br>Hilton International of Puerto Rico, Inc., Hotel Development Corp.<br>            Demandados | CT-2008-04 |

Opinión disidente y concurrente emitida por la Jueza Asociada SEÑORA FIOL MATTA

En San Juan, Puerto Rico, a 31 de julio de 2008.

En este caso está en controversia si los terrenos ganados al mar que son parte del predio donde se construye el proyecto Paseo Caribe son bienes de dominio público. Una mayoría de este Tribunal concluye que no lo son. Disiento, en parte, de esta decisión pues el análisis de las leyes, la jurisprudencia y los principios aplicables a la controversia me llevan a concluir que los terrenos ganados al mar que son parte de la parcela denominada "Coast Guard Parcel" constituyen bienes de dominio público del Pueblo de Puerto Rico desde su traspaso a nuestra jurisdicción en

1991. En cuanto a los terrenos ganados al mar en la parcela conocida como "Condado Bay Parcel" concurro con la decisión mayoritaria.

## I-    El Tratado de París de 1898:

En 1898, a través del Tratado de París, los Estados Unidos adquirieron todas las tierras de Puerto Rico  que eran propiedad de la Corona Española.[51] Sobre el particular, el artículo VIII del Tratado dispone lo siguiente:

> En cumplimiento de lo convenido en los artículos I, II y III de este tratado, España renuncia en Cuba y cede en Puerto Rico y en las otras islas de la Indias Occidentales, en la Isla de Guam y en el Archipiélago de las Filipinas, todos los edificios, muelles, cuarteles, fortalezas, establecimientos, vías públicas **y demás bienes inmuebles que con arreglo a derecho son del dominio público, y como tal corresponden a la Corona de España.** (Énfasis nuestro) Art. VIII, Tratado de París de 1898, L.P.R.A. Tomo 1.

En virtud de este artículo, Estados Unidos adquirió los bienes de dominio público que pertenecían a la Corona Española, entre éstos, las playas, sus riberas y la zona marítimo terrestre. En El Pueblo v. Dimas et al., 18 D.P.R. 1061 (1912), este Tribunal explica que según el artículo 339 del Código Civil español, vigente cuando se celebró el Tratado de París, las playas y sus riberas eran bienes de dominio público.[52] De igual forma, según la ley de puertos

---

[51] El artículo II del Tratado de París dispone lo siguiente:

> España cede a los Estados Unidos la Isla de Puerto Rico y las demás que están bajo su soberanía en las Indias Occidentales, y la Isla de Guam en el Archipiélago de las Marianas o Ladrones. Art. II, Tratado de París de 1898, L.P.R.A. Tomo 1.

[52] El artículo 339.1 del Código Civil español de 1889 dispone lo siguiente:

> Son bienes de dominio público:

española vigente en aquella fecha, la zona marítimo terrestre era un bien de dominio público que pertenecía a la Corona Española y por lo tanto, fue adquirido por Estados Unidos a través del tratado.[53] Ley de Puertos española de 1880, Colección Legislativa de España, Madrid, 1881, Tomo 124, 2da parte, pág. 787. Véase, El Pueblo v. Dimas et al., supra, en las págs. 1072-1073. Véase además, Pueblo v. Del Valle, 60 D.P.R. 184, 190-192 (1942).

## II- La Ley Foraker de 1900

El 12 de abril de 1900 el Congreso de los Estados Unidos aprobó la Carta Orgánica de 1900, mejor conocida como la Ley Foraker. 31 Stat. 77, L.P.R.A. Tomo 1. Dos secciones de esta ley son particularmente importantes para la solución de este caso.

---

1° Los destinados al uso público, como los caminos, canales, ríos, torrentes, puertos y puentes construidos por el Estado; **las riberas, playas**, radas y otros análogos. (Énfasis nuestro) Art. 339.1 del Código Civil español de 1889.

[53] El artículo 1 de la Ley de Puertos española de 1880 establece lo siguiente:

Son del dominio nacional y uso público, sin perjuicio de los derechos de particulares:
1° La zona marítimo-terrestre, que es el espacio de las costas o fronteras marítimas del territorio español que baña el mar en su flujo y reflujo, en donde son sensibles las mareas, y las mayores olas en los temporales, en donde no lo sean.
Esta zona marítimo-terrestre se extiende tambien [sic] por las márgenes de los rios [sic] hasta el sitio en que sean navegables ó [sic] se hagan sensibles las mareas. Art. 1 de la Ley de Puertos española de 1880, Colección Legislativa de España, Madrid, 1881, Tomo 124, 2da parte, pág. 787.

La primera, la sección 8 de la Ley Foraker, mantuvo en vigor las leyes y ordenanzas de Puerto Rico vigentes al aprobarse la ley federal, en todo aquello que no fuera incompatible con las leyes de los Estados Unidos localmente aplicables, o con las disposiciones de la propia Ley Foraker, mientras no fueran alteradas, enmendadas o revocadas por la autoridad legislativa de Puerto Rico o por una ley del Congreso. Sec. 8 de la Carta Orgánica de 1900, L.P.R.A. Tomo 1.[54] Muñoz Díaz v. Corte, 42 D.P.R. 384, 390 (1931). Aunque habremos de analizar esta sección más adelante, es importante mencionar a este punto que de acuerdo a la misma, tanto el Código Civil español de 1889, extendido a Puerto Rico por Real Decreto del 31 de julio de 1889, como la Ley de Puertos española de 1880, supra, extendida a Puerto Rico por Real Decreto en 1886 y denominada como la Ley de Puertos para la Isla de Puerto Rico, mantuvieron su vigencia en la isla luego del traspaso de soberanía en 1898. Respecto a la Ley de Puertos para la Isla de Puerto Rico, en adelante la Ley de Puertos de 1886, véase Colección Legislativa de España, Madrid, 1887, Tomo

---

[54] En lo pertinente, la sección 8 de la Ley Foraker dispone lo siguiente:

> Que las leyes y ordenanzas de Puerto Rico actualmente en vigor, continuarán vigentes, excepto en los casos en que sean alteradas, enmendadas o modificadas por la presente; o hayan sido alteradas o modificadas por órdenes militares y decretos vigentes cuando esta ley entre a regir, y en todo aquello en que las mismas no resulten incompatibles, o en conflicto con las leyes estatutarias de los Estados Unidos no inaplicables localmente, o con las presentes disposiciones, hasta que sean alteradas, enmendadas o revocadas por la autoridad legislativa creada por la presente para Puerto Rico, o por una ley del Congreso de los Estados Unidos. Sec. 8 de la Carta Orgánica de 1900, L.P.R.A. Tomo 1.

136, pág. 434; Rubert Amstrong v. E.L.A., 97 D.P.R. 588

(1969). En cuanto a la vigencia del Código Civil español en

Puerto Rico véase Colección Legislativa de España, Madrid,

1890, Tomo 143, pág. 582; Olivieri v. Biaggi, 17 D.P.R. 704

(1911).

La segunda sección en la que debemos detenernos es la

sección 13 de la Ley Foraker, mediante la cual el Gobierno

de los Estados Unidos traspasó al Gobierno de Puerto Rico

algunos de los bienes de dominio público que adquirió de la

Corona Española bajo el Tratado de París, **sin incluir entre**

**ellos la superficie de los puertos ni las aguas navegables.**

Sobre el particular, la sección 13 dispone lo siguiente:

> Que todas las propiedades que puedan haber adquirido en
> Puerto Rico los Estados Unidos por la cesión de España en
> dicho Tratado de Paz [Tratado de París de 1898], en
> puentes públicos, casas camineras, fuerza motriz de agua,
> carreteras, corrientes no navegables, y los lechos de las
> mismas, aguas subterráneas, minas o minerales bajo la
> superficie de terrenos particulares, y toda propiedad que
> al tiempo de la cesión pertenecía, bajo las leyes de
> España entonces en vigor, a las varias Juntas de Obras de
> Puertos de Puerto Rico, y todas las orillas de los
> puertos, muelles, embarcaderos y terrenos saneados, **pero**
> **sin incluir la superficie de los puertos o aguas**
> **navegables**, por la presente quedan bajo la dirección del
> Gobierno establecido por esta Ley, para ser administrados
> en beneficio de El Pueblo de Puerto Rico; y la Asamblea
> Legislativa creada por la presente, tendrá autoridad para
> legislar respecto a todos esos asuntos, según lo estimare
> conveniente, con sujeción a las limitaciones impuestas a
> todos sus actos. (Énfasis nuestro) Sec. 13 de la Carta
> Orgánica de 1900, L.P.R.A. Tomo 1.

**III- La Ley federal de 1902 y la Reserva Militar de San**

   **Juan:**

La Ley Pública Núm. 249 del 1 de julio de 1902 (Ley

federal de 1902) autorizó al Presidente de los Estados

Unidos a reservar, para usos públicos, tierras públicas y

edificios pertenecientes a los Estados Unidos en la isla de

Puerto Rico. La ley cedió al gobierno de Puerto Rico, para

ser administrados en beneficio del pueblo, todas las tierras

públicas y edificios que pertenecían a los Estados Unidos

para esa fecha, que no fueran reservadas para usos públicos

por el Presidente, **excluyendo específicamente los puertos**,

**aguas navegables y terrenos sumergidos**.[55] De esta forma, la

Ley federal de 1902, supra, no afectó la titularidad de las

aguas navegables y terrenos sumergidos, pues los excluyó

expresamente tanto del requisito de ser reservados

específicamente por el Presidente para permanecer bajo la

jurisdicción federal como de la posibilidad de ser

traspasados al Gobierno de Puerto Rico.[56]

---

[55] La Ley Pública Núm. 249 del 1 de julio de 1902 dispone lo siguiente:

> *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the President be, and he is hereby, authorized to make, **within one year** after the approval of this Act, such reservation of public lands and buildings belonging to the United States in the island of Porto Rico, for military, naval, light-house, marine-hospital, post-offices, custom-houses, United States courts, and other public purposes, as he may deem necessary, and all the public lands and buildings, **not including harbor areas and navigable streams and bodies of water and the submerged lands underlying the same**, owned by the United States in said island and not so reserved be, and the same are hereby, granted to the government of Porto Rico, to be held or disposed of for the use and benefit of the people of said island: *Provided*, That said grant is upon the express condition that the government of Porto Rico, by proper authority, release to the United States any interest or claim it may have in or upon the lands or buildings reserved by the President under the provisions of this Act. (Énfasis nuestro) *Id.*

[56] Cabe señalar que el Secretario de Justicia de los Estados Unidos expresa esta misma conclusión al emitir una opinión sobre otra Proclama del Presidente que creó una reserva naval en Puerto Rico el 26 de junio de 1903. En su opinión, el Secretario de Justicia Federal expresó lo siguiente:

Finalmente, como condición al traspaso de estos terrenos, la ley requirió la renuncia por el gobierno de Puerto Rico a cualquier interés o reclamo en los terrenos y edificios reservados por el Presidente. La Asamblea Legislativa de Puerto Rico autorizó dicha renuncia mediante la Ley de 16 de febrero de 1903. Véase, El Pueblo v. Dimas et al., supra, en la pág. 1074.

Utilizando la facultad que le concedió la Ley federal de 1902, el Presidente de los Estados Unidos reservó ciertos terrenos conocidos como la Reserva Militar de San Juan, a través de la Orden Ejecutiva del 30 de junio de 1903 (en adelante Orden Ejecutiva del 1903). La descripción de la reserva en la orden ejecutiva es la siguiente:

---

These propositions are not tenable, for such lands as belonged to Spain, under the treaty of Paris, were ceded to the United States. The organic act of Porto Rico, section 13 (31 Stat., 80), especially reserved to the National Government "harbor areas and navigable waters." The act of July 1, 1902 (32 Stat., 731), under which the President issued his proclamation, especially provides that he may make such reservation of public buildings and lands in Porto Rico belonging to the United States "as he may deem necessary, and all the public lands an buildings, not including harbor areas and navigable streams and bodies of water and the submerged lands underlying the same, owned by the United States in said island and not so reserved be, and the same are hereby, granted to the government of Porto Rico." And the President in his proclamation reserving the tract in question, makes use of the same language.
The southern boundary of the reservation, viewed from any aspect of the question, must be fixed at some line where the President has power and authority to establish it, and this under the organic act could not be upon "harbor areas and navigable waters," and under the act of July 1, 1902, and the proclamation based thereon, it could not be upon "navigable streams of waters and the submerged lands underlying the same." In issuing his proclamation, the President could not have had in contemplation the sumerged lands of the harbor, for he could not make these property of Porto Rico". 25 U.S. Op. Atty. Gen. 172, 176 (1904). Véase además, 22 U.S. Op. Atty. Gen. 544 (1899).

Main Reservation, San Juan, Porto Rico
All that piece or parcel of land forming the westerly and northerly portions of the island of San Juan, Porto Rico, and extending from the Marina to El Morro on the west and from the Morro to San Geronimo in the north, said tract of land containing part of the southerly wall of the city, all of the westerly wall, and all of the northerly wall, together with Casa Blanca, the Infantry Barracks, El Morro, Artillery Park, San Cristobal, San Geronimo, and other military lands and buildings which said tract is more particularly described as follows:
    Beginning at the northwesterly corner of Tetuan and San Juan Cristo streets and running thence along said house
    1. S 85° 48' W. 56.6 feet; thence
    2. S 85° 48' W. 56.6 feet; thence…
    82. S. 66° 31' E. parallel to the military road and 633 feet distant therefrom 1746 feet; thence
    83. S. 23° 29'W. 633 feet to the northerly line of said military road; thence crossing said military road
    84. S. 23° 29 W. 1000 feet more or less to the San Antonio Channel; thence following said channel easterly to the San Antonio Bridge; thence northerly along the shore line of the Laguna to the sea passing in front San Geronimo; the northerly and westerly along the sea passing San Geronimo, Escambron, and San Cristobal to a point in line with the westerly line of the San Sebastian Bastion;…. (Énfasis nuestro) Orden Ejecutiva del 30 de junio de 1903.

Acorde a esta descripción, la Reserva Militar de San Juan **no incluyó expresamente las aguas navegables ni los terrenos sumergidos bajo ellas**. Por el contrario, en la Proclama se utiliza consistentemente el vocablo "along" refiriéndose, en lo que nos concierne, a "along the shoreline" o "along the sea". La palabra "along" significa "al lado de" y se refiere, por tanto, a la línea de colindancia con la playa ("shoreline") y con el mar ("sea"). Nos parece evidente que cuando la descripción de una propiedad especifica que ésta colinda con el mar, quedan excluidas de ésta las aguas navegables y terrenos sumergidos adyacentes. Por esto, el límite de la Reserva Militar de San Juan establecida en 1903 **colinda con el mar pero no incluye** las aguas navegables o terrenos sumergidos adyacentes a ésta.

No obstante, la Proclama del Presidente de los Estados Unidos de 26 de agosto de 1929, cuyo propósito fue ceder al gobierno de Puerto Rico parte de los bienes reservados en 1903, expresa que la reserva militar creada por la Orden Ejecutiva de 1903 incluyó los terrenos sumergidos colindantes con ésta.[57] Proclama del Presidente de los Estados Unidos Núm. 1889 del 26 de agosto de 1929 (en adelante Proclama de 1929). Esta proclama describió los terrenos de la reserva que eran cedidos al gobierno de Puerto Rico de la siguiente manera:

> Begining at a point No. 84 of the Military Road, as shown on the Military Chart of the Military Reservation of San Juan, Porto Rico, and extending in a straight line No. 23° 29' E., through point No. 83 to the east thence easterly along the shore line and outside of Fort San Geronimo to the Laguna; thence southerly and outside of the shore line of Fort San Geronimo, and westerly and southerly along the shore line of the Laguna to San Antonio Battery; thence along San Antonio Channel to a point where the line through points No. 83 and No. 84 intersets the channel; thence along the line N. 23° 29' E. to point No. 84, **together with all the right, title, and interest of the United States in all shore and submerged lands lying shoreward** of a line drawn through points Nos. 90, 91, 92 and 93, as shown on the military chart of the Military Reservation of San Juan, Porto Rico; (Énfasis nuestro).

Al incluir en la descripción de la Reserva Militar de San Juan creada los terrenos sumergidos colindantes con ésta, la Proclama de 1929 contradice la Ley federal de 1902 y la Orden Ejecutiva de 1903 que creó la reserva. Según vimos, en la Orden Ejecutiva de 1903 el Presidente de los Estados Unidos no reservó expresamente las aguas navegables y

---

[57] A la misma conclusión llegó el Comisionado de lo Interior de Puerto Rico en la Certificación del 19 de diciembre de 1934, inscrita en el Registro de la Propiedad en el folio 48 vto, tomo 9 de Puerta de Tierra, finca 196. Dicha certificación describe la Reserva Militar de San Juan según la Proclama Presidencial de 1929.

terrenos sumergidos adyacentes a la reserva militar. Además, la Ley federal de 1902 **no autorizaba al Presidente a reservar dichos terrenos.** Más aún, el Presidente sólo podía ejercer la facultad delegada durante el periodo de un año. Sabemos que acorde al principio de separación de poderes, el Presidente de los Estados Unidos debe ceñirse a las facultades que le son delegadas por el Congreso de los Estados Unidos conforme al propósito e intención de dicho cuerpo legislativo. Véase, Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952). Considerado todo esto, no podemos concluir que una expresión en una Proclama Presidencial, emitida 27 años después de la Ley federal de 1902, tenga el efecto de reservar retroactivamente las aguas navegables y terrenos sumergidos que no se reservaron expresamente durante el periodo concedido para ello por el Congreso. Más aún, cuando el propósito de la Proclama de 1929 no era crear nuevas reservas o añadir terrenos a éstas, sino cederle al gobierno de Puerto Rico terrenos reservados previamente por el gobierno federal.

Por otra parte, nos parece evidente también que el Tribunal de Primera Instancia se equivocó al basarse en un documento titulado "Military Chart of the Military Reservation of San Juan, Porto Rico" para concluir que la reserva militar de 1902 incluyó las aguas navegables y los terrenos sumergidos bajo éstas. El mencionado documento no forma parte del expediente de este caso y además, no puede ser contrario al lenguaje explícito de la propia orden ejecutiva que creó la reserva ni a la Ley federal de 1902.

### IV- La Ley Jones y la Ley de Relaciones Federales:

En 1917 los Estados Unidos traspasó al gobierno de Puerto Rico el control sobre las aguas navegables de la isla y los terrenos sumergidos bajo éstas, a través de la Ley Jones o Carta Orgánica de 1917. Al hacerlo, no incluyó los terrenos reservados por los Estados Unidos para fines públicos. En particular, el artículo 8 de la ley expresa lo siguiente:

> **La superficie de los puertos y los cursos y extensiones de aguas navegables y los terrenos sumergidos bajo ellos** dentro y alrededor de la Isla de Puerto Rico y de las islas y aguas adyacentes **que ahora pertenecen a los Estados Unidos y no han sido reservados por los Estados Unidos para fines públicos, quedan por la presente colocados bajo el dominio del Gobierno de Puerto Rico,** para que sean administrados de la misma manera y con sujeción a las mismas limitaciones que las propiedades enumeradas en el artículo precedente; Disponiéndose que todas las leyes de los Estados Unidos para la protección y mejoramiento de las aguas navegables de los Estados Unidos, y para la conservación de los intereses de la navegación y del comercio, serán aplicables a dicha isla y aguas y a sus islas y aguas adyacentes, excepto en aquello en que las mismas sean localmente inaplicables; Disponiéndose, además, que nada de lo contenido en esta Ley se interpretará en el sentido de afectar o menoscabar de ningún modo los términos o condiciones de cualesquiera autorizaciones, permisos u otras facultades concedidos legalmente hasta ahora por el Secretario de la Guerra u otro funcionario o agente autorizado de los Estados Unidos en o en relación con dichas aguas y terrenos sumergidos en y alrededor de dicha isla y de sus islas adyacentes, o hasta este momento ejercidos legalmente en o en relación con las mismas aguas y terrenos; (Énfasis suplido) 2 de marzo de 1917, Cap. 145, art. 8, 39 Stat. 954, L.P.R.A. Tomo I.[58]

---

[58] El ex Juez Presidente del Tribunal Supremo de Puerto Rico, licenciado José Trías Monge, expresó lo siguiente respecto a este artículo de la Ley Jones:

> En lo concerniente a la entrega a Puerto Rico del control de la superficie de los puertos y de los cursos y extensiones de agua navegables y los terrenos sumergidos bajo ellos que entonces perteneciesen a los Estados Unidos y que no hubiesen sido reservados para fines públicos, la ley Jones mejoraba la anterior ley orgánica, ya que el art. 13 de ésta expresamente excluía del control del gobierno de Puerto Rico estas zonas y aguas. J. Trías Monge, Historia Constitucional de Puerto Rico, (1981), II, 91.

Se desprende de esta ley federal que las aguas navegables y los terrenos sumergidos adyacentes a la Reserva Militar de San Juan fueron cedidos al gobierno de Puerto Rico en 1917, ya que, según explicamos en la parte III de esta opinión, éstos no fueron reservados por el Presidente en 1903. En 1950, la Ley Pública 600, 64 Stat. 319, denominó a la Ley Jones o Carta Orgánica de 1917 como la Ley de Relaciones Federales con Puerto Rico, manteniendo en vigor la sección antes citada. Posteriormente, a través de la sección 606 de la Ley Pública 96-205 del 12 de marzo de 1980, 94 Stat. 91, el Congreso de los Estados Unidos enmendó la Ley de

---

Según la Opinión del Secretario de Justicia del 7 de noviembre de 1930:

> Las superficies de puertos y terrenos sumergidos dentro y alrededor de la Isla de Puerto Rico están colocados bajo el dominio del Gobierno de Puerto Rico por la sección 8 de la Ley Orgánica, con sujeción a cualesquiera leyes de los Estados Unidos que sean aplicables. En el ejercicio de este dominio el Gobierno de Puerto Rico actúa por conducto de la Legislatura de Puerto Rico.
> […]
> Podrá usted notar del lenguaje usado en la sección 8 de la Ley Orgánica que las superficies de los puertos y los terrenos sumergidos no están colocados bajo el dominio de la Comisión de Servicio Público, sino bajo el Gobierno de Puerto Rico, lo que en realidad significa el poder legislativo de Puerto Rico. Op. Sec. Just. Núm. 42 del 7 de noviembre de 1930.

Varias opiniones posteriores del Secretario de Justicia de Puerto Rico han abordado la discusión de los poderes que transfiere el artículo 8 de la Ley Jones al gobierno de Puerto Rico. En particular, la Opinión del Secretario de Justicia del 8 de junio de 1951 expresa lo siguiente:

> Como se observará, el Artículo 8, *supra*, pone los terrenos sumergidos en y alrededor de la isla de Puerto Rico bajo el control del Gobierno de Puerto Rico, y los Artículos 7 y 8, conjuntamente, confieren a la Legislatura de Puerto Rico poderes legislativos amplios y discreción en relación con aguas en Puerto Rico. Op. Sec. Just. Núm. 29 del 8 de junio de 1951.

Relaciones Federales para reiterar su intención de cederle

el dominio de las aguas navegables y los terrenos sumergidos

bajo éstas al gobierno de Puerto Rico.[59] Dicha sección

establece lo siguiente:

> Sec. 606. (a) Section 8 of the Act of March 2, 1917 ("Jones Act"), as amended (48 U.S.C. 749), is amended by adding the following after the last sentence thereof: **"Notwithstanding any other provision of law, as used in this section** (1) **'submerged lands underlying navigable bodies of water' include** lands permanently or periodically covered by tidal waters up to but not above the line of mean high tide, all lands underlying the navigable bodies of water in and around the island of Puerto Rico and the adjacent islands, and **all artificially made, filled in, or reclaimed lands which formerly were lands beneath navigable bodies of water;** (2) 'navigable bodies of water and submerged lands underlying the same in and around the island of Puerto Rico and the adjacent islands and water' extend from the coastline of the island of Puerto Rico and the adjacent islands as heretofore or hereafter modified by accretion, erosion or reliction, seaward to a distance of three marine leagues; (3) '**control**' includes <u>**all right, title, and interest**</u> **in and to and** <u>**jurisdiction**</u> **and authority over the submerged lands underlying the harbor areas and navigable streams and bodies of water in and around the island of Puerto Rico and the adjacent islands and waters**, and the natural resources underlying such submerged lands and waters, and includes proprietary rights of ownership, and the rights of management, administration, leasing, use, and development of such natural resources and submerged lands beneath such waters". (Énfasis nuestro). *Id.*[60]

El historial legislativo de la ley no deja dudas respecto

a la intención del Congreso de los Estados Unidos de

concederle a Puerto Rico los mismos derechos que tienen los

estados de la Unión y otros territorios de los Estados

Unidos sobre sus aguas navegables y terrenos sumergidos. A

esos fines el informe del Comité del Senado federal expresa

lo siguiente:

---

[59] Véase además, Op. Sec. Just. Núm. 2 del 10 de febrero de 1981.

[60] Véase texto citado en la nota 20.

This section, proposed by Senator Jackson, would **confirm the jurisdiction of Puerto Rico over its submerged lands** to three marine leagues. This jurisdiction was conferred on Puerto Rico by sections 7 and 8 of the Organic Act of 1917 ('Jones Act') which transferred to the administration of the Government of Puerto Rico control over lands acquired by the United States from Spain through the Treaty of Paris in 1899.

Puerto Rico's jurisdiction and control has been evidenced since 1917 and as recently as 1974, in commenting on the Territorial Submerged Lands Act, the formal administration report stated in part that 'Puerto Rico, pursuant to 48 U.S.C. 749, controls the submerged lands around the islands of Puerto Rico.' In order to prevent any unintentional exclusion of Puerto Rico from the measure **since the Commonwealth is not included in either the Submerged Lands Act or the Territorial Submerged Lands Act**, Senator Johnston, Chairman of the Subcommittee on territories and insular affairs, **at the request of then Governor Rafael Hernandez Colon and Resident Commissioner Jaime Benitez requested further confirmation of Puerto Rico's jurisdiction**. The Director of the Office of Territorial Affairs testified that 'by Act of Congress in 1917 (48 U.S.C. 749) the Government of Puerto Rico obtained control of its submerged lands. As far as we are aware, Puerto Rico's administration of its submerged lands had been quite smooth.'

Although the precise seaward jurisdiction was not as explicitly stated in the 1917 Act for Puerto Rico as was later done for the States under the Submerged Lands Act and for the territories under the Territorial Submerged Lands Act, the basis for such jurisdiction rests on grounds similar to those asserted by Texas and Florida based on Spanish Law and custom. The grant to Puerto Rico in 1917, therefore, was three leagues. **The amendment merely confirms the action of the United States taken in 1917 by conforming the language of the 1917 Act to the language of the Submerged Lands Act and the Territorial Submerged Lands act.**" (Énfasis nuestro) S. Rep. 96-467, 1980 U.S.C.C.A.N. 135.[61]

A través de la Ley de Relaciones Federales y sus enmiendas, el Congreso de los Estados Unidos ha reiterado su intención de cederle al gobierno de Puerto Rico el control de sus aguas navegables y terrenos sumergidos hasta tres leguas marinas alrededor de la isla e islas adyacentes, con excepción de aquellos terrenos que los Estados Unidos haya

---

[61] Véase, Submerged Lands Act of 1953, 43 U.S.C.A. secs. 1301-1315; Territorial Submerged Lands Act, Ley Pública Núm. 93-435 del 5 de octubre de 1974.

reservado para usos públicos. La ley especifica que el concepto de terrenos sumergidos incluye los terrenos ganados al mar mediante relleno y además, establece que el término **"control" comprende todo derecho, título, interés, jurisdicción y autoridad sobre estos terrenos**.

Finalmente, el Congreso dispuso que todas las leyes federales para la protección y mejoramiento de las aguas navegables de los Estados Unidos y para la conservación de los intereses de la navegación y comercio serán aplicables a Puerto Rico y sus aguas navegables, a menos que éstas sean localmente inaplicables.[62] Posteriormente veremos la importancia de esta legislación en cuanto al dominio sobre los terrenos ganados al mar en controversia.

**V-   El traspaso de la Reserva Militar de San Juan al Departamento de la Marina y el arrendamiento a Virgil Baker**

En 1919 el Departamento de Guerra de los Estados Unidos traspasó parte de los terrenos de la Reserva Militar de San Juan al Departamento de la Marina de los Estados Unidos, llamándola entonces Reserva Naval San Jerónimo. Esta reserva fue inscrita en el Registro de la Propiedad a favor de los Estados Unidos.

Posteriormente, a través de la Ley Pública Núm. 35 del 12 de junio de 1921, el Congreso de los Estados Unidos autorizó al Secretario del Departamento de la Marina a arrendar o

---

[62] Un ejemplo de una ley federal creada para la protección y conservación de las aguas navegables de los Estados Unidos y aplicable a Puerto Rico es el Clean Water Act, 33 U.S.C. secs. 1251 et seq. *Véase*, United States v. Rivera Torres, 826 F. 2d 151 (1987).

traspasar los terrenos bajo su control.[63] El 15 de julio de

1921, el Secretario de la Marina de los Estados Unidos firmó

un contrato de arrendamiento con el Teniente Comandante de

la Marina retirado, Virgil Baker. A través de este contrato,

cuya vigencia sería de 999 años, la Marina de los Estados

Unidos arrendó parte de la Reserva Militar de San Juan,

específicamente una porción de terreno localizado en la

Reserva Naval de San Gerónimo, descrita como sigue:

> Site of Land bounded on the North by the Sea, on the East by the small Inlet known as the Laguna, on the South by the main Naval Reservation from which said Site is segregated, and on the West by a tract of land belonging to the TREASURY DEPARTMENT of the UNITED STATES and by the Military Reservation of San Juan, Porto Rico….

El contrato fue inscrito en el Registro de la Propiedad y

en lo pertinente establece lo siguiente:

> In accordance with the desire of the PARTY OF THE FIRST PART this LEASE is granted in lieu of the complete Transfer of Title provided for previous agreements hereinbefore mentioned, and is accepted by the PARTY OF THE SECOND PART in complete and entire satisfaction of all such previous agreements. It is also mutually understood and agreed that this LEASE is NOT REVOCABLE EXCEPT BY MUTUAL AGREEMENT OF BOTH PARTIES, but that the **NAVY DEPARTMENT SHALL RETAIN TITLE TO SAID SITE OF LAND**, and in accordance with the Provisions of the ACT OF CONGRESS authorizing the grant of this LEASE, it is mutually understood and agreed that the NAVY DEPARTMENT SHALL HAVE, IN TIME OF WAR OR NATIONAL EMERGENCY, IF NECESSARY, FREE AND UNLIMITED USE, WITHOUT COST, OF THE SITE OF LAND HEREIN, LEASED. (Énfasis nuestro).

---

[63] En particular, la sección 5 de la referida ley estableció lo siguiente:

> That as consideration for a suitable site and requisite rights, privileges, and easements for a receiving and distant-control radio station in Porto Rico the Secretary of the Navy be, and he hereby is, authorized to exchange or lease for such period as he may deem proper any land under naval control in Porto Rico not otherwise required for naval purposes: *Provided*, That in time of war or national emergency, if necessary, the Navy Department shall have without cost free and unlimited use of any land so exchanged or leased. Sec. 5 de la Ley Pública Núm. 35 del 12 de junio de 1921.

En 1928 el gobierno de los Estados Unidos demandó para anular el contrato, alegando fraude. El Pueblo de Puerto Rico intervino en el pleito reclamando ser el titular de los terrenos sumergidos colindantes a los terrenos incluidos en el arrendamiento. Eventualmente, el caso llegó al Tribunal de Apelaciones para el Primer Circuito y dicho foro sostuvo la validez del contrato. Sobre el asunto de la titularidad de los terrenos sumergidos, reconoció que había controversia entre la alegación del Pueblo de Puerto Rico y la aseveración de título de los Estados Unidos. No obstante, el tribunal apelativo federal decidió que no era necesario resolver la reclamación del Pueblo de Puerto Rico, ya que el Comandante Baker había cedido voluntariamente cualquier derecho, título o interés que pudiera tener sobre los terrenos sumergidos adyacentes a los terrenos que le fueron arrendados.[64]

---

[64] Específicamente, expresó lo siguiente:

  The people of Puerto Rico have filed a bill of intervention, alleging that the deed by the United States to Baker includes underwater area, and that the United States could not lease such area to Baker, because it belonged to the insular government, the people of Porto Rico, and that Baker defrauded the United States. The defendants answered, tendering a quitclaim deed by Commander Baker to the people of Porto Rico of all rights which the defendants had in such area, without prejudice to the interest of the United States.
  It will be seen that the government included the underwater area in their lease. The bill of complaint alleges that the tract, including the underwater area, belonged to the United States. **We do not think it necessary to discuss the action of the people in the insular government with reference to this underwater area. So far as this suit is concerned, we think this question is settled by the tender by Commander Baker of a quitclaim deed to the insular government.** This tendered deed was to "release, relinquish, and quitclaim in favor of the people of Porto Rico any right, title, or interest which he has

**VI-  La Proclama del Presidente de los Estados Unidos de 1929 y la reserva militar de cinco acres o "Coast Guard Parcel"**

Según mencionamos en la parte III de esta opinión, el 26 de agosto de 1929, mediante proclama dictada en el ejercicio de su facultad bajo el artículo 7 de la Ley de Relaciones Federales, supra, el Presidente de los Estados Unidos traspasó al Pueblo de Puerto Rico todo derecho, título e interés de los Estados Unidos sobre los terrenos de la Reserva Naval San Jerónimo, incluyendo aquéllos arrendados al señor Baker. La Proclama de 1929 cedió al Pueblo de Puerto Rico los terrenos que el Presidente de los Estados Unidos había reservado a través de la Orden Ejecutiva de 1903. En la parte III de esta opinión explicamos que si bien la Proclama de 1929 incluye los terrenos sumergidos en la descripción de la reserva, estos terrenos realmente nunca fueron incluidos en la reserva. Además, el Congreso de los Estados Unidos había cedido dichos terrenos sumergidos al gobierno de Puerto Rico desde 1917, a través de la Ley de Relaciones Federales, supra. Véase la parte IV de esta opinión.

Ahora bien, en su proclama, el presidente excluyó de los terrenos cedidos a Puerto Rico una reserva militar de alrededor de cinco acres sobre la cual el gobierno federal

---

or may have by virtue of the said lease of July 15, 1921, to the submerged area." It seems clear to us that, if the insular government in fact owned this area, the lease by the United States to Baker was a nullity to this extent, and, if any bill of intervention were filed, it should have been directed primarily against the United States. (Énfasis nuestro). Baker v. United States, 27 F. 2d 863, 877 (1er Cir. 1928).

mantuvo jurisdicción. La Proclama describe este terreno como

sigue:

> (…) southerly of and contiguous to the tract heretofore
> leased to Virgil Baker, and bounded on the north by the
> southerly line of the said Virgil Baker tract, being a
> straight line drawn from the point known as Point 85 at
> the southwesterly corner of the Virgil Baker tract,
> easterly along the southerly line of said Virgil Baker
> tract through Point No. 86 to the Laguna; on the west by a
> straight line drawn southerly from said Point 85 along the
> westerly line of the tract hereby conveyed; on the east by
> the shore line of the Laguna; and on the south by the
> northerly line of a proposed road the course and location
> of which road are to be fixed hereafter. The United States
> retains title and jurisdiction over the said last
> mentioned five acre tract. (Énfasis nuestro).

La reserva militar de alrededor de cinco acres establecida

en la proclama de 1929, mejor conocida como la **"Coast Guard**

**Parcel"**, fue retenida por el Presidente de los Estados

Unidos para que el Departamento de la Marina desarrollara en

ella servicios de comunicación. Contrario a la descripción

de los terrenos cedidos a Puerto Rico, la descripción de

esta reserva **no incluyó los terrenos sumergidos colindantes**

**con ésta**. No hubo, pues, intención de reservar estos

terrenos sumergidos. Abona a nuestra conclusión el que la

reserva original creada en 1903 tampoco los incluía.[65]

---

[65] El Acta Aclaratoria del Comisionado del Interior de Puerto
Rico del 17 de junio de 1935, que describe el "Coast Guard
Parcel", tampoco incluye estos terrenos al expresar que la
reserva **colinda con** la zona marítimo terrestre adyacente a
ésta. En lo pertinente, el Acta Aclaratoria expresa lo
siguiente:

> PARCELA B- Urbana- Parcela de terreno radicada en el
> barrio Puerta de Tierra, del término municipal de San
> Juan, **cuya propiedad se reserva el Gobierno de los Estados
> Unidos de América**. Tiene un area superficial de 1 hectares
> [sic] 87 acres 93.24 centiareas [sic], equivalentes a **4
> cuerdas con 781 centésimas de otra. <u>Colinda</u>** al norte con
> la parcela A, antes descrita, propiedad de El Pueblo de
> Puerto Rico y arrendada al Teniente Comandante de Marina,
> retirado, Virgil Baker, por el sur con la margen norte de
> la variante de la Avenida Ponce de León que a (…) al

**VII- Rellenos o terrenos ganados al mar aledaños al Coast Guard Parcel**

El 2 de julio de 1940 el Congreso de los Estados Unidos aprobó la Ley Pública Núm. 703. Esta ley autorizó al Secretario de Guerra, entre otras cosas, a llevar a cabo las construcciones y mejoras necesarias en las distintas localidades militares.[66] En el caso de autos, el Tribunal de Primera Instancia se basó en esta ley para concluir que las obras de relleno de los terrenos sumergidos aledaños a la "Coast Guard Parcel" constituían un ejercicio de expropiación forzosa del gobierno federal. Esta interpretación no puede sostenerse. No se desprende de la Ley Pública Núm. 703 de 1940 el propósito de expropiar terreno alguno. Tampoco se llevó a cabo proceso alguno de expropiación al amparo de dicha ley. Según surge del expediente, el gobierno federal nunca tuvo la intención de

---

puente Guillermo Esteves; **por el este con la zona marítima de la Laguna del Condado**; y por el oeste, con terrenos propiedad del Gobierno de los Estados Unidos de América.

[66] En particular, la Ley Pública Núm. 703 dispone lo siguiente:

[I]n order to expedite the building up of the national defense, the Secretary of War is authorized, out of the moneys appropriated for the War Department for national-defense purpose for the fiscal year ending June 30, 1941, with or without advertising, (1) to provide for the necessary construction, rehabilitation, conversion, and installation at military posts, depots, stations, or other localities, of plants, buildings, facilities, utilities and appurtenances thereto (including Government-owned facilities at privately owned plants and the expansion of such plants, and the acquisition of such land, and the purchase or lease of such structures, as may be necessary). Ley Pública 703 del 2 de julio de 1940.

expropiar dichos terrenos, simplemente autorizó al Secretario de Guerra a destinar recursos para las obras que fueran necesarias en el "Coast Guard Parcel" y adquirir los terrenos para llevarlas a cabo.

En diciembre de 1940 la Marina de los Estados Unidos solicitó la autorización del Departamento de Guerra de los Estados Unidos, la Comisión de Servicio Público de Puerto Rico y el Departamento del Interior de Puerto Rico para rellenar un área de los terrenos sumergidos aledaños al "Coast Guard Parcel". Estas tres solicitudes de permisos confirman que el gobierno federal no tuvo la intención de expropiar los terrenos sumergidos aledaños al "Coast Guard Parcel". Más aún, la solicitud de permiso dirigida a la Comisión de Servicio Público de Puerto Rico, fechada el 4 de diciembre de 1940, manifestó que se requería que el gobierno de Puerto Rico aprobara la obra propuesta. De esta forma, se reconoció expresamente que dichos terrenos eran propiedad del gobierno de Puerto Rico desde 1917, según las disposiciones de la Ley de Relaciones Federales.

El 18 de diciembre de 1940 el Comisionado Interino del Departamento del Interior de Puerto Rico, señor José G. Bloise, envió una carta al Secretario de la Comisión del Servicio Público en la que endosó las obras de relleno propuestas y reiteró que los terrenos sumergidos adyacentes al "Coast Guard Parcel" eran propiedad del gobierno de Puerto Rico desde 1917. En lo pertinente, dicha carta expresa lo siguiente:

> Allow me to call your attention to the fact that the submerged lands comprised in the construction of said dike and fill belong to the People of Puerto Rico, according to

article 8th of the Organic Act approved by the Congress of the United States of America on March 2nd, 1917, and also by Proclamation No. 1889 of the President of the United States of America, dated August 26th, 1929. [67]

Además, el Comisionado Interino recomendó al Departamento de la Marina de los Estados Unidos que solicitara al Gobernador de Puerto Rico la transferencia de dichos terrenos al gobierno federal.[68]

El 7 de enero de 1941, la Comisión de Servicio Público de Puerto Rico aprobó el permiso solicitado. En carta fechada el 27 de enero de 1941, el Cuerpo de Ingenieros de los Estados Unidos recomendó aprobar el permiso. El 10 de febrero de 1941, el Departamento de Guerra de los Estados Unidos autorizó el relleno. El 25 de febrero de 1941 el Cuerpo de Ingenieros de los Estados Unidos notificó de ello

---

[67] Incluso, el Teniente Coronel J. Hyde, del Cuerpo de Ingenieros de los Estados Unidos, reconoce que los terrenos sumergidos eran propiedad del Pueblo de Puerto Rico en su memorando del 27 de enero de 1941. En particular expresa:

> The Acting Commissioner of the Interior states in the attached setter that **the land belongs to the People of Puerto Rico**, and recommends that steps be taken to transfer this land to the Navy Department.
> […]
> The land where the proposed construction is to be made is owned by the People of Puerto Rico (Énfasis nuestro).

[68] La comunicación del Comisionado Interino del Departamento del Interior de Puerto Rico expresa que la Ley Núm. 66 del 25 de abril de 1940 (Ley Núm. 66), 1940 Leyes de Puerto Rico, pág. 477-479, aplica a los terrenos sumergidos aledaños al "Coast Guard Parcel". Esta ley autoriza la transferencia por el gobernador de Puerto Rico de terrenos sumergidos al Gobierno federal para propósitos de defensa nacional. Sin embargo, la propia Ley Núm. 66 expone que sus disposiciones aplican a los terrenos sumergidos que se encuentran alrededor de la Bahía de San Juan. La Laguna del Condado no forma parte de la Bahía de San Juan aunque sus aguas estén conectadas por el Canal San Antonio, y, por ende, la Ley Núm. 66 no aplicaba a los terrenos en controversia.

al Capitán del Puerto de San Juan, a la Comisión de Servicio Público y al Comisionado del Departamento del Interior de Puerto Rico. Las obras de relleno se terminaron el 1 de octubre de 1941 y una inspección que llevó a cabo el Departamento de Guerra de los Estados Unidos confirmó que las obras se hicieron conforme a los permisos. Véase, Memorando del 4 de diciembre de 1941 respecto a Pmts. PR 170/6 del Departamento de Guerra de los Estados Unidos.

**VIII-** **El dominio sobre los terrenos aledaños al "Coast Guard Parcel" ganados al mar bajo la jurisdicción federal**

Aclarada la manera en que se crearon los terrenos ganados al mar aledaños al "Coast Guard Parcel", debemos abordar la controversia de su titularidad. Para ello, es necesario precisar el derecho aplicable.

Según quedó establecido, al momento en que se llevaron a cabo las obras de relleno en los terrenos sumergidos colindantes al "Coast Guard Parcel", el gobierno federal era el titular de dicha parcela. Siendo ese el caso, la titularidad de dichos terrenos debe determinarse conforme al derecho federal. Así lo resolvió el Tribunal Supremo de los Estados Unidos en California ex rel. State Lands Commission v. United States, 457 U.S. 273 (1982), cuando dispuso que toda controversia respecto a los terrenos costeros que sean propiedad de los Estados Unidos debe resolverse de acuerdo al derecho federal. Id., pág. 288. A esos efectos afirmó que el derecho federal se aplicará mientras los Estados Unidos sea el titular del terreno costero y mantenga su interés

sobre éste.[69] Quiere ello decir que para determinar la titularidad de los terrenos ganados mar aledaños al "Coast Guard Parcel", al momento en que se rellenaron esos terrenos, **debemos recurrir al derecho federal, y no al derecho puertorriqueño.**

Ya vimos que una ley federal, la Ley de Relaciones Federales, supra, contiene disposiciones aplicables a los terrenos ganados al mar en Puerto Rico. Según esta ley, Puerto Rico tiene todo derecho, título, interés, jurisdicción y autoridad sobre los terrenos ganados al mar mediante relleno alrededor de la isla e islas adyacentes, con excepción de aquellos que los Estados Unidos hayan reservado para usos públicos. 48 U.S.C.A. sec. 749.[70] Véase

---

[69] De forma cónsona establecimos en Roberts v. U.S.O. Council of P.R., 145 D.P.R. 58 (1998), que, como norma general, en los enclaves militares de los Estados Unidos hay jurisdicción legislativa federal exclusiva. Al respecto, definimos que la jurisdicción legislativa se refiere a "quién tiene la facultad de regular, mediante legislación, determinada materia, hecho o situación".

[70] La Ley de Relaciones Federales, 48 U.S.C.A. sec. 749, expresa lo siguiente:

> **The harbor areas and navigable streams and bodies of water and submerged lands** underlying the same in and around the island of Porto Rico [Puerto Rico] and the adjacent islands and waters, now owned by the United States and **not reserved by the United States for public purposes**, be, and the same are hereby, placed under the control of the government of Porto Rico [Puerto Rico], to be administered in the same manner and subject to the same limitations as the property enumerated in the preceding section: *Provided,* That all laws of the United States for the protection and improvement of the navigable waters of the United States and the preservation of the interests of navigation and commerce, except so far as the same may be locally inapplicable, shall apply to said island and waters and to its adjacent islands and waters: *Provided further,* That nothing in this Act contained shall be construed so as to affect or impair in any manner the terms or conditions of any authorizations, permits, or other

además, la parte IV de esta opinión. Esto, sin embargo, no resuelve la controversia particular que nos ocupa, pues cuando los terrenos sumergidos aledaños al "Coast Guard Parcel" fueron rellenados en 1940, la parcela colindante a dichos terrenos pertenecía al gobierno de los Estados Unidos y la jurisprudencia del Tribunal Supremo federal requiere, según vimos, que recurramos a la legislación federal y, en su defecto, al derecho común federal ("federal common law") para resolver las dudas sobre la titularidad en estas

powers heretofore [prior to March 2, 1917] lawfully granted or exercised in or in respect of said waters and submerged lands in and surrounding said island and its adjacent islands by the Secretary of War [Secretary of the Army] or other authorized officer or agent of the United States. Notwithstanding any other provision of law, as used in this section (1) **"submerged lands underlying navigable bodies of water"** include lands permanently or periodically covered by tidal waters up to but not above the line of mean high tide, all lands underlying the navigable bodies of water in and around the island of Puerto Rico and the adjacent islands, and **all artificially made, filled in**, or reclaimed lands which formerly were lands beneath navigable bodies of water; (2) "navigable bodies of water and submerged lands underlying the same in and around the island of Puerto Rico and the adjacent islands and waters" extend from the coastline of the island of Puerto Rico and the adjacent islands as heretofore or hereafter modified by accretion, erosion, or reliction, seaward to a distance of **three marine leagues**; (3) **"control" includes all right, title, and interest in and to and jurisdiction and authority over the submerged lands underlying the harbor areas and navigable streams and bodies of water in and around the island of Puerto Rico and the adjacent islands and waters**, and the natural resources underlying such submerged lands and waters, and includes proprietary rights of ownership, and the rights of management, administration, leasing, use, and development of such natural resources and submerged lands beneath such waters. (Énfasis nuestro) 48 U.S.C.A. sec. 749.

circunstancias. <u>California ex rel. State Lands Commission v.</u>

<u>United States</u>, supra, págs. 282-284.[71]

En <u>California ex rel. State Lands Commission v. United</u>

<u>States</u>, supra, el Supremo federal abordó una controversia

sobre la titularidad de unas accesiones que se crearon

paulatinamente sobre unos terrenos sumergidos del Estado de

California. La parcela de terreno colindante a éstas era una

reserva militar de la Guardia Costanera de los Estados

Unidos. La controversia del caso requería determinar si

dichos terrenos formados por accesión de manera paulatina

pertenecían al gobierno de los Estados Unidos o al Estado de

California. El Tribunal Supremo federal resolvió la

controversia a favor de los Estados Unidos aplicando el

"Submerged Lands Act", 43 U.S.C.A. sec. 1301-1315. Sin

embargo, aclaró que aunque no fuera aplicable esa

legislación, el derecho común federal desplazaría al derecho

---

[71] Respecto a la aplicación del derecho común federal ("federal common law") el tratadista Chemerinsky nos explica lo siguiente:

> The phrase federal common law refers to the development of legally binding federal law by the federal courts **in the absence of directly controlling constitutional or statutory provisions.** Chemerinsky, <u>Federal Jurisdiction</u>, 1989, pág. 293.

En particular, respecto a la aplicación del derecho común federal cuando existe un interés propietario de los Estados Unidos, Chemerinsky explica:

> [F]ederal common law has developed where the Supreme Court has decided that federal rules are "necessary to protect uniquely federal interests." Included in this category is the creation of federal common law to protect federal proprietary interests in cases involving the United States government…. Chemerinsky, op. cit., pág. 297.

Véase además, J.P. Ludington, <u>The Supreme Court and the Post-Erie Federal Common Law</u>, 31 L.Ed. 2d 1006.

estatal de California, con la consecuencia de que las accesiones serían de los Estados Unidos, en virtud de los derechos reconocidos bajo el derecho común federal a los dueños del litoral o parcelas colindantes. California ex rel. State Lands Commission v. United States, supra, pág. 284.

Sin embargo, esta norma de derecho común federal sólo se refiere a las accesiones **paulatinas o imperceptibles** causadas natural o artificialmente. Específicamente, el Tribunal Supremo federal definió la accesión que estaba en controversia en California ex rel. State Lands Commission v. United States, supra, de la siguiente manera: "**gradual process** by which sand accumulated along the shore, although caused by a jetty affecting the action of the sea." (Énfasis nuestro) *Id.,* pág. 287. Véase, United States v. State of Washington, 294 F. 2d 830 (1961). Ahora bien, según indica el Tribunal de Apelaciones de los Estados Unidos para el Tercer Circuito en Alexander Hamilton v. Government of Virgin Islands, 757 F.2d 534 (1985): "there is a distinct body of common law relating to the ownership of artificially created fastlands". *Id.,* págs. 538-539. Específicamente, el derecho común federal ha establecido que el propietario costero no obtiene la propiedad sobre los terrenos resultantes del **relleno** de terrenos sumergidos, por el mero acto de depositar o causar el depósito de dicho relleno. Véase, State of New Jersey v. State of New York, 523 U.S. 767 (1998); Georgia v. South Carolina, 497 U.S. 376 (1990); Marine Railway & Coal Company, Inc. v. United States, 257 U.S. 47 (1921); Alexander Hamilton v. Government of Virgin

Islands, supra, 538-539; Burns v. Forbes, 412 F. 2d 995 (1969).

En el caso de Alexander Hamilton v. Government of Virgin Islands, supra, el Tribunal apelativo federal discutió a mayor profundidad esta norma y señaló que el propietario costero adquirirá el título sobre el terreno **cuando lleva a cabo el relleno con la debida autorización**. Específicamente, el tribunal explica lo siguiente:

> Where the reclamation and filling of the adjacent shore or submerged soil was expressly permitted by legislative enactment, or was authorized by a statute fixing a bulkhead, harbor, or dock line, or similar statute, or by a valid license or permit or by local common law, it has usually been held or recognized that filled land created by a riparian or littoral proprietor belongs to him as part of the upland, at least where the public rights with respect to navigation and commerce are not substantially impaired. *Id.*, pág. 546. Véase, United States v. Groen, 72 F. Supp. 713 (1947). Véase además, B.H. Glenn, Rights to land created at water's edge by filling or dredging, sección 2[b], 91 A.L.R.2d 857.

El tribunal aclara que esta norma no aplicará si el permiso o autorización dispone expresamente que el propietario original **de los terrenos sumergidos** retendrá la titularidad de éstos una vez se lleven a cabo las obras de relleno. Sobre esta situación, el tribunal apelativo federal explica lo siguiente:

> [T]he rationale behind this common law rule is that one who obtained permission to improve his property should be able to rely on the government's expression of approval for the knowledge that he will become the owner in fee simple of any such improvements. Given an express provision in the instrument of authorization to the contrary, however, that landowner is no longer entitled to rely on the authorization for the transfer of property rights. Alexander Hamilton v. Government of Virgin Islands, supra, pág. 547.

Según el expediente del caso que nos ocupa, el gobierno federal obtuvo los permisos necesarios para llevar a cabo

las obras de relleno en los terrenos sumergidos aledaños al "Coast Guard Parcel". Además, ninguno de los permisos otorgados expresó que el gobierno de Puerto Rico retendría sobre esos terrenos el dominio que era suyo desde 1917. Por eso, **según el derecho común federal aplicable al momento en que se rellenaron los terrenos, éstos pasaron a ser propiedad del Departamento de la Marina de los Estados Unidos y estuvieron sujetos a la jurisdicción federal durante alrededor de 50 años (1941–1991).**

**IX- Adquisición de los terrenos ganados al mar aledaños al "Coast Guard Parcel" por el Gobierno de Puerto Rico**

En 1973, el Departamento de la Marina de los Estados Unidos transfirió el "Coast Guard Parcel" a la Guardia Costanera de los Estados Unidos. Véase, "Disposal Report No. 439" de 28 de septiembre de 1973. El 21 de mayo de 1990, en respuesta a una solicitud de información del gobierno de Puerto Rico sobre la titularidad de esa parcela, la Administración de Servicios Generales le envió ciertos estudios de título y un memorando de la Guardia Costanera de los Estados Unidos en el que se concluye que el gobierno federal era dueño de los terrenos ganados al mar en dicha parcela desde 1941.

El 20 de julio de 1990 el Gobernador de Puerto Rico para esa fecha, Hon. Rafael Hernández Colón, escribió al Presidente de los Estados Unidos solicitándole que, según la autoridad conferida a éste por la sección 7 de la Ley de Relaciones Federales, supra, cediera el "Coast Guard Parcel"

y los terrenos sumergidos aledaños a ésta al gobierno de Puerto Rico, ya que la Guardia Costanera de los Estados Unidos la había desalojado y la Administración de Servicios Generales de los Estados Unidos tenía planes de venderla.[72]

El 4 de septiembre de 1990, el gobierno de los Estados Unidos contestó la petición del Gobernador de Puerto Rico informándole que la Administración de Servicios Generales no le cedería el "Coast Guard Parcel" al gobierno de Puerto Rico, sino que estaba en disposición de vendérsela. La carta indica lo siguiente:

> The relocation and sale of the San Geronimo Housing Area will be highly beneficial to the Commonwealth of Puerto Rico and the Federal Government. We would like to continue negotiations with the Commonwealth for the purchase of this property as soon as possible. **Otherwise, we have no choice but to offer the property for sale to the general public on a competitive bid basis.** (Énfasis nuestro).

El 4 de octubre de 1990, el entonces Secretario del Departamento de Justicia de Puerto Rico, licenciado Héctor Rivera Cruz, le informó a la Administración de Servicios Generales que el gobierno de Puerto Rico presentaría una demanda contra los Estados Unidos para lograr que el "Coast Guard Parcel" y los terrenos ganados al mar adyacentes a ésta fueran cedidos a Puerto Rico, según la sección 7 de la Ley de Relaciones Federales, supra. Esto, con el fin de evitar que el gobierno federal vendiera la parcela a una

---

[72] En lo pertinente, la sección 7 de la Ley de Relaciones Federales, supra, dispone lo siguiente:

> Disponiéndose, que el Presidente podrá de tiempo en tiempo, a su discreción, traspasar al Pueblo de Puerto Rico aquellos terrenos, edificios o intereses en terrenos u otras propiedades pertenecientes en la actualidad a los Estados Unidos y dentro de los límites territoriales de Puerto Rico, que a su juicio no se necesiten ya para propósitos de los Estados Unidos. *Id.*

tercera persona, según lo había advertido en la carta del 4 de septiembre de ese año.

El gobierno federal respondió a la carta del Secretario de Justicia de Puerto Rico el 16 de noviembre de 1990, recomendando que se llevaran a cabo negociaciones para llegar a un acuerdo aceptable a ambas partes. El 14 de febrero de 1991, un memorando interno de la Oficina del Gobernador de Puerto Rico que consta en autos indica al Gobernador Hernández Colón que al gobierno de Puerto Rico le convenía más comprar la parcela que envolverse en un litigio sobre titularidad. En cuanto a esto, el memorando expresa lo siguiente:

> [E]l ELA no podrá adquirir dicha propiedad litigando ya que aunque el Tribunal Federal interprete la ley a favor nuestro, los Estados Unidos podrían derrotar nuestro propósito ubicando en dichas facilidades algún personal o equipo del Coast Guard, aunque éste sea ínfimo.
> Aunque este asunto había sido discutido previamente con usted, traigo nuevamente a su atención el mismo. En tasación hecha por la Administración de Terrenos, se valoró la propiedad en 10.73 millones. La oferta inicial de GSA era de 6.8 millones. Ante esta situación, sugiero se autorize [sic] al licenciado Pérez [para entonces Secretario de Justicia] a negociar con GSA un descuento de 50% de nuestro precio de tasación; lo que equivaldría aproximadamente a unos 5 millones.

El 22 de agosto de 1991, la Administración de Terrenos de Puerto Rico notificó al gobierno federal que compraría la propiedad para beneficio del Pueblo de Puerto Rico. En dicha comunicación el gobierno de Puerto Rico afirmó que la adquisición de los terrenos serviría al interés público asegurando un buen manejo de la propiedad y la protección de la zona costera. Además, señaló que la Administración de Terrenos planificaba el manejo público de la propiedad y no

la venta o traspaso a personas privadas. Específicamente, la

carta expresó lo siguiente:

> The Puerto Rico Land Administration, an agency of the
> Commonwealth of Puerto Rico, is purchasing the San
> Geronimo property **for the benefit of the people of the
> Commonwealth. The public interest will be served by
> ensuring controlled management of the property and
> shoreline protection.**
> The Land Administration at this time envisions **public
> management** of the property and has not selected a private
> firm for any future development. (Énfasis nuestro).

Para determinar el efecto de esta transferencia sobre la

titularidad de los terrenos, debemos acudir una vez más a la

jurisprudencia federal. En el caso de Oregon ex rel. State

Land Board v. Corvallis Sand & Gravel Co., 429 U.S. 363

(1977), el Tribunal Supremo federal resolvió que una vez el

interés federal sobre una propiedad se ha extinguido de

acuerdo a las leyes de los Estados Unidos, dicha propiedad

estará sujeta al derecho estatal. Al respecto, el tribunal

explica lo siguiente:

> We hold the true principle to be this, that whenever the
> question in any Court, state or federal, is whether a
> title to land which has once been property of the United
> States has passed, that question must be resolved by the
> laws of the United States; **but that whenever, according to
> these laws, the title shall have passed, then that
> property, like all other property in the state, is subject
> to state legislation; so far as that legislation is
> consistent with the admission that the title passed and
> vested according to the laws of the United States.**
> (Énfasis nuestro) Oregon ex rel. State Land Board v.
> Corvallis Sand & Gravel Co., supra, pág. 377 [citando a
> Wilcox v. Jackson, 13 Pet. 498, 517 (1839)].[73]

---

[73] En California ex rel. State Lands Commission v. United
States, 457 U.S. 273 (1982), el Tribunal Supremo federal
estableció una distinción entre ese caso y el de Oregon ex
rel. State Land Board v. Corvallis Sand & Gravel Co., 429
U.S. 363 (1977), basándose en que en Corvallis, la
controversia giraba en torno a un terreno que colindaba con
el lecho de un río que el gobierno federal había
patentizado, mientras que en California ex. rel., se trataba
de una parcela costera que aún era propiedad del gobierno
federal. Además, el Supremo federal distinguió la norma de
Corvallis de aquellas controversias que se refieran a una

CT-2008-04                                                        33

Según lo requiere esta norma federal el contrato de compraventa celebrado entre ambos gobiernos el 21 de noviembre de 1991 se redactó conforme a las exigencias de las leyes y regulaciones de los Estados Unidos. Así lo indica expresamente el contrato en una de sus cláusulas que dispone lo siguiente: "the parties hereto desire to consumate the sale **in accordance with applicable law and regulation of the United States of America**". (Énfasis nuestro). El precio de compraventa fue 4.8 millones de dólares, menos de la mitad del valor de tasación, según informado en el memorando al Gobernador Hernández Colón antes citado.

A través de este contrato el gobierno federal cedió al gobierno de Puerto Rico todo derecho, título e interés sobre la propiedad. De esa forma, **el interés federal sobre los terrenos ganados al mar aledaños al "Coast Guard Parcel" desapareció conforme a las leyes y regulaciones de los Estados Unidos y dichos terrenos entraron a nuestra jurisdicción**. En particular, entraron a nuestra jurisdicción bajo la administración de la Rama Ejecutiva de nuestro gobierno.

Una vez los terrenos ganados al mar aledaños al "Coast Guard Parcel" entraron a la administración de Puerto Rico,

_____

propiedad costera patentizada por el gobierno federal. Esto, según explica el Juez Rehnquist en su opinión concurrente en California ex rel. State Lands Commission v. United States, supra, pág. 290 (a la que se unieron los Jueces Stevens y O'Connor) se hizo a modo de dicta, pues el terreno en controversia en California ex. rel., era propiedad de la Guardia Costanera de los Estados Unidos, lo cual hacía innecesario referirse a terrenos patentizados por el gobierno federal. Por lo tanto, dicha distinción no era pertinente al caso.

**la Rama Ejecutiva del gobierno de Puerto Rico tenía la obligación de administrarlos según el derecho aplicable en nuestra jurisdicción**, conforme explicó el Tribunal Supremo federal en el caso de <u>Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.</u>, supra. Decidir lo contrario nos llevaría a concluir que el derecho de los Estados Unidos continúa vigente sobre unos terrenos costeros que hace diecisiete años fueron liberados del interés federal.

Veamos entonces cuál era el derecho aplicable a los terrenos ganados al mar en controversia al momento en que éstos entraron a nuestra jurisdicción.

En primer lugar, sabemos que las leyes de puertos vigente en Puerto Rico cuando se llevaron a cabo las obras de relleno en 1941 no regularon la titularidad de los terrenos, pues según ya explicamos, en aquel momento los terrenos ganados al mar estaban bajo la jurisdicción federal y el derecho aplicable era el de los Estados Unidos. Nótese que la desafectación de estos terrenos en 1941 ocurrió en protección del interés federal, acorde al ordenamiento jurídico de dicha jurisdicción.

En 1991, cuando se traspasan los terrenos a la jurisdicción de Puerto Rico, la ley aplicable vigente era la Ley de Puertos de 1968, Ley de Muelles y Puertos de Puerto Rico de 1968, 23 L.P.R.A. secs. 2101-2801. Según ésta, los siguientes bienes inmuebles son bienes de dominio público, ya que están incluidos en la **zona marítimo terrestre**:

> [E]l espacio de las costas de Puerto Rico que baña el mar en su flujo y reflujo, en donde son sensibles las mareas, y las mayores olas en los temporales en donde las mareas no son sensibles, **e incluye los terrenos ganados al mar** y las márgenes de los ríos hasta el sitio en que sean

navegables o se hagan sensibles las mareas; y el término, sin condicionar, significa la zona marítima terrestre de Puerto Rico. (Énfasis nuestro). Art. 1, sec. 1.03 de la Ley de Puertos de 1968, 23 L.P.R.A. sec. 2103.

Se desprende de esta disposición, que bajo la Ley de Puertos de 1968 los terrenos ganados al mar son bienes de dominio público.

En segundo lugar, según el Reglamento de zonificación especial del Condado de 1986, Reg. núm. 3319 del 7 de junio de 1986, el "Coast Guard Parcel" se zonificó como una **zona pública y/o recreativa (P)**. Sec. 2.02 del Reglamento de Zonificación Especial del Condado, supra. **Por lo tanto, al momento de entrar a nuestra jurisdicción, el "Coast Guard Parcel" tenía una zonificación de zona pública o recreativa y los terrenos ganados al mar aledaños a ésta eran bienes de dominio público, según la Ley de Puertos de 1968, supra.**

La opinión mayoritaria concluye que el que se adquirieran los terrenos ganados al mar en controversia en este caso mediante contrato de compraventa con los Estados Unidos conlleva, de por sí, el que dichos terrenos pasaran a ser patrimoniales del Estado y que por lo tanto, se requería un acto afirmativo de afectación al dominio público para que dejaran de serlo. Por el contrario, al extinguirse el interés federal y aplicar por primera vez nuestro ordenamiento a los terrenos ganados al mar aledaños al "Coast Guard Parcel", la Ley de Puertos de 1968 estableció una afectación expresa al dominio público sobre dichos terrenos, que, como veremos en la parte XI de esta opinión, sólo podía derrotarse por un acto legislativo de

desafectación.[74] Además, las cartas, memorandos y el propio contrato de compraventa demuestran que el gobierno de Puerto Rico optó por comprar porque según las leyes, reglamentos y exigencias de la jurisdicción federal, no tenía otra forma de adquirir estos terrenos. El contrato de compraventa entre los gobiernos de Estados Unidos y Puerto Rico fue sólo el instrumento formal a través del cual el gobierno federal aceptó ceder su interés sobre los terrenos en controversia. Por eso, según ya explicamos, desde que nuestro gobierno adquirió los terrenos ganados al mar cumpliendo con las condiciones establecidas por las leyes y reglamentos federales, dichos terrenos están sujetos a nuestro ordenamiento. De esa forma, les aplica la afectación de bienes de dominio público que establece la Ley de Puertos de 1968, supra. Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co., supra, pág. 377 [citando a Wilcox v. Jackson, 13 Pet. 498, 517 (1839)].

Se desprende claramente del expediente que durante todo el proceso de negociación con el gobierno federal el gobierno de Puerto Rico tuvo la intención de dedicar los terrenos adquiridos al uso público y protección de las costas. Dicha intención se evidencia específicamente en la carta enviada por la Administración de Terrenos al gobierno federal el 22 de agosto de 1991, en la que informó lo siguiente:

> The Puerto Rico Land Administration, an agency of the Commonwealth of Puerto Rico, is purchasing the San Geronimo property **for the benefit of the people of the Commonwealth. The public interest will be served by ensuring controlled management of the property and shoreline protection.**

---

[74] En vista de lo anterior, no es correcto aseverar que la aplicación de la Ley de Puertos de 1968 es retroactiva.

The Land Administration at this time envisions **public management** of the property and has not selected a private firm for any future development. (Énfasis nuestro).

Abona a nuestra conclusión el que la reglamentación vigente a la fecha de la adquisición zonificara al "Coast Guard Parcel" como una zona pública y/o recreativa (P). Sin embargo, la opinión mayoritaria concluye que el expediente no provee evidencia que demuestre que al momento de la adquisición el gobierno de Puerto Rico destinase los terrenos a un uso público determinado.

Abordemos ahora la controversia sobre la titularidad de los terrenos ganados al mar en la segunda parcela objeto de este litigio, la parcela conocida como "Condado Bay Parcel". Para ello, debemos remontarnos nuevamente a la Proclama Presidencial de 1929, a través de la cual el gobierno federal cedió las parcelas colindantes a dichos terrenos al gobierno de Puerto Rico.

**X-   El dominio sobre los terrenos ganados al mar en el "Condado Bay Parcel"**

Según explicamos en la parte III y VI de esta opinión, el 26 de agosto de 1929, el Presidente de los Estados Unidos emitió una proclama mediante la cual traspasó al Pueblo de Puerto Rico todo derecho, título e interés de los Estados Unidos sobre los terrenos de la Reserva Naval San Jerónimo, incluyendo los arrendados al señor Virgil Baker. Posteriormente, el Hotel Caribe Hilton fue construido en parte de estos terrenos.

En 1949 el gobierno de Puerto Rico presentó una demanda de expropiación, con el fin de recuperar aquellos terrenos sobre los cuales el señor Baker mantenía control en calidad

de arrendatario, aunque el título de propiedad sobre ellos había pasado al gobierno de Puerto Rico mediante cesión en 1929. En la demanda de expropiación el gobierno de Puerto Rico alegó lo siguiente:

> Que el interés que El Pueblo de Puerto Rico se propone adquirir en la propiedad objeto de este procedimiento es el **uso y disfrute de la misma durante el término del arrendamiento otorgado al señor Virgil Baker** y su esposa Stella May Baker, por el Secretario interino de la Marina de los Estados Unidos, Theodore Roosevelt, el día 15 de julio de 1921, ahora subarrendada a la San Gerónimo Development Co. Inc. (Énfasis nuestro).

El 28 de agosto de 1956 el gobierno de Puerto Rico compensó al señor Baker y obtuvo todos los derechos sobre la propiedad.

En la década de los cincuenta la Compañía de Fomento Industrial de Puerto Rico decidió ampliar el Hotel Caribe Hilton, para lo cual presentó una Consulta de Ubicación ante la Junta de Planificación de Puerto Rico. El 22 de junio de 1955, la Junta de Planificación aprobó la consulta y, entre otras cosas, autorizó que se rellenaran los terrenos sumergidos aledaños a la parcela que los Estados Unidos había arrendado al señor Baker y que fue cedida al gobierno de Puerto Rico en 1929. **Los terrenos así rellenados o ganados al mar constituyen la parcela denominada "Condado Bay Parcel".** Hoy día, se construye parte del proyecto en controversia, Paseo Caribe, sobre dicha parcela. Por lo tanto, es necesario analizar la titularidad de estos terrenos según el derecho aplicable al "Condado Bay Parcel" al momento en que se llevaron a cabo las obras de relleno en la década de los cincuenta.

Nuestro derecho sobre los bienes de dominio público marítimo terrestres proviene del Derecho romano y el Derecho civil español. Por esto, debemos examinar en cierto detalle las políticas públicas a las que responden estas normas jurídicas en las que se basa nuestro ordenamiento.

En el Derecho romano, el mar y sus riberas eran cosas comunes que pertenecían a todas las personas en general y a ninguna en particular. Esto, contrario a las cosas públicas que pertenecían al Estado y eran destinadas al uso público. Martínez Escudero explica:

> Las riberas del mar no son en el Derecho romano, como hemos visto, cosas públicas, sino cosas comunes, cuya naturaleza jurídica es diferente. En efecto, las *res comunes omnium* no pertenecen al *populus romanus*, como las *re publicae*, ni a las ciudades, como las *res universitatis*, sino son cosas que por su *ius gentium* pertenecen a todos los hombres en general y a ninguno en particular. L. Martínez Escudero, Playas y Costas: su Régimen Jurídico Administrativo, 2da ed., Madrid, Editorial Montecorvo S.A., 1985, págs. 28-29.

Fundamentándose en el Derecho romano, la Ley III del Título XXVIII de la Partida III de las Siete Partidas, establece que el mar y sus riberas son cosas comunes. En lo pertinente, dicha ley dispone:

> Las **cosas que comunalmente pertenecen a todas las criaturas** que biuen eneste mundo son estas, el ayre, e las aguas dela lluvia, e **el mar, e su ribera**. (Énfasis nuestro). I. Miralles González, Dominio público y propiedad privada en la nueva Ley de Costas, 1ra ed., España, Editorial Civitas, S.A., 1992, pág. 21. Véase, L. Martínez Escudero, op. cit., págs. 30-33.

El Derecho civil español moderno se apartó de esta doctrina cuando clasificó el mar litoral, la zona marítima y las playas como bienes de dominio público bajo la Ley de Aguas del 3 de agosto de 1866 (Ley de Aguas de 1866), Colección Legislativa de España, Madrid, 1866, Tomo 106, 2da parte,

pág. 294. Véase, I. Miralles González, op. cit., pág. 24.

Según los artículos 1 y 4 de dicha ley, las costas,
fronteras marítimas, mar litoral, zona marítima, las playas,
los terrenos sumergidos bajo éstos y las accesiones o
aterramientos que ocasionara el mar son bienes de dominio
público. Adviértase que esta clasificación no incluyó los
terrenos ganados al mar.[75]

En Rubert Armstrong v. E.L.A., supra, explicamos que la
exposición de motivos de la Ley de Aguas de 1866 caracterizó
a los bienes de dominio público como bienes **inalienables e
imprescriptibles**. En particular, citamos el siguiente
fragmento de la exposición de motivos de la ley:

---

[75] Los artículos 1 y 4 de la Ley de Aguas de 1866 disponen lo
siguiente:

**Artículo 1º** Son de dominio nacional y uso público
1º Las **costas o fronteras marítimas** del territorio
español, con sus obras, ensenadas, calas, radas, bahías y
puertos.
2º El **mar litoral, ó bien la zona marítima** que ciñe las
costas, en toda la anchura determinada por el derecho
internacional. En esta zona dispone y arregla el Estado la
vigilancia y los aprovechamientos, así como el derecho de
asilo e inmunidad, conforme á las leyes y á los tratados
internacionales.
3º **Las playas.** Se entiende por playa el espacio que
alternativamente cubren y descubren las aguas en el
movimiento de la marea. Forma su límite interior ó
terrestre la línea hasta donde llegan las más altas mareas
y equinocciales. Donde no fueren sensibles las mareas,
empieza la playa por la parte de tierra en la línea a
donde llegan las aguas en las tormentas ó temporales
ordinarios. (Énfasis nuestro) Art. 1 de la Ley de Aguas de
1866, supra, págs. 294-295

**Artículo 4º** Son del dominio público los terrenos que se
unen á las playas por las **accesiones y aterramientos que
ocasione el mar**. Cuando ya no los bañen las aguas del mar,
ni sean necesarios para los objetos de utilidad pública,
ni para el establecimiento de especiales industrias, ni
para el servicio de vigilancia, el Gobierno los declarará
propiedad de los dueños de las fincas colindantes en
aumento de ellas. (Énfasis nuestro) Art. 4 de la Ley de
Aguas de 1866, supra, pág. 295.

Por **dominio público** de la Nación entiende al que a ésta compete sobre **aquellas cosas cuyo uso es común por su propia naturaleza o por el objeto a que se hallan destinadas**; tales son, por ejemplo, *las playas, ríos*, caminos, muelles y puertos públicos; su *carácter principal es* ser ***inenajenable e imprescriptible***. Y por dominio particular del Estado entiende el que a éste compete sobre aquellas cosas destinadas a su servicio, o sea, a la satisfacción de sus necesidades colectivas, *y no al uso común*, cosas de las que dispone como los particulares de las que constituyen su patrimonio: tales son, entre otras muchas, los *montes*, minas, arsenales, fortalezas y edificios militares.
[…]
Al declarar también del dominio público de la Nación las playas, se ha creído conveniente restablecer la disposición de nuestras antiguas leyes que de acuerdo con las romanas, les fijaban por límite aquel donde alcanzan las olas del mar en su temporales ordinarios, espacio bastante para las necesidades de la navegación y pesca; y en vez de la zona contigua de 20 varas, que después se ha considerado como ensanche de aquellas, se establecen sobre las heredades limítrofe las servidumbres de salvamento y vigilancia, con las cuales quedan suficientemente atendidos los intereses de la navegación en casos de naufragios, y los de la Hacienda pública para vigilancia de las costas, sin necesidad de *condenar a perpetua esterilidad* terrenos que en algunas comarcas son susceptibles de cultivo. (Énfasis nuestro). *Id.*, pág. 620.

Según se desprende de la exposición de motivos de la Ley de Aguas de 1866, el propósito de la normativa española era sustraer los bienes de dominio público marítimo terrestres del comercio de las personas, ya que dichos bienes satisfacen necesidades colectivas y sustentan el bienestar común. Sin embargo, el propio esquema normativo permitía la apropiación de estos bienes bajo circunstancias que <u>en aquél momento histórico lo justificaban</u>. Explica Mª del Pino Rodríguez González en cuanto a esto:

Dentro del Derecho positivo español, fue la Ley de Aguas de 3 de agosto de 1866 la primera norma que reguló con carácter general las aguas marítimas y terrestres, y la que dio comienzo a la citada tendencia expansiva. En todo caso, incluyó dentro del dominio público marítimo-terrestre las costas o fronteras marítimas del territorio español con sus abras, ensenadas, calas, bahías y puertos; el mar litoral (hoy denominado mar territorial); las playas (sustituyendo este término al de ribera del mar

utilizado primero por el Derecho romano y luego por Las Partidas), pero para referirse a la zona bañada por el flujo y reflujo del mar, definición que coincide en términos generales con el concepto de zona marítimo-terrestre acogido luego en las Leyes de Puertos de 1880 y 1928; así como, finalmente, los terrenos que se unen a las playas por accesiones o aterramientos ocasionados por el mar. **No obstante, también esta norma, tras declarar el uso público de todos estos bienes, admitió la posibilidad de que los particulares fueran propietarios de las marismas y fincas colindantes con el mar o con sus playas o que adquirieran los terrenos ganados al mar mediante las obras de desecación de marismas propiedad del Estado o comunales.** (Énfasis nuestro) J.V. González García y otros, Derechos de los Bienes Públicos, 1ra ed., Valencia, Tirant Lo Blanch, 2005, pág. 135.

Un ejemplo de este esquema privatizador es el artículo 5 de la Ley de Aguas de 1866, supra, que dispone lo siguiente respecto a los terrenos ganados al mar:

Los **terrenos ganados al mar** por consecuencia de obras construidas por el Estado ó por las provincias, pueblos ó particulares competentemente autorizados, **serán de propiedad de quien hubiere construido las obras**, á no haberse establecido otra cosa en la autorización. (Énfasis nuestro) Art. 5 de la Ley de Aguas de 1866, supra, pág. 295.

Se colige de este artículo, que aunque el propósito de la ley era que los bienes de dominio público no estuvieran sujetos al tráfico comercial, el propio esquema legislativo permitía que los terrenos sumergidos fueran privatizados a través de obras competentemente autorizadas que tuvieran como resultado ganar dichos terrenos al mar.

Posteriormente, España promulgó la Ley de Puertos de 1880, a la que hemos hecho referencia. Esta adoptó una clasificación de bienes de dominio público similar a la de la ley de 1866 y utilizó por primera vez el término jurídico de **zona marítimo terrestre.** Los terrenos ganados al mar no fueron incluidos bajo esta clasificación de bienes. Al

respecto, los artículos 1 y 2 de la ley establecen lo

siguiente:

**Artículo 1º** Son de dominio nacional y uso público, sin perjuicio de los derechos que correspondan á los particulares:

1° La **zona marítimo-terrestre**, que es el espacio de las costas o fronteras marítimas del territorio español que baña el mar en su flujo y reflujo, en donde son sensibles las mareas, y las mayores olas en los temporales, en donde no lo sean.

Esta zona marítimo-terrestre se extiende tambien [sic] por las márgenes de los ríos hasta el sitio en que sean navegables ó se hagan sensibles las mareas.

2° El **mar litoral, ó bien la zona marítima** que ciñe las costas ó fronteras de los dominios de España, en toda la anchura determinada por el derecho internacional, con sus ensenadas, radas, bahías, puertos y demás abrigos utilizables para la pesca y navegación. En esta zona dispone y arregla el Estado la vigilancia y los aprovechamientos, así como el derecho de asilo e inmunidad, conforme todo á las leyes y á los Tratados internacionales. (Énfasis nuestro) Art. 1 de la Ley de Puertos española de 1880, supra, págs. 787-788.

**Artículo 2º** Son del dominio público los terrenos que se unen á la zona marítimo-terrestre por las **accesiones y aterramientos que ocasione el mar.** Cuando, por consecuencia de estas accesiones, y por efecto de retirarse el mar, la línea interior que limita la expresada zona avance hacia aquél, los terrenos sobrantes de lo que era antigua zona marítimo-terrestre pasarán á ser propiedad del Estado, prévio el oportuno deslinde de los Ministerios de Hacienda, Fomento y Marina, y el primero podrá enajenarlos cuando no se consideren necesarios para servicios marítimos ú otros de utilidad pública. Si se enajenasen con arreglo á [sic] las leyes, se concederá el derecho de tanteo á los dueños de los terrenos colindantes. (Énfasis nuestro) Art. 2 de la Ley de Puertos española de 1880, supra, pág. 788.

Esta ley de 1880 tuvo el propósito de desarrollar y

explotar las zonas portuarias, por lo que no cambió

significativamente el esquema privatizador que existía bajo

la Ley de Aguas de 1866. Sobre esto, la tratadista Miralles

González expresa lo siguiente:

La Ley de Puertos del 7 de mayo de 1880 **vino a regular a modo supletorio la falta de legislación suficiente en la materia.** Esta ley, como es obvio de su propia denominación, se centraba en la construcción y explotación de las infraestructuras portuarias, por lo que sólo

tangencialmente incidía en el tema que nos ocupa. No obstante, **la definición que dio en su artículo 1 de la "zona marítimo-terrestre" se convirtió en clásica y su referencia en obligado hito legislativo** a partir del cual se incluían como pertenecientes al dominio público las riberas. (Énfasis nuestro) I. Miralles González, op. cit., pág. 25.

La Ley de Puertos de 1880 no incluyó la norma establecida en el artículo 5 de la Ley de Aguas de 1866 según la cual los terrenos ganados al mar mediante obras realizadas con autorización competente eran propiedad de quien las hubiera realizado. Sin embargo, reguló los terrenos ganados al mar en los puertos de forma cónsona a dicho artículo, pues reconoció que algunos de estos terrenos pudieran ser propiedad del concesionario al disponer lo siguiente:

En las concesiones de obras en los puertos con las cuales se ganen terrenos al mar, se exceptuará siempre de **los que se reconozcan de propiedad del concesionario** la parte necesaria para la zona de servicio á que se refiere el artículo 31, la cual quedará de propiedad del Estado. (Énfasis nuestro) Art. 57 de la Ley de Puertos de 1880, supra.

Con relación a los terrenos ganados al mar en zonas no portuarias, el 20 de agosto de 1883 España adoptó por Real orden la Instrucción para tramitar las concesiones a particulares bajo la Ley de Puertos de 1880 (en adelante, Instrucción de la Ley de Puertos de 1880), Colección Legislativa de España , Madrid, 1884, Tomo 131, 2da parte, pág. 390. Según la Instrucción, los terrenos ganados al mar fuera de zonas portuarias serían propiedad de quien hubiere realizado las obras con autorización competente, de forma consistente con el esquema privatizador ya establecido bajo

el artículo 5 de la Ley de Aguas de 1866.[76] La doctrina

española aplicó e interpretó la Ley de Puertos de 1880,

supra, de forma cónsona a la instrucción. En cuanto a esto,

Tomás Quintana López indica que:

> La antigua Ley de Aguas de 1866 ya sancionó en su artículo
> 5 esta solución, posteriormente aceptada por la normativa
> reguladora de las aguas marítimas, reparando cada una de
> las normas siguientes en la circunstancia de que las obras
> para ganar terreno al mar se realicen fuera o dentro de
> los puertos.
> […]
> Con posterioridad a la genérica privatización de los
> terrenos ganados al mar que contempla nuestra primera Ley
> de Aguas, es una norma de rango reglamentario –**Real Orden
> de 20 de agosto de 1883**– **la que individualiza las obras
> realizadas fuera de los puertos para atribuir la propiedad
> de los terrenos ganados al mar mediante ellas a quien las
> hubiere realizado. La privatización de estos terrenos se
> mantiene en los Reglamentos de Puertos de 1912 y 1928,**
> que, sin perturbar el principio, demanializan una zona de
> aquéllos para destinarla a la vigilancia del litoral.
> (Énfasis nuestro) T. Quintana López, <u>La privatización de
> los terrenos de que ha sido desalojado el mar</u>, 111 R.A.P.
> 373, 384 (1986).

De igual manera, Martínez Escudero reitera lo siguiente:

> La Ley de Aguas de 1866, en su artículo 5°, estableció que
> ‹‹los terrenos ganados al mar por consecuencia de obras
> construidas por el Estado o por las provincias, pueblos o

---

[76] El artículo 22 de la instrucción estableció lo siguiente
respecto a los terrenos ganados al mar en y fuera de los
puertos:

> Los terrenos ganados al mar litoral **fuera de los puertos**
> con obras construídas por el Estado, las provincias, los
> Municipios ó los particulares, competentemente
> autorizados, serán de **propiedad** de la entidad que los
> hubiere llevado á cabo.
> En las concesiones de obras **dentro de los puertos**, en las
> cuales se ganan terrenos al mar, sólo se reconocerá de
> propiedad de los concesionarios la parte que no ocupe la
> zona de servicio, á que se refiere el art. 31 de la ley, y
> fuera de ella no resulte destinada á vías y servicios
> públicos en el estudio de los terrenos sobrantes, así de
> los ya existente como de los ganados al mar, para
> distribuirlos en relación al ensanche de las poblaciones y
> á su enlace con los puertos; estudio que ha de aprobarse
> antes del otorgamiento de la concesión, oyendo á los
> respectivos Ayuntamientos, y que ha de acompañar á todo
> proyecto de puerto. Art. 22 de la Instrucción de la Ley de
> Puertos española de 1880, supra.

particulares competentemente autorizados, serán de propiedad de quien hubiera construido las obras, a no haberse establecido otra cosa en la autorización.

En cambio, la Ley de Puertos de 1880 solamente se refiere –art. 57– a los terrenos ganados al mar dentro de los puertos, omitiendo la referencia a los terrenos ganados al mar fuera de los puertos, criterio seguido fielmente por la Ley de Puertos de 1928.

**La laguna legal quedó salvada en los textos reglamentarios, en los que, en efecto, se halla regulada la cuestión de los terrenos ganados al mar tanto dentro como fuera de los puertos. Así: artículo 22 de la Instrucción de 20 de agosto de 1883,** artículo 99 del Reglamento de Puertos de 1912 y artículo 101 del Reglamento de 1928. (Énfasis nuestro) L. Martínez Escudero, op. cit., pág. 147.

Según explicamos en la parte II de esta opinión, a través de la sección 8 de la Ley Foraker, supra, se mantuvieron en vigor las leyes y ordenanzas vigentes en Puerto Rico en el año 1900. Muñoz Díaz v. Corte, supra. Por esto, tanto el Código Civil español de 1889, como la Ley de Puertos española de 1880, supra, extendida a Puerto Rico por Real decreto en 1886 y denominada como la Ley de Puertos para la Isla de Puerto Rico (Ley de Puertos de 1886), supra, mantuvieron su vigencia en la isla luego del traspaso de soberanía en 1898. Rubert Amstrong v. E.L.A., supra. Véase, Olivieri v. Biaggi, supra.

El artículo 2 del Real decreto de la Ley de Puertos de 1886, supra, dispuso que el Ministro de Ultramar dictaría la instrucción para la ejecución de la ley. El 10 de mayo de 1886, cumpliendo con el mandato de este artículo, se adoptó por Real orden la Instrucción del Ministro de Ultramar para implantar la Ley de Puertos de 1886 en Puerto Rico. Colección Legislativa de España, Madrid, 1887, Tomo 136, 2da parte, pág. 1116; Publicada en la Gaceta de Madrid el 19 de mayo de 1886, No. 139, 1886/03882. Veamos entonces cuál era

la fuerza jurídica de la Instrucción de la Ley de Puertos de 1886, de acuerdo al ordenamiento jurídico español vigente en aquél momento, con miras a determinar si mantuvo su vigencia en Puerto Rico luego del traspaso de soberanía en 1898.

Según el artículo 50 de la Constitución Española de 1876, el Rey tenía la potestad de ejecutar las leyes. Además, según el artículo 54 de dicha Constitución, el Rey dictaba los decretos, reglamentos e instrucciones de aplicación general necesarios para la ejecución de las leyes. Los reglamentos e instrucciones así dictados eran Reales decretos o Reales órdenes, dependiendo de la forma en que fueran adoptados para su publicación. Alcubilla, Diccionario de Administración, Madrid, 1887, Tomo 8, págs. 277-278.

Tanto el Real decreto como la Real orden manifestaban y hacían efectiva la voluntad del Rey al implantar las leyes. La diferencia principal entre ambos instrumentos ejecutivos era su formalidad, ya que en el Real decreto hablaba el Rey y en la Real Orden hablaba un Ministro a nombre del Rey sobre asuntos de menos importancia y solemnidad. F. Seix, Enciclopedia Jurídica Española, Barcelona, 1910, Tomo 26, págs. 580, 586. Alcubilla, op. cit., pág. 277. Sobre la fuerza jurídica de un Real decreto y una Real orden, Francisco Seix explica que "a) el Real decreto no puede oponerse á la Constitución, ni derogar una ley; b) un Real decreto no debe ser derogado ni modificado por una Real orden ú otra disposición de inferior categoría formal". (Énfasis nuestro) F. Seix, op. cit., págs. 581-582.

En este caso, la Instrucción de la Ley de Puertos de 1886 fue dictada por el Ministro de Ultramar, quien tenía a su

cargo el despacho de todos los asuntos de las provincias de Ultramar, y fue adoptada por el Rey mediante Real orden. Véase, Alcubilla, Diccionario de Administración, Madrid, 1887, Tomo 7, pág. 382; F. Seix, Enciclopedia Jurídica Española, op. cit., pág. 563.[77] Por lo tanto, según el ordenamiento jurídico de España, la Instrucción de la Ley de Puertos de 1886, supra, tenía fuerza administrativa y según la sección 8 de la Ley Foraker, supra, mantuvo su vigencia en Puerto Rico luego del traspaso de soberanía en 1898, junto a las demás leyes y ordenanzas vigentes en aquél momento histórico.[78]

La Ley de Puertos de 1886, adaptó la clasificación de bienes de dominio público de la Ley de Puertos española de 1880, al contexto puertorriqueño. De esta forma, sus artículo 1 y 2 disponen lo siguiente:

> Artículo 1° Son del dominio nacional y uso público, sin perjuicio de los derechos que correspondan á los particulares:
> 1° La zona marítimo-terrestre, que es el espacio de las costas ó fronteras marítimas de la Isla de Puerto Rico y sus adyacentes que forman parte del territorio español, y que baña el mar en su flujo y reflujo, en donde son sensibles las mareas, y las mayores olas en los temporales en donde no lo sean.
> Esta zona marítimo-terrestre se extiende también por las márgenes de los ríos hasta el sitio en que sean navegables ó se hagan sensibles las mareas.
> 2° El mar litoral ó bien la zona marítima que ciñe las costas de la Isla y sus adyacentes en toda la anchura determinada por el derecho internacional, con sus

---

[77] El Ministerio de Ultramar fue creado por Real Decreto del 20 de mayo de 1863 para atender todos los asuntos de las provincias de Ultramar. Alcubilla, Diccionario de Administración, Madrid, 1887, Tomo 7, pág. 382. Véase, F. Seix, Enciclopedia Jurídica Española, Barcelona, 1910, Tomo 22, pág. 563.

[78] Ejemplo de otra ley y reglamento que mantuvieron su vigencia luego del cambio de soberanía en 1898 son la Ley Hipotecaria y su Reglamento. Giménez et al. v. Brenes, 10 D.P.R. 128, 138 (1906).

ensenadas, radas, bahías, puertos y demás abrigos utilizables para la pesca y navegación. En esta zona dispone y arregla el Estado la vigilancia y los aprovechamientos, así como el derecho de asilo e inmunidad, conforme todo á las leyes y á los Tratados internacionales. (Énfasis nuestro). Art. 1 de la Ley de Puertos de 1886, supra.

**Artículo 2º Son de dominio público los terrenos que se unen á la zona marítimo-terrestre por las accesiones y aterramientos que ocasione el mar.** Cuando por consecuencia de estas accesiones, y por efecto de retirarse el mar la línea interior que limita la expresada zona avance hacia aquél los terrenos sobrantes de lo que era antigua zona marítimo-terrestre, pasarán á ser propiedad del Estado, **previo al oportuno deslinde por el Ministerio de Ultramar**, de acuerdo con el de Marina; y el primero podrá enajenarlos cuando no se consideren necesarios para servicios marítimos ú otros de utilidad pública. Si se enajenasen con arreglo á las leyes, se concederá el derecho de tanteo á los dueños de los terrenos colindantes. (Énfasis nuestro). Art. 2 de la Ley de Puertos de 1886, supra.

La citada clasificación de bienes de dominio público no incluyó los terrenos ganados al mar artificialmente. Respecto a éstos, el artículo 22 de la Instrucción de la Ley de Puertos de 1886, supra, pág. 1124, dispone lo siguiente: "**Los terrenos ganados al mar litoral fuera de los puertos, con obras construidas por el Estado, la provincia, los Municipios ó los particulares, competentemente autorizados, serán de propiedad de la entidad que los hubiere llevado a cabo**". (Énfasis nuestro). A través de este artículo se extendió a Puerto Rico el esquema privatizador iniciado bajo la Ley de Aguas de 1866, que establecía que los terrenos ganados al mar con autorización competente en zonas no portuarias puertorriqueñas, serían propiedad de quien los hubiera creado. Esto, de forma cónsona al esquema jurídico español ya discutido que fue refrendado por la Ley de Puertos española de 1880 y su instrucción. Por esto, la

Instrucción de la Ley de Puertos de 1886 es crucial para la adjudicación de este caso.

En 1928 se adoptó la Ley de Muelles y Puertos de Puerto Rico (Ley de Puertos de 1928), Ley núm. 59 del 30 de abril de 1928. Esta ley mantuvo la clasificación de bienes de dominio público establecida en los artículos 1 y 2 de la Ley de Puertos de 1886. Además, respecto a los terrenos ganados al mar, la sección 47 de la Ley de Puertos de 1928 dispuso que los capitanes de puertos y el Comisionado del Interior tenían la obligación de **conservarlos**. En lo pertinente, la sección 47 dispone:

> Vigilar por sí y con su [sic] auxiliares, por la conservación de los muelles, malecones, terraplenes, y porque tanto éstos como los terrenos públicos que forman la zona marítima y los terrenos agregados a ella o <u>ganados al mar, sean conservados y no sean ocupados sin el consentimiento del Comisionado del Interior</u>. (Énfasis nuestro) Sec. 47 de La Ley de Puertos de 1928, supra.

Este mandato de conservación aplicaba tanto a bienes públicos como a bienes patrimoniales. Por lo tanto, la sección 47 de la Ley de Puertos de 1928 citada no estableció una clasificación de bienes sino que impuso la obligación de proteger, custodiar y mantener dichos bienes acorde a su clasificación.

La Ley de Puertos de 1928 también derogó "[t]oda ley o parte de ley que se oponga a la presente". Sec. 52 de la Ley de puertos de 1928, supra. Veamos entonces si el artículo 22 de la Instrucción de la Ley de Puertos de 1886, que establece que los terrenos ganados al mar en zonas no portuarias son propiedad de quien los haya creado con autorización competente, se puede reconciliar con la sección 47 de la Ley de Puertos de 1928. Hacemos este ejercicio

concientes de nuestro deber de armonizar las disposiciones legales sobre una misma materia. Garriga, Jr. V. Tribunal Superior, 88 D.P.R. 245, 248 (1963), Correa Suárez v. Junta Retiro para Maestros, 88 D.P.R. 590, 598 (1963). En este sentido, salta a la vista que si bien ambas disposiciones versan sobre los terrenos ganados al mar, el artículo 22 de la Instrucción de la Ley de Puertos de 1886, se refiere a la **titularidad** y la sección 47 de la Ley de puertos de 1928, a la **conservación** de dichos terrenos. De esta forma, el mandato de conservación de los terrenos ganados al mar que encontramos en la sección 47 de la Ley de Puertos de 1928 se puede reconciliar con el artículo 22 de la Instrucción de la Ley de Puertos de 1886, que establece que la titularidad de los terrenos ganados al mar en zonas no portuarias y con autorización competente, será de quien los haya creado.

Además, la Ley de Puertos de 1928 no alteró la clasificación de bienes de dominio público que establece la Ley de Puertos de 1886. Según ya discutimos en la opinión, esta clasificación no incluye los terrenos ganados al mar. Por el contrario, la Ley de Puertos de 1968, supra, incluyó expresamente los terrenos ganados al mar como bienes de dominio público y por lo tanto, **derogó el artículo 22 de la Instrucción de la Ley de Puertos de 1886.**

Examinemos ahora los cambios que se han hecho a nuestro Código Civil a través de los años, para determinar si éstos afectaron el esquema jurídico sobre los terrenos ganados al mar en zonas no portuarias vigente en Puerto Rico hasta 1968.

Según el artículo 338 del Código Civil español de 1889, supra, extendido a Puerto Rico por Real decreto en dicho año, los bienes se clasificaban en dos categorías: dominio público o propiedad privada.[79] En 1902 Puerto Rico enmendó su Código Civil, apartándose de la tradición española y adoptando la norma tripartita del Estado de Louisiana, proveniente del Derecho romano, según la cual los bienes pueden ser comunes, de dominio público o privados. Art. 448 del Código Civil de Louisiana.[80] Por esto, el artículo 254 del Código Civil de Puerto Rico de 1930, 31 L.P.R.A. sec. 1023, establece que el mar y sus riberas son bienes comunes y no bienes de dominio público. Dicho artículo expresa lo siguiente: "Las cosas comunes son aquéllas cuya propiedad no pertenece a nadie en particular y en las cuales todos los hombres tienen libre uso, en conformidad con su propia naturaleza: tales son el aire, las aguas pluviales, el mar y sus riberas". *Id.*[81]

---

[79] El artículo 338 del Código Civil español dispone lo siguiente: "Los bienes son de dominio público o de propiedad privada". Art. 338 del Código Civil español.

[80] En lo pertinente, el artículo 448 del Código Civil de Louisiana dispone lo siguiente: "Things are divided into common, public, and private". Yiannopoulos explica esta división se deriva del "Romanist tradition and corresponds with divisions of things in the civil codes of other jurisdictions". 2 A.N. YIANNOPOULOS, LA. CIV. L. TREATISE, PROPERTY § 45 (4ta ed.).

[81] Aunque Puerto Rico adoptó la norma tripartita del Estado de Lousiana, dicho estado no clasifica la zona marítimo terrestre ni el mar litoral de sus costas como cosas comunes. Por el contrario, las clasifica como cosas públicas. Sobre esto, los artículos 449 y 450 del Código Civil de Louisiana disponen lo siguiente:

**Common things** may not be owned by anyone. They are such as the air and the high seas that may be freely used by everyone comfortably with the use for which nature has

Ahora bien, de acuerdo al artículo 12 del mismo cuerpo de ley, el Código Civil se aplicará de manera supletoria en las materias que se rijan por leyes especiales. 31 L.P.R.A. sec. 12.[82] Por lo tanto, mientras haya una ley especial de puertos que regule la titularidad de los terrenos en controversia en este caso, no habrá necesidad de recurrir a las disposiciones supletorias del Código Civil. Resolver lo contrario conllevaría concluir que una ley general puede derogar tácitamente las disposiciones de una ley especial, lo cual es contrario a derecho. Housing Investment Corp. v. Luna, 112 D.P.R. 173, 177-178 (1982), Sierra v. Tribl. Superior, 75 D.P.R. 841, 846-847 (1954), Vázquez v. Corte, 65 D.P.R. 598, 603 (1946).

_____

intended them. (Énfasis nuetsro). Art. 449 del Código Civil de Lousiana.

**Public things** are owned by the state or its political subdivisions in their capacity as public persons.
Public things that belong to the state are such as running waters, the **water and bottoms of natural navigable bodies, the territorial sea, and the seashore.**
Public things that may belong to political subdivisions of the state are such as streets and public squares. (Énfasis nuestro). Art. 450 del Código Civil de Louisiana.

Respecto al artículo 450 Yiannopoulos explica lo siguiente:

Article 450 of the Louisiana Civil Code places the "sea", that is, the water and bottom of the Gulf of Mexico within Lousiana borders, in the category of public things. This deviation from the Romanist tradition, according to which the sea is a common thing, was prompted by well-established Louisiana practice antedating the 1978 revision. 2 A.N. YIANNOPOULOS, LA. CIV. L. TREATISE, PROPERTY § 69 (4ta ed.).

Véase, Figueroa v. Municipio de San Juan, 98 D.P.R. 534, 566 (1970), para una discusión sobre la adopción de las normas del Código Civil de Louisiana en nuestra jurisdicción.

[82] "En las materias que se rijan por leyes especiales, la deficiencia de éstas se suplirá por las disposiciones de este título". 31 L.P.R.A. sec. 12.

**Por lo tanto, el derecho aplicable a la controversia de titularidad sobre los terrenos ganados al mar en el "Condado Bay Parcel" al momento de llevarse a cabo las obras de relleno en la década de los cincuenta, es la clasificación de bienes de dominio público de la Ley de Puertos de 1886, supra, y el artículo 22 de la instrucción de dicha ley.**

Los terrenos sumergidos sobre los cuales se llevaron a cabo las obras de relleno que resultaron en el "Condado Bay Parcel", eran bienes de dominio público bajo la Ley de Puertos de 1886, supra. Según ya explicamos, el artículo 22 de la instrucción de dicha ley proveía para que dichos terrenos fueran privatizados a través de obras de relleno realizadas con la autorización competente. Por consiguiente, una vez el gobierno de Puerto Rico llevó a cabo dichas obras con la autorización competente de las agencias facultadas para ello, los terrenos ganados al mar se convirtieron en propiedad del gobierno, de acuerdo a la política pública vigente en aquél momento histórico. **De esta forma, el "Condado Bay Parcel" se integró válidamente al comercio de las personas y no puede ser clasificada como bien de dominio público en la controversia de este caso.**

Establecido lo anterior debemos retomar la discusión respecto a los bienes de dominio público del "Coast Guard Parcel" y evaluar las consecuencias negativas históricas del esquema privatizador establecido por la Ley de Puertos de 1886 y su instrucción, que han requerido un cambio significativo en la política pública de Puerto Rico encaminada a la protección efectiva de los bienes de dominio público marítimo terrestres.

## XI- Potestad de la Rama Ejecutiva del gobierno de Puerto Rico para destinar los bienes de dominio público del "Coast Guard Parcel" a uso patrimonial o privado.

Los bienes de dominio público son bienes sustraídos de la actividad comercial porque satisfacen necesidades colectivas y sustentan el bienestar común. En función de la importancia pública de estos bienes, nuestro ordenamiento jurídico ha establecido, según ya explicamos en la parte IX de esta opinión, que los bienes de dominio público son **inalienables, imprescriptibles e inembargables**. Rubert Amstrong v. E.L.A., supra, pág. 620, Figueroa v. Municipio de San Juan, 98 D.P.R. 534, 562-563 (1970). Véase, M.J. Godreau, J.A. Giusti, Las Conceciones de la Corona y propiedad de la tierra en Puerto Rico, Siglos XVI-XX: Un estudio jurídico, 62 REV. JUR. U.P.R. 351, 562-564 (1993).

El tratadista Puig Peña explica que las cosas públicas o bienes de dominio público se caracterizan por lo siguiente:

1° Por ser *inalienables*, estar fuera de comercio y ser *imprescriptibles*.
2° Por la imposibilidad de imponer sobre las mismas, *cargas y servidumbres*.
3° Por la *generalización a todos los ciudadanos* para obtener los beneficios y ventajas que lleva consigo el destino de utilidad pública.
4° Porque los agentes administrativos no tienen necesidad de dirigirse a los Tribunales de Justicia para proteger la cosa pública, pudiendo ejercitar su actividad coactiva para que la propiedad de la cosa pública sea respetada. F. Puig Peña, Tratado de Derecho Civil Español, 1ra ed., Madrid, Editorial revista de Derecho Privado, 1958, Tomo I, Volumen II, págs. 299.

La **afectación** de un bien al dominio público puede darse por acto legislativo en protección del bienestar común.[83]

---

[83] Véase, J.V. González García y otros, Derechos de los Bienes Públicos, op. cit., págs. 88-92, para una discusión sobre

Cuando esto ocurre, la ley puede identificar unos bienes en particular o puede establecer unas características o criterios a partir de los cuales se puede identificar un bien de dominio público. Por ejemplo, Martínez Escudero explica que todo bien al que pueda aplicársele la definición de zona marítimo terrestre establecida por ley es un bien de dominio público. L. Martínez Escudero, Playas y Costas: su Régimen Jurídico Administrativo, 2da ed., Madrid, Editorial Montecorvo S.A., 1985, pág. 57. A su vez, Isabel Miralles González expone lo siguiente respecto a la afectación por acto legislativo:

> La consideración de dominio público de un bien arranca de una declaración legal. El destino público de esos bienes se hace para todos aquellos que participen de la misma denominación, llámesele naturaleza o no, es decir, para todos aquellos bienes reconocibles por sus características intrínsecas, razón por la cual no precisan de un acto específico de afectación. **Basta con que la Ley** (…) **declare el carácter de bienes de dominio público a los de un tipo determinado, para que todos los que participan de esa misma naturaleza vengan a integrarse en dicho dominio.** (Énfasis nuestro) I. Miralles González, Dominio público y propiedad privada en la nueva Ley de Costas, 1ra ed., España, Editorial Civitas, S.A., 1992, pág. 69.

Por esto, si un bien es afectado como bien de dominio público mediante legislación y no ha perdido, por causas naturales, las características físicas o factores que lo hacen formar parte de dicha clasificación jurídica, sólo un **acto de igual fuerza jurídica** podrá permitir su **desafectación.**[84] Constituye esto un ejercicio de política pública que llamaremos en adelante el **principio de la**

---

las posibles formas de afectación de un bien al dominio público.

[84] Adviértase que **no** hemos abordado el análisis jurídico de qué ocurre cuando la pérdida de las características físicas de un bien de dominio público sean causadas por la voluntad o arbitrariedad del ser humano y no por procesos naturales.

**desafectación.** Al respecto, Godreau y Giusti explican lo

siguiente:

> En tanto la terminación o cesación de la utilidad pública permite que el bien sea enajenado, **tal transformación no puede darse arbitrariamente o sólo mediante la determinación del funcionario o de la entidad que tenga su custodia; será necesario, o bien que la inutilidad surja de fenómenos naturales, o bien que medie un acto legislativo declarando el cese de tal utilidad pública.** (Énfasis nuestro) M.J. Godreau, J.A. Giusti, <u>Las Conceciones de la Corona y propiedad de la tierra en Puerto Rico, Siglos XVI-XX: Un estudio jurídico</u>, supra, pág. 563.

Además, Martínez Escudero nos explica lo siguiente respecto

al principio de la desafectación:

> Por lo que se refiere a las playas, la garantía de su inalienabilidad se encuentra en **el hecho de que su destino al uso público está establecido por declaración expresa de la Ley …, por lo cual sería preciso una disposición con fuerza de ley para hacer posible su enajenación;** L. Martínez Escudero, <u>Playas y Costas, su Régimen Jurídico Administrativo</u>, op. cit., pág. 194.

De igual forma, Julio V. González García nos explica:

> El fenómeno contrario al de la incorporación de un bien al dominio público está constituido por la **desafectación** de un bien, esto es, la operación por la cual el bien deja de estar destinado al cumplimiento de un uso general  o un servicio público y perderán [sic] en el mismo instante la condición de bien de dominio público, pasando a estar integrado en el grupo de los bienes patrimoniales o, en ciertos casos recogidos en la legislación, yendo a manos privadas.
> Para evitar los problemas que plantea la pérdida de destino de los bienes, resulta preciso un acto expreso en el que se tome esta decisión. **Acto expreso que debe tener, como mínimo, el mismo rango que la decisión por la que entró un bien en el dominio público.** J.V. González García y otros, <u>Derechos de los Bienes Públicos</u>, op. cit., pág. 93.

En la parte IX de esta opinión aclaramos que el esquema

jurídico privatizador que existía en Puerto Rico antes de

1968 permitía la privatización de terrenos sumergidos a

través de obras autorizadas que alteraban la naturaleza

física de dichos terrenos, convirtiéndolos en terrenos

ganados al mar, según la Instrucción de la Ley de Puertos de 1886, supra. Según explicamos, dicha instrucción es un acto jurídico de fuerza administrativa bajo el esquema jurídico español. Por esto, el esquema privatizador extendido a Puerto Rico en 1886 era antagónico al principio de la desafectación, pues permitía que un acto administrativo regulara la desafectación de unos bienes de dominio público que fueron clasificados como tal por un acto legislativo. Ante esta realidad jurídica y sus consecuencias negativas, tanto la jurisdicción española como la nuestra han adoptado un nuevo esquema jurídico que evita dicho antagonismo, clasificando los terrenos ganados al mar como bienes de dominio público mediante acto legislativo. Veamos lo sucedido en España, antes de examinar el esquema jurídico vigente actualmente en nuestra jurisdicción.

En España, donde el sistema privatizador de los bienes de dominio público marítimo terrestre estuvo en vigor durante más de un siglo, la doctrina identificó las consecuencias negativas del sistema y reiteró la importancia de proteger dichos bienes. Mª del Pino Rodríguez González elabora sobre la importancia de los bienes de dominio público marítimo terrestre en el contexto español, explicando lo siguiente:

> Los bienes marítimo-terrestre juegan un papel protagonista dentro de la categoría general de los bienes de dominio público. **A nadie se esconde la importancia que actualmente se asigna a aquéllos, lo cual justifica los objetivos proteccionistas que preside hoy su regulación legal y la actuación de nuestras administraciones públicas.** Y es que no debe olvidarse que estos bienes son susceptibles de un intenso aprovechamiento económico, no sólo porque es en la franja costera donde se concentra la mayor parte de la oferta turística española (actividad que constituye una de las principales fuentes de nuestra economía), sino también como objeto de explotación pesquera o como fuente de abundantes recursos mineros y petrolíferos. Se trata, por

tanto, de terrenos valiosos por las grandes posibilidades que ofrecen, así como su valor social como lugar de ocio y disfrute de los ciudadanos, pero escasos por las crecientes demandas que soportan y muy sensibles y de difícil recuperación en su equilibrio físico. (Énfasis nuestro) J.V. González García y otros, <u>Derechos de los Bienes Públicos</u>, 1ra ed., Valencia, Tirant Lo Blanch, 2005, pág. 131.

La exposición de motivos de la Ley de Costas española de 1988 también se refiere a las consecuencias negativas del esquema jurídico privatizador bajo el régimen español de 1880 y la importancia de proteger los bienes de dominio público marítimo terrestre en la actualidad:

Las consecuencias del creciente proceso de privatización y depredación, posibilitado por una grave dejación administrativa, han hecho irreconciliable, en numerosas zonas, el paisaje litoral de no hace más de treinta años, con un urbanismo nocivo de altas murallas de edificios al mismo borde de la playa o del mar, vías de transporte de gran intensidad de tráfico demasiado próximas a la orilla, y vertidos al mar sin depuración en la mayoría de los casos.
Este doble fenómeno de destrucción y privatización del litoral, que amenaza extenderse a toda su longitud, exige de modo apremiante una solución clara e inequívoca, acorde con la naturaleza de estos bienes, y que, con una perspectiva de futuro, tenga como objetivos la defensa de su equilibrio y su progreso físico, la protección y conservación de sus valores y virtualidades naturales y culturales, el aprovechamiento racional de sus recursos, la garantía de su uso y disfrute abierto a todos, con excepciones plenamente justificadas por el interés colectivo y estrictamente limitadas en el tiempo y en el espacio, y con la adopción de las adecuadas medidas de restauración. Ley núm. 22/1988, Aranzadi, Repertorio cronológico de legislación, vol. III, pág. 3474 (1988).

Por esto, en 1978, España elevó a rango constitucional los principios de inalienabilidad, imprescriptibilidad e inembargabilidad, así como el principio de la desafectación de los bienes de dominio público. De esta forma, el artículo 132.1 de la Constitución Española de 1978 dispone lo siguiente: "La Ley regulará el régimen jurídico de los bienes de dominio público y de los comunales, **inspirándose**

**en los principios de inalienabilidad, imprescriptibilidad e inembargabilidad, así como su desafectación".** (Énfasis nuestro) M. Pulido Quedeco, <u>La Constitución Española: Con la Jurisprudencia del Tribunal Constitucional</u>, 1ra ed., Pamplona, Aranzadi, S.A., 1996, pág. 1592.

Además, el artículo 132.2 de la Constitución Española de 1978 delegó al legislador la clasificación o afectación de bienes de dominio público, y especificó que tanto la zona marítimo terrestre como las playas, el mar litoral y los recursos naturales de la zona económica y la plataforma continental siempre serán de dominio público. Dicho artículo expresa lo siguiente: "Son bienes de dominio público estatal los que determine la ley y, en todo caso, la zona marítimo terrestre, las playas, el mar territorial y los recursos naturales de la zona económica y la plataforma continental". M. Pulido Quedeco, <u>op. cit</u>. Según Mª del Pino Rodríguez González esto significó, para el ordenamiento jurídico español:

> un paso decidido hacia la **demanialidad absoluta de los espacios costeros.**[85] Por vez primera en nuestra historia constitucional y sin que existan precedentes en el Derecho comparado, se hizo una declaración constitucional expresa e inequívoca a favor del carácter demanial de determinados bienes, con la particularidad de que los únicos a los que se atribuye directamente dicha clasificación pertenecen al dominio público marítimo-terrestre, mencionando, expresamente, a la zona marítimo-terrestre, playa, mar territorial y recursos naturales de la zona económica y plataforma continental, **declarando definitivamente su titularidad pública a favor del Estado y remitiendo al legislador estatal el establecimiento de su régimen jurídico.** (Énfasis nuestro) J.V. González García y otros, <u>Derechos de los Bienes Públicos</u>, 1ra ed., Valencia, Tirant Lo Blanch, 2005, pág. 131.

---

[85] El concepto "demanial" significa perteneciente o relativo al demanio o dominio público. Diccionario de la Real Academia Española, <u>http://buscon.rae.es/draeI/</u>, (última visita el 2 de julio de 2008).

España adoptó la Ley de Costas de 1988 basándose en este mandato constitucional y apartándose definitivamente del sistema privatizador de los bienes de dominio público que había existido en su jurisdicción desde 1866. Así lo reconoció la exposición de motivos de la ley al expresar lo siguiente:

> La Ley cierra el paréntesis de signo privatizador que inició la Ley de Aguas de 1866 con un equívoco respecto a los derechos legítimamente adquiridos, que no deberían ser otros que los concesionales, continuado por las Leyes de Puertos de 1880, así como por la Ley de Costas de 1969, a pesar de los graves problemas que ya existían en esta época y de la postura contraria y prácticamente unánime de la doctrina. (Citas omitidas) Ley núm. 22/1988, Aranzadi, Repertorio cronológico de legislación, vol. III, pág. 3475 (1988).

El artículo 4 de la Ley de Costas de 1988 clasificó los terrenos ganados al mar como bienes de dominio público. *Id.*, pág. 3477. Esto, cumpliendo con el propósito de eliminar la posibilidad de que se pudiera adquirir la propiedad de los terrenos ganados al mar a través de obras y establecer, además, mecanismos que favorezcan la incorporación de terrenos al dominio público, con el objetivo de ampliar la estrecha franja costera que en 1988 contaba con la clasificación demanial en España. *Id.*, pág. 3475.

Veamos ahora el esquema jurídico vigente en Puerto Rico en lo que respecta a los terrenos ganados al mar. En 1952 se aprobó la Constitución del Estado Libre Asociado de Puerto Rico, Const. E.L.A., L.P.R.A., Tomo 1, 1999, pág. 247. El artículo VI sección 19 de la Constitución estableció como política pública del Estado Libre Asociado "la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio

general de la comunidad". Art. VI sec. 19 Const. E.L.A., supra, pág. 421. Este Tribunal ha interpretado que esta disposición constituye un mandato constitucional que impone al Estado el deber ineludible de conservar los recursos naturales, a la vez que procura su desarrollo y aprovechamiento para el beneficio general de la comunidad. Misión Industrial v. Junta de Calidad Ambiental, 145 DPR 908, 919 (1998). Este mandato constitucional no es más que la exigencia de lograr un desarrollo sostenible de los recursos naturales del país.

Un desarrollo sostenible es aquél que crea y mantiene las condiciones bajo las cuales el ser humano y la naturaleza pueden existir en armonía productiva. Véase, Ley sobre política pública ambiental, Ley Núm. 416 del 22 de septiembre de 2004, 12 L.P.R.A. sec. 8001 et seq.; Ley sobre política pública de desarrollo sostenible, Ley Núm. 267 del 10 de septiembre de 2004, 23 L.P.R.A. secs. 501-508. Por lo tanto, la política pública de desarrollo sostenible nos impone el reto de lograr la conservación de los recursos naturales que es necesaria e imprescindible para sostener las necesidades de desarrollo del país, para bien tanto de las presentes como de las futuras generaciones. Esto, según expresamos hace más de una década, con el fin de establecer "una protección frente al estado, la sociedad, el gobierno, e incluso el hombre, que en el mundo contemporáneo, sin darse cuenta que está socavando su propia existencia, destruye la naturaleza en aras de un materialismo y un consumismo rampante, creando desbalances sistemáticos

irreversibles". <u>Paoli Méndez v. Rodríguez</u>, 138 D.P.R. 449, 462 (1995).

Este Tribunal ha reconocido que el mandato constitucional de lograr el desarrollo sostenible del país es el "criterio jurídico primordial para juzgar la validez o interpretar el significado de cualquier norma o decisión relativa al uso o protección de los recursos naturales formulada por la Asamblea Legislativa o por cualquier agencia, departamento, municipio o instrumentalidad gubernamental". <u>Misión Industrial v. Junta de Calidad Ambiental</u>, 145 DPR 908, 919-920 (1998). Además, hemos determinado que esta disposición es un mandato que debe observarse rigurosamente y que prevalece sobre cualquier estatuto, reglamento u ordenanza que sea contraria a éste. *Id*.

Los bienes de dominio público marítimo terrestres son recursos naturales que tienen una importancia tal en Puerto Rico que **todo esquema jurídico que se haya adoptado para su regulación deberá interpretarse según el mandato constitucional de lograr para éstos un desarrollo sostenible.**[86] Nuestra Ley de Puertos de 1968, supra,

---

[86] En cuanto a la urgencia de proteger estos bienes en el contexto puertorriqueño, resultan particularmente reveladoras las siguientes expresiones del Reglamento para el aprovechamiento, vigilancia, conservación y administración de las aguas territoriales, los terrenos sumergidos bajo éstas y la zona marítimo terrestre, Reg. núm. 4860 del 29 de diciembre de 1992:

> **Puerto Rico es una isla cuya extensión territorial es relativamente limitada.** Con una cordillera montañosa central y reducidos llanos costeros, aproximadamente la mitad del área superficial consiste de montañas y colinas con declives de 45 grados o más. Los relativamente planos terrenos costeros constituyen una tercera parte del espacio superficial y un 80 porciento del total de superficie plana. Como es de esperarse, gran parte del

establece que los terrenos ganados al mar son bienes de dominio público, ya que los incluye específicamente dentro de la zona marítimo terrestre.[87] De esta forma, quedó derogada por acto legislativo la Instrucción de la Ley de Puertos de 1886, que permitía la privatización de estos terrenos a través de un acto administrativo.[88] Además, la Ley

---

desarrollo de la Isla ha ocurrido, precisamente, en los llanos costeros y sus inmediaciones.

[…]

Hoy, casi quince años después de la aprobación del Programa de Manejo, y de la suscripción de acuerdos por entidades del ELA y del gobierno federal, **las aguas territoriales, los terrenos sumergidos y la zona marítimo-terrestre continúan caracterizándose por la proliferación de usos antagónicos y conflictivos. El aprovechamiento privado de bienes del dominio público, reflejado por la privatización de facto de la zona marítimo-terrestre mediante construcciones que reducen parcial o totalmente los accesos a las playas**; el menoscabo de la integridad de los sistemas naturales típicos de la costa, reflejado por el vertido, con y sin autorización, de aguas residuales o por el acceso a éstos de personas en exceso de su capacidad de acarreo; el incremento en los riesgos a la seguridad pública y propiedad, resultantes de construcciones y desarrollos dentro de la zona marítimo-terrestre que ocasionan la erosión y degradación del litoral, continúan. Art. 1.3 del Reglamento para el aprovechamiento, vigilancia, conservación y administración de las aguas territoriales, los terrenos sumergidos bajo éstas y la zona marítimo terrestre, supra.

[87] El Art. 1, sec. 1.03 de la Ley de Puertos de 1968, 23 L.P.R.A. sec. 2103, define este término de la manera siguiente:

[E]l espacio de las costas de Puerto Rico que baña el mar en su flujo y reflujo, en donde son sensibles las mareas, y las mayores olas en los temporales en donde las mareas no son sensibles, **e incluye los terrenos ganados al mar** y las márgenes de los ríos hasta el sitio en que sean navegables o se hagan sensibles las mareas; y el término, sin condicionar, significa la zona marítima terrestre de Puerto Rico. (Énfasis nuestro).

[88] Adviértase que esta ley no tiene efecto retroactivo, por lo que no cabe argumentar que aplica a la controversia de los terrenos que constituyen el "Condado Bay Parcel". 23 L.P.R.A. sec. 2111.

de Puertos de 1968, no adopta y por ende, no permite, la posibilidad de desafectar estos bienes.

La sección 1.09 (d) de la Ley de Puertos de 1968, 23 L.P.R.A. sec. 2110, establece que a excepción de la zona marítimo terrestre incluida en una zona portuaria, para lo cual la ley provee específicamente, el Secretario de Transportación y Obras Públicas (antes Comisionado del Interior) tendrá sobre la zona marítimo terrestre y los terrenos agregados a ellas o ganados al mar las mismas facultades y funciones de vigilancia, conservación y concesión de permisos que le fueron conferidas a través de las secciones 18 y 47 de la Ley de Puertos de 1928. Ya vimos, en la parte IX de esta opinión, que la sección 47 de la ley de 1928 ordenaba la vigilancia y conservación de "los muelles, malecones, terraplenes, (…) terrenos públicos que forman la zona marítima y los terrenos agregados a ella o ganados al mar, (…)". Sec. 47 de La Ley de Puertos de 1928, supra.

En el contexto jurídico del artículo VI sección 19 de la Constitución de 1952, la jurisprudencia y la propia Ley de puertos de 1968, el criterio jurídico primordial para interpretar el significado de la sección 47 de la Ley de Puertos de 1928 es el mandato constitucional de lograr el desarrollo sostenible de los bienes de dominio público marítimo terrestres, dado que la Ley de Puertos de 1968 clasificó los terrenos ganados al mar como bienes de dominio público marítimo terrestres. Interpretada de esta forma, la sección 47 de la Ley de Puertos de 1928, supra, le impone al Secretario de Transportación y Obras Públicas la obligación

de conservar los terrenos ganados al mar acorde a su clasificación demanial.

Por lo tanto, **cuando los terrenos ganados al mar aledaños al "Coast Guard Parcel" entraron nuevamente a nuestra jurisdicción en 1991 eran terrenos ganados al mar afectados como bienes de dominio público y la Rama Ejecutiva del gobierno de Puerto Rico no tenía discreción para desafectarlos y destinarlos a otro uso.**

**XII- Los actos de la Rama Ejecutiva del gobierno de Puerto Rico sobre los bienes de dominio público del "Coast Guard Parcel" luego de su adquisición en 1991**

El 19 de diciembre de 1934, luego que los Estados Unidos le hubiera cedido al Pueblo de Puerto Rico la Reserva Naval San Gerónimo, el Comisionado del Interior del Gobierno de Puerto Rico emitió una certificación que identificó la reserva cedida como la finca 196 en el Registro de la Propiedad. El "Coast Guard Parcel" se inscribió a nombre de los Estados Unidos en una nota marginal de la finca 196. El Acta Aclaratoria emitida por el Comisionado del Interior en 1935, antes de que los Estados Unidos llevaran a cabo las obras de relleno en la parcela, describe el "Coast Guard Parcel" de la siguiente manera:

> PARCELA B- Urbana- Parcela de terreno radicada en el barrio Puerta de Tierra, del término municipal de San Juan, **cuya propiedad se reserva el Gobierno de los Estados Unidos de América.** Tiene un area [sic] superficial de 1 hectares 87 acres 93.24 centiareas, equivalentes a **4 cuerdas con 781 centésimas de otra. <u>Colinda</u>** al norte con la **parcela A**, antes descrita, propiedad de El Pueblo de Puerto Rico y arrendada al Teniente Comandante de Marina, retirado, Virgil Baker, por el sur con la margen norte de la variante de la Avenida Ponce de León que a (…) al puente Guillermo Esteves; por el **este con la zona marítima de la Laguna del Condado;** y por el oeste, con terrenos propiedad del Gobierno de los Estados Unidos de América.

Acta Aclaratoria del Comisionado del Interior de Puerto Rico del 17 de junio de 1935.

La descripción citada e inscrita en el Registro de la Propiedad no incluyó los terrenos sumergidos aledaños a la parcela. Después que la Administración de Terrenos de Puerto Rico adquiriera el "Coast Guard Parcel" del gobierno federal, se presentó la escritura de compraventa entre ambos gobiernos al Registro de la Propiedad en 1992. La descripción de la propiedad en la escritura incluyó los terrenos ganados al mar.

En 1991, el "Coast Guard Parcel" estaba zonificada como una **zona pública y/o recreativa (P)**. Sec. 2.02 del Reglamento de Zonificación Especial del Condado, supra. Véase la parte IX de esta opinión. En 1993, la Junta de Planificación aprobó el Plan de Usos del Terreno y Reglamento de Zonificación Especial para la entrada de la Isleta de San Juan. Este plan adoptó la definición de la zona marítimo-terrestre que incluye los terrenos ganados al mar como bienes de dominio público y rezonificó al "Coast Guard Parcel" como una **Zona de Desarrollo Especial (ZDE-A)**. Reglamento de Planificación Núm. 23 del 15 de enero de 1993.

El 13 de diciembre de 1994, el Departamento de Recursos Naturales y Ambientales certificó el deslinde de la zona marítimo terrestre de la "Coast Guard Parcel", de acuerdo a un Plano de Mensura preparado por la Administración de Terrenos. El deslinde incluyó los terrenos ganados al mar como parte de la propiedad de dicha agencia.[89]

_____

[89] El deslinde de la zona marítimo terrestre hecho por el Departamento de Recursos Naturales y Ambientales en 1998 fue

El 10 de septiembre de 1998 la Administración de Terrenos aprobó la venta del "Coast Guard Parcel" a la Corporación de Desarrollo Hotelero, subsidiaria de la Compañía de Turismo de Puerto Rico. El 15 de septiembre de 1998 el agrimensor Renán López de Azua hizo una mensura del "Coast Guard Parcel" que corrige su descripción y cabida. Al describir la propiedad, dicho agrimensor especifica que ésta colinda con la Laguna del Condado, incluyendo, por tanto, los terrenos ganados al mar.

El 5 de octubre de 1998, la Administración de Terrenos y el Departamento de Transportación y Obras Públicas de Puerto Rico presentaron una Instancia Solicitando Rectificación Registral para abrir un folio independiente del "Coast Guard Parcel" que indicara que su titular era la Administración de Terrenos. Hasta entonces la parcela aparecía en una nota marginal a la finca 196. El Registrador así lo hizo y designó al "Coast Guard Parcel" como la finca 904.

El 21 de octubre de 1998 la Junta de Planificación aprobó la venta del "Coast Guard Parcel". A renglón seguido, el 6 de noviembre de 1998 la Administración de Terrenos le transfirió la parcela a la Corporación de Desarrollo Hotelero a través de la escritura número 1 expedida por el notario público Juan Alberto Correa Suárez. Ese mismo día, la Corporación de Desarrollo Hotelero vendió la parcela a "Hilton Internacional of Puerto Rico, Inc.", a través de la escritura número uno autorizada por el notario público José Antonio Fernández Jaquete, la cual fue inscrita en el

respecto a los terrenos del Hotel Caribe Hilton y no respecto al "Coast Guard Parcel".

registro de la propiedad. **Ambas escrituras, al igual que el deslinde de 1994, incluyen los terrenos ganados al mar como parte de la propiedad, ya que la describen como una parcela que colinda con la Laguna del Condado.**

El 12 de enero de 2000 la Junta de Planificación acordó aprobar el proyecto mixto residencial, comercial y turístico propuesto por "San Geronimo Caribe Project, Inc." a través de una consulta de ubicación. Los terrenos objeto de la consulta fueron descritos en el párrafo 2 de la resolución administrativa de la siguiente manera:

> El predio de consulta tiene una cabida de 6.51 cuerdas. El mismo está delimitado por el Norte, con el hotel Caribe Hilton, su estacionamiento y varias propiedades privadas; por el Sur, con la Avenida Ponce de León y la Laguna del Condado; por el Este, con la Laguna del Condado y el Fortín San Gerónimo [sic]; y por el Oeste con la Avenida Muñoz Rivera.

El 6 de junio de 2000 se actualizaron los estudios de título y el 21 de julio de ese año "Hilton Internacional of Puerto Rico, Inc." vendió el "Coast Guard Parcel" a "San Geronimo Caribe Project, Inc.". Posteriormente, "San Gerónimo Caribe Project, Inc." recibió los permisos administrativos para llevar a cabo el proyecto Paseo Caribe.[90] En particular, la Administración de Reglamentos y Permisos expidió los permisos de construcción y uso para los distintos componentes del proyecto, que incluyen la construcción de obras permanentes sobre los terrenos ganados al mar en la parcela.

Además, el 28 de octubre de 2002 el Subsecretario de Justicia emitió una opinión dirigida al Secretario del

---

[90] Véase el Índice o resumen de los permisos otorgados a Paseo Caribe que surge del expediente.

Departamento de Recursos Naturales y Ambientales, en la que se concluye que los terrenos ganados al mar en controversia no son bienes de dominio público. El Subsecretario explica que los terrenos ganados al mar aledaños al "Coast Guard Parcel" fueron desafectados prospectiva y permanentemente por los actos soberanos de los Estados Unidos y que por lo tanto, a dichos terrenos no les aplica la Ley de Puertos de 1968, supra, que clasifica los terrenos ganados al mar como bienes de dominio público marítimo terrestre. Op. Sec. Just. Núm. 2002-19 del 28 de octubre de 2002. Como bien sabemos, no es hasta el 11 de diciembre de 2007, que el Secretario de Justicia reevaluó su posición y determinó que los terrenos ganados al mar en el "Coast Guard Parcel" son bienes de dominio público.

Estos hechos revelan que luego de que se adquiriera el "Coast Guard Parcel" en 1991, la Rama Ejecutiva del gobierno de Puerto Rico administró los bienes de dominio público marítimo terrestres en controversia como bienes patrimoniales. Estos actos denotan, a mi entender, una clara deficiencia en la administración pública de unos bienes que por mandato legislativo fueron afectados al dominio público para satisfacer necesidades colectivas y asegurar el bienestar común. Además, demuestran indiferencia respecto al valor histórico y cultural que tienen estos terrenos por estar localizados alrededor del Fortín San Jerónimo. Esto, sin ignorar el impacto negativo que dicha deficiencia e indiferencia causó al interés propietario del aquí peticionario, "San Gerónimo Caribe Project, Inc.". Ante esta

realidad, debemos evaluar el efecto de estos hechos sobre la titularidad de los terrenos en controversia.

Uno de los actos contrarios a la naturaleza demanial de estos terrenos fue el deslinde que el Departamento de Recursos Naturales y Ambientales llevó a cabo en 1994. Dicho deslinde incluyó los terrenos ganados al mar en la propiedad de la Administración de Terrenos, incumpliendo así el mandato legislativo de la Ley de Puertos de 1968, supra, que los sustrae del comercio de las personas.[91]

**Un deslinde administrativo no adjudica titularidad ni otorga derechos de propiedad**, sino que establece los límites entre los bienes de dominio público y las propiedades colindantes con éstos, creando una presunción de corrección sobre dicha delimitación. Al respecto Martínez Escudero indica que de esa forma: "… el deslinde permite fijar los límites de las playas y de la zona marítimo-terrestre, declarando respecto de ellas y a favor de la Administración un estado posesorio de hecho, **sin prejuzgar las cuestiones relativas a la propiedad privada**". L. Martínez Escudero, op.

---

[91] En 1992 el Departamento de Recursos Naturales y Ambientales adoptó el Reglamento para el aprovechamiento, vigilancia, conservación y administración de las aguas territoriales, los terrenos sumergidos bajo éstas y la zona marítimo terrestre, supra, con el propósito de atemperar la legislación reguladora de los bienes de dominio público marítimo terrestres a las realidades contemporáneas de conservación y crear criterios y mecanismos para la delimitación, vigilancia, conservación, saneamiento y otorgación de concesiones y autorizaciones para el uso y aprovechamiento de dichos bienes. En su artículo 2.108 el reglamento adopta la definición de la zona marítimo terrestre de la Ley de Puertos de 1968, supra, que incluye los terrenos ganados al mar. El artículo 3 del reglamento establece el proceso de deslinde que lleva a cabo el Departamento de Recursos Naturales y Ambientales para determinar el límite tierra adentro de la zona marítimo terrestre según definida en el artículo 2.108.

cit., pág. 204. Véase además, la sección 24.02 del Reglamento de Zonificación de la Zona Costanera y de Acceso a las Playas y Costas de Puerto Rico, Reg. núm. 17 del 31 de marzo de 1983.

**Por lo tanto, el deslinde de 1994, aunque incluyó los terrenos ganados al mar, no le concedió ningún derecho de propiedad sobre dichos bienes a la Administración de Terrenos.** Sin embargo, el deslinde trajo como consecuencia que en 1998 el Registrador de la Propiedad creara un folio independiente del "Coast Guard Parcel" (finca 904) en el cual, conforme a la escritura de compraventa presentada en el registro en 1992 y el mencionado deslinde, se inscribieron los terrenos ganados al mar como parte del solar propiedad de la Administración de Terrenos. A esto siguió, según vimos, la venta de la parcela el 6 de noviembre del mismo año a la Corporación de Desarrollo Hotelero, y, el mismo día, a "Hilton Internacional of Puerto Rico, Inc.". Esta venta fue inscrita en el Registro de la Propiedad. Dos años más tarde, después que la Junta de Planificación aprobó el Proyecto Paseo Caribe, "Hilton Internacional of Puerto Rico, Inc." le vendió el "Coast Guard Parcel" a "San Geronimo Caribe Project, Inc.". Esta venta también fue inscrita en el Registro de la Propiedad e incluyó los terrenos ganados al mar como parte de la propiedad vendida. Por lo tanto, debemos determinar si dicha inscripción y su historial registral tuvo el efecto de

conceder el título de propiedad de estos bienes de dominio público al peticionario.[92]

El Tribunal de Primera Instancia concluyó que "San Geronimo Caribe Project, Inc." adquirió el título de propiedad sobre los terrenos ganados al mar en controversia por ser un tercero registral. No es correcta esta conclusión. La tercería registral es una protección que sólo puede oponerse respecto a bienes sujetos al comercio de las personas. Según hemos discutido, los bienes de dominio público son **inalienables** y están excluidos de dicho comercio. Rubert Amstrong v. E.L.A., supra, pág. 620, Figueroa v. Municipio de San Juan, supra, págs. 562-563. Véase, M.J. Godreau, J.A. Giusti, Las Concesiones de la Corona y propiedad de la tierra en Puerto Rico, Siglos XVI-XX: Un estudio jurídico, op. cit., 562-564.

De acuerdo al principio de la inalienabilidad, el artículo 39 de la Ley Hipotecaria establece que los bienes de dominio público no son inscribibles en el Registro de la Propiedad. 30 L.P.R.A. sec. 2202. Además, si la clasificación demanial de un bien surge de la ley, la fe pública registral no se puede oponer a la disposición legislativa. Al respecto, Rivera Rivera explica que "la norma jurídica no requiere de publicidad registral para que afecte a terceros". L. R. Rivera Rivera, Derecho Registral Inmobiliario

---

[92] Debemos aclarar que el caso Rubert Amstrong v. E.L.A., supra, no aplica a esta controversia registral. En dicho caso, se determinó que la parcela en controversia no era un bien de dominio público, de acuerdo a la Ley de Puertos de 1880, supra, ya que dicha ley no tenía efecto retroactivo sobre derechos adquiridos e inscritos en el Registro de la Propiedad y además, permitía la privatización de marismas. Id., págs. 624-631.

Puertorriqueño, 2da ed., San Juan, Jurídica Editores, 2002,

pág. 159. De esta forma, cita a Lacruz Berdejo expresando

lo siguiente: "Las limitaciones y cargas públicas afectan a

todos los propietarios por igual, vienen publicadas por ley,

son cognoscibles por cualquiera y con ellas debe contar todo

adquirente. Es el Derecho objetivo y no la situación

individual jurídica del Registro quien informa sobre tales

cargas". *Id.*

Sin embargo, este caso presenta la situación particular de

que la inscripción de los bienes demaniales fue producto de

la venta de éstos por el Estado. Surge así la controversia

de si la fe pública registral debe proteger a quien adquirió

los bienes confiando en la inscripción causada por el

Estado. Respecto a esta controversia Clavero Arevalo aclara

lo siguiente:

> La protección de la buena fe que hace este precepto, de
> quien adquiera un bien inscrito de persona que aparezca
> como titular registral del mismo, puede pugnar con la
> regla de la inalienabilidad del dominio público **cuando el
> bien adquirido por el tercero tenga este carácter y lo
> adquiere de quienes a su vez lo adquirieron de la
> Administración pública.** Si en tales casos la
> Administración puede hacer entrar en juego la
> inalienabilidad del dominio público para recobrar el bien
> vendido, el tercero hipotecario puede también hacer entrar
> en juego el principio de la fe pública registral que le
> ampara, (…). ¿Cuál de estas dos protecciones debe
> prevalecer?
> Para resolver esta interrogación hay que tener en cuenta
> que los bienes del dominio público están exceptuados del
> Registro de la Propiedad. La Ley hipotecaria tiene por
> objeto regular el comercio jurídico inmobiliario, y por
> ello quedan al margen de la misma los bienes que no son
> susceptibles de tráfico jurídico. (…)
> Este carácter extrarregistral [sic] de los bienes de
> dominio público determina que para los mismos no puedan
> jugar los principios hipotecarios, que sólo tienen validez
> para los bienes que tienen acceso al registro. (…) **De esta
> manera, siendo el principio de la fe pública registral un
> principio hipotecario, no puede jugar en contra de la
> inalienabilidad del dominio público, porque estos bienes
> están exceptuados del Registro de la Propiedad.**

El problema se plantea cuando los bienes de dominio público,…, han tenido acceso al Registro y se han inmatriculado. Creemos que en tales casos procede la misma solución, por cuanto **se tratará en todo caso de una inmatriculación y posteriores inscripciones indebidas, que no constituyen por sí mismas desafectación del dominio público**. (Énfasis nuestro) M. F. Clavero Arevalo, La inalienabilidad del dominio público, 1ra ed., Sevilla, 1958, págs. 116-118. Véase, R. Fornesa Ribó, Eficacia del título hipotecario sobre parcelas de zona marítimo-terrestre, 46 R.A.P. 123, 140-144 (1965), I. Miralles González, op. cit., págs. 43-46.

**Acorde a lo anterior, aunque la administración pública erróneamente los haya inscrito y enajenado, éstos bienes no perderán su naturaleza demanial a base de una inscripción inválida en el Registro de la Propiedad.**

El que "San Gerónimo Caribe Project, Inc." recibiera los permisos administrativos para llevar a cabo el proyecto Paseo Caribe tampoco afecta el carácter demanial de los terrenos ganados al mar en controversia. Los permisos administrativos no confieren titularidad y mucho menos pueden convalidar un acto nulo de enajenación de bienes de dominio público. Por lo tanto, los permisos concedidos por las agencias administrativas a "San Gerónimo Caribe Project, Inc." no afectan el carácter demanial de los terrenos ganados al mar en controversia.

**XIII- Conclusión**

El análisis histórico del derecho y los principios jurídicos aplicables a las controversias sometidas a nuestra consideración demuestran, primeramente, que los terrenos ganados al mar en el "Condado Bay Parcel" sobre los que "San Gerónimo Caribe Project, Inc." tiene el título de propiedad inscrito en el Registro de la Propiedad, no son bienes de dominio público. Por eso concurro con la opinión mayoritaria

en cuanto a esto. No puedo concurrir, sin embargo, con el análisis mayoritario respecto a los terrenos ganados al mar aledaños al "Coast Guard Parcel". Los fundamentos discutidos me han convencido que éstos son bienes de dominio público y no son susceptibles de tráfico jurídico. Dada la realidad de que el peticionario adquirió y ha construido sobre esos terrenos como consecuencia, aparentemente, de errores del Estado, corresponde a la administración pública rectificar dichos errores haciendo un ejercicio competente de planificación, con el fin de lograr el desarrollo sostenible de estos bienes conforme a su regulación jurídica demanial y su realidad física actual.

La opinión mayoritaria de este Tribunal señala reiteradamente que el resultado de este caso afectará los derechos adquiridos de miles de familias y ciudadanos puertorriqueños que durante las décadas de los cuarenta y cincuenta establecieron sus propiedades sobre terrenos ganados al mar. Sin embargo, la opinión mayoritaria acepta, como lo hacemos en esta opinión, que los terrenos ganados al mar **desde 1968** son bienes de dominio público en nuestra jurisdicción. Por lo tanto, al aplicar la Ley de Puertos de 1968 no se afectan los derechos adquiridos por

dichos ciudadanos bajo el viejo régimen privatizador.


                                        Liana Fiol Matta
                                         Jueza Asociada